**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

BETSY ROSS, *et al.*,                                   :

     Plaintiffs,                                   :

                                 :

v.                                   :          Case No. 1:11-CV-00181-WDQ

                                 :

NICHOLAS RICCUTI, *et al.*,                                   :

                                 :

     Defendants.                                   :

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' RESPONSE IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED
COMPLAINT OR FOR <u>SUMMARY JUDGMENT, AND CROSS-MOTION FOR SUMMARY
JUDGMENT</u>**

---

COMES NOW, Plaintiffs, Betsy Ross and Betsy Ross as next friend of Minor K.R., by their

attorney Daniel L. Cox, The Cox Law Center, LLC, and submit this Memorandum in support of their

Response to Defendants' Motion to Dismiss Second Amended Complaint or for Summary Judgment.,

and Cross-Motion for Summary Judgment.

**INTRODUCTION AND BACKGROUND**

Plaintiffs have filed a Second Amended Complaint requesting damages and injunctive relief

against individuals and agents of the Cecil County Department of Social Services ("CCDSS") for their

actions related to an unlawful entry into and removal of foster and pre-adoptive children from Plaintiff

Ross's home based on spurious allegations of neglect alleged to have occurred two (2) years prior to the

date of report.

Foster and adoptive families of Maryland need not fear second class citizen status of their

homes under the law, because should this Court permit Betsy Ross' to proceed with defending her

liberty interests it is likely a finder of fact will ultimately decide in her favor.  Adoption and foster care

must be supported in this State because the interests of children and this State cry out for open arms

and homes by all kind hearts who willingly step forward to welcome children.   If the Fourth and Fourteenth Amendments, state law and regulations and substantive and procedural liberty interests outlined in Plaintiffs' Second Amended Complaint no longer apply to foster care families as they do to everyone else, then foster care families will be less inclined to volunteer their constitutionally protected homes for a non-protected stecond-class status, and that at a time when the Courts of Maryland and local departments of social services are clogged with needy children who need good foster care families.

Additionally, there should not be any special exception to the law carved out for social and foster care workers, as the hearth and home *always* includes people, families and children.   To make a special exception under the law as applied to foster and adoptive families would open the door for the total destruction and burial of the ancient and active constitutional protection of our citizens in the sanctity of their homes under the *Castle Doctrine's* natural, constitutional and common law interests.

Defendants filed five (5) affidavits with their latest motion to dismiss; yet the new affidavits are belied on their face and by the facts.   **Stunningly absent is any affidavit from the apparent key player Ms. Klesius relied upon to travel deep into Pennsylvania the morning of August 15, 2008 in order to falsely report Betsy Ross' for neglect: Tina Linkous.**   Betsy Ross' affidavit and Second Amended Complaint aver specific facts of violations of her rights by Mary Klesius and Tina Linkous which stand uncontroverted. For the reasons set forth below, Defendants Motions should be denied and Plaintiffs' counter-motion for summary judgment should be granted.

## STANDARDS OF REVIEW

Motions to dismiss should be granted only in the most limited circumstances where a plaintiff is not entitled to relief under any set of facts which could be proved in support of the claim. *Rogers v. Jefferson-Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir. 1989). In analyzing a motion to dismiss under

this Rule, the court construes the complaint in the light most favorable to the plaintiff and presumes the truth of all allegations therein. *Finlator v. Powers*, 902 F.2d 1158, 1160 (4th Cir. 1990); *Waterford Citizens' Ass'n v. Reilly*, 970 F.2d 1287, 1290 (4th Cir. 1992).

Under Fed. R. Civ. Pro. 8(a)(2), Fed. R. Civ. Pro. 12(b)(6), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), Plaintiffs' claims, even if they lack detailed factual allegations, must still survive a motion to dismiss if the allegations contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 1949 (internal citations omitted). The allegations need not meet a "probability requirement," but must simply show more than the "sheer possibility" that Defendants acted unlawfully. *Id.* (internal citations omitted).

Motions for summary judgment should be granted only when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). The court is required to "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (internal citations omitted). The court must deny summary judgment if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Defendants' Motions to Dismiss Amended Complaint or for Summary Judgment fail to meet any of these standards and should be denied.

**Moreover, Defendants rely on specious statements and exhibits that should have been destroyed by the CPS pursuant to COMAR § 07.02.07.17, which states that a finding of Ruled Out neglect requires that the CPS immediately expunge its record related to the investigation.** Defendants rely on a "Child Neglect Report" from the Maryland CPS in their Motions to Dismiss (Mem. Supp. Mot. Dismiss 2nd Amend. Compl. Ex. D.), which is a document relating to the CPS investigation that should have been destroyed pursuant to COMAR § 07.02.07.17 since the CPS

3

concluded its investigation of Plaintiff Ross with a finding of Ruled Out.   Defendants also rely upon newly filed affidavits of several Defendants and one third party, but left out five (5): **Tina Linkous**, Rebecca Sutton, Susan Bailey, Barbara Siciliano and Director Ricciuti.   This is because Plaintiffs' Second Amended Complaint avers sworn facts which are material to this case involving all Defendants, not just the four (4) who filed affidavits, and to which each of the remaining five (5) Defendants do not agree, making summary judgment as requested by the State improper.

## FACTS AS ALLEGED IN SECOND AMENDED COMPLAINT AND CORRECTION OF DEFENDANTS' FACTUAL AVERMENTS

Plaintiff Betsy Ross is a former president of the Cecil County Foster Parent Association ("CCFPA") and a former foster parent. (2nd Am. Compl. ¶ 2.)   Plaintiff K.R. is the adopted child of Betsy Ross. (2nd Am. Compl. ¶ 22.)   Defendant LaTonya Cotton is a social service worker with the CCDSS and is sued in her official and individual capacity. (2nd Am. Compl. ¶ 5.)   Defendant Rebecca Sutton is a social service worker with the CCDSS and is sued in her official and individual capacity. (2nd Am. Compl. ¶ 6.)   Defendant Kim Compton is a social service worker with the CCDSS and is sued in her official and individual capacity. (2nd Am. Compl. ¶ 7.)   Defendant Tina Linkous is the Adoption Coordinator for CCDSS and is sued in her official and individual capacity. (2nd Am. Compl. ¶ 8.) Defendant Susan Bailey is the Assistant Director for CCDSS and is sued in her official and individual capacity. (2nd Am. Compl. ¶ 9.)   Defendant Barbara Siciliano is a social worker and supervisor at CCDSS and is sued in her official and individual capacity.  (2nd Am. Compl. ¶ 10.)   Defendant Helen Murray-Miller is a foster care licensing coordinator for the Maryland Department of Human Resources, Social Services Department and is sued in her individual and official capacity. (2nd Am. Compl. ¶ 11.)

On or around July 2008, Plaintiff discovered that the CCDSS was placing unspent State funds into the CCFPA checking account and managing these funds through the oversight and control of Mary Klesius and began taking steps to report this apparently unlawful practice. (2nd Am. Compl. ¶ 14.) On

4

or about August 15, 2008 at 1:30pm   Mary Klesius informed Plaintiff that CCDSS was removing Plaintiff's foster care children and that she would be further investigated. (2nd Am. Compl. ¶ 15.) On or about August 15, 2008, CCDSS commenced an investigation into Plaintiff. (2nd Am. Compl. ¶ 16.) On or about August 15, 2008, **at 3:10pm Defendant Tina Linkous reported allegations of neglect against Plaintiff Ross.** (2nd Am. Compl. ¶ 17.) On or about August 15, 2008, Defendants Tina Linkous and Mary Klesius decided, based on allegations of neglect, that Plaintiff's foster children must be removed from her home. (2nd Am. Compl. ¶ 18.) On or about August 15, 2008 CCDSS and its agents removed foster children J .C., J.C., K.C. and I.K.D. from Plaintiff's care and control. (2nd Am. Compl. ¶ 19.) On or about August 15, 2008, Defendants Rebecca Sutton, Latonya Cotton, and Kim Compton removed the minor adoptee-child K.R., who was in Plaintiff's full legal custody, care and control, from the care, custody and control of Plaintiff without permission or a warrant and without any indication or belief of serious immediate danger. (2nd Am. Compl. ¶ 20.) On or about January 21, 2010, following the revelation of apparently false and contradictory testimony by agents of the CCDSS, a settlement agreement was reached between CCDSS and Plaintiff that ruled out the false allegations against her and required CCDSS and Plaintiff Ross to keep the terms of the settlement agreement confidential, and which required CCDSS to "make no negative statements" regarding Plaintiff Ross. (2nd Am. Compl. ¶ 27, & Ex. A.) At that time, because of "irreconcilable differences," Plaintiff offered to voluntarily relinquish her CCDSS foster care home license since her application to become a privately certified and licensed foster care provider was pending with The Arc - Northern Chesapeake Region ("Arc"), a private foster care agency. (2nd Am. Compl. ¶ 28.)  Sometime before March 18, 2010, Defendant Helen Murray-Miller communicated to The Arc the false information that Plaintiff and CCDSS still had unresolved issues that would prevent The Arc from granting Plaintiff a private license. (2nd Am. Compl. ¶ 24.)  On or about March 18, 2010 the Arc sent Plaintiff a letter stating in its conclusion, "following consultation with our licensed monitor from Department of Human Resources" that the "unresolved

and high profile nature of your current situation with several entities determines that it is not a good time to proceed with a home study," and that Plaintiff could attempt the process again, "once your issue with Cecil County Department of Social Services are resolved to our mutual satisfaction." (2nd Am. Compl. ¶ 25.)  Following the settlement agreement of January 21, 2010, no unresolved issues existed between Plaintiff and CCDSS. (2nd Am. Compl. ¶ 27.)


**I.      Plaintiffs' Fourth Amendment claim against Defendants should not be dismissed because the entry into Plaintiffs' home to retrieve foster children was not reasonable under the Fourth Amendment and Defendants did not have qualified immunity.**

Defendants assert that "all the children removed [including K.R.] were **nothing more than** foster children" and that Plaintiff Betsy Ross was **"a mere foster parent."** (Defs. Mot. Dism. 2nd Am. Compl., ¶ 4, pg. 5 and ¶ 2, pg. 6).   Because of the lesser status of said citizen Plaintiffs, the State asserts, "the Fourth Amendment's application to entry into a foster home...," that "such an entry [does] not violate the Fourth Amendment." (Defs. Mot. Dism. 2nd Am. Compl., ¶ 2-3, pg. 6).  Setting aside the potentially electric question of whether this Court recognizes lesser status protections under the Fourth Amendment as applied to the homes and persons of foster kids and parents participating in foster care, the issue under the Fourth Amendment before this Court is rather precisely about what "such an entry" under the law is permissible.  *Wildauer v. Frederick County*, 993 F.2d 369 (4th Cir. 1993).   The State avoids this analysis altogether and unilaterally asserts instead a complete and unfettered assumed authority to enter and seize at will, rather than by law.

The State argues that Plaintiffs' "'Second Amended Complaint admits'" [sic], to an entry into her home and removal of non-custodial children "based on allegation of neglect." (Defs. Mot. Dism. 2nd Am. Compl., ¶ 2, pg. 7).   But the State then goes on and states its support for this argument is that Plaintiffs' statement that Defendants removed the children contrary to law is "unsupported" and

"conclusory."   The State then immediately lists so-called conclusory allegations that supported Defendants violating the law in their entry into the foster home and removal of the children: allegations "...[of] leaving the children unattended in the family pool, and one child almost drowned...leaving an 8 year old to care [for younger]...children, a Foster Care child being exposed to sexual behaviors of Ms. Ross' teenage daughter, a foster care child [sic] falling down the stairs and another child falling off a couch," is unstable if not *Id.*

First, all these allegations had <u>no</u> factual support and were therefore RULED OUT by Defendants, but not until Plaintiff Ross hired attorneys to defend her right to the protection of the law from false reports.

Second, the allegations were actually developed by Defendant Linkous, are vigorously disputed by Plaintiffs and even later changed in Ms. Linkous' testimony before the ALJ in many material respects.   Contrary to Defendants bald allegations the evidence will show: 1) the pool incident supposedly occurred two (2) years prior to 8/15/2008 and there was no evidence of *any* immediate safety issue; 2) Betsy Ross' boyfriend, also an approved foster care parent, was at all times with the children in the pool when Ms. Ross was not; 3) there was no truthful evidence that any child had ever "almost drowned" and in fact all other foster children of Ms. Ross' independently interviewed by non-CCDSS social workers stated that had never happened; 4) **at no time was Ms. Ross' foster home instructed to close its pool, which CCDSS had licensed her to have open with the children, even when CCDSS re-placed K.R. back into her home for adoption finalization to finally occurr only a few weeks later**; 5) there was no evidence that Ms. Ross had ever left an 8 year old in charge because it never happened and that allegation was made because the "reporter" stated she, at age 8, had "rescued and saved" *two (2)* of Ms. Ross' foster children from drowing in the pool while no adult was around – all a proven falsity,; 6) at no time were foster care children "exposed to sexual behaviors of Ms. Ross' teenage daughter" as the statement alleging the same by the inventive child Ms. Linkous

7

interviewed contradicted itself, was denied by every other foster child of Ms. Ross' home interviewed, and the evidence even at the time of removal was that **CCDSS had approved Ms. Ross' teenage daughter to also be around and to babysit the foster children**.   Never had they questioned, investigated or otherwise sought to establish a safety plan for such bald and conclusory allegations without any basis in fact.  7) At no time was there any credible evidence or truth to the allegation that an unidentified foster child(ren) "fell down the stairs" or "fell off a couch," as CCDSS had approved Ms. Ross' home with child gates on her stairs, no child had ever fallen down the stairs, and the allegation of falling off a couch was so laughable as to be absurd, strongly suggesting leading questioning by Ms. Linkous of the so-called reporter. Once again, the "reporter" claimed to be like a superwoman in heroic acts of valor saving her foster siblings from disaster.  The reporter was still very upset for being placed out of Ms. Ross' home after her disruptive antics and uncontrollable behavior caused Ms. Ross and CCDSS to replace her out of Ms. Ross' home earlier that summer.   CCDSS knew that the "reporter" was a young 10 year old known for her wild tales and lies, extreme temper and revenge at anyone who dared cross her demands.  As a troubled youth, for the Defendants to travel over four (4) hours out of state even though they have an in interstate compact with the Commonwealth of Pennsylvania, just to permit Mary Klesius and CCDSS staff to seek out her "statements" in order to violate Plaintiffs' liberty interests is unconscionable.

Defendants argue the allegations "indicated...possible danger to foster children."  (Defs. Mot. Dism. 2nd Am. Compl., ¶ 2, pg. 7).  The law does not contemplate a raid of a home without a warrant signed by a judge upon mere *possibility* of danger when less invasive measures could be taken, and indeed were mandated to be taken by law.  *Wildauer,* 993 F.2d at 371.  Under that reasoning, every home with children, whose very existence in the home raises a "possibility" of danger even in the safest of environments, may be randomly raided by state DSS workers without warrants and such is not contemplated in American jurisprudence.

8

Defendants did not have a proper interest in removing the children from Plaintiffs' home because Defendants did not follow the requirements either of Md. Fam. Law § 5-706 or Code of Maryland Regulations ("**COMAR") § 07.02.25.15(a). (Am. Compl. ¶¶ 17–20.) Md. Fam. Law § 5-706 establishes detailed procedures for conducting an investigation based on allegations of neglect, including requiring that within twenty-four (24) hours of the reports, the agency "see the child"** and "attempt to have an on-site interview with the child's caretaker." Md. Fam. Law §§ 5-706(b) (1)–(2). *Wildauer v. Frederick County*, 993 F.2d 369 (4th Cir. 1993), demonstrates the importance of the local agency following these procedures, which in that case resulted in findings of neglect. *Id*. at 371. Defendants did not follow these procedures, and did not find neglect before removing the children. On or around August 15, 2008, about the same time that Defendants received "reported allegations of neglect," (2nd Am. Compl. ¶ 17.), Defendants entered Plaintiff Ross's home under threat of force and removed the children from Plaintiff Ross's home without any actual finding of neglect, as well as without "permission, a warrant, or any indication or belief of serious, immediate danger." (2nd Am. Compl. ¶ 19.)

Defendants also failed to follow the procedure established under COMAR § 07.02.25.15(a). On June 18, 2009, Plaintiff Ross sent a letter to a Maryland delegate, a letter that Defendants included as Exhibit A to their Motion to Dismiss the Amended Complaint, filed on September 22, 2011. What Defendants did not include, however, was Defendant Ricciuti's letter in response, dated July 9, 2009, to the same Maryland delegate attempting to assure the delegate that "all actions by the [CCDSS were] conducted in complete accordance with federal and state laws." (attached and incorporated as **Exhibit A**). In that letter, Defendant Ricciuti mis-cites COMAR § 07.02.25.15, claiming that that subsection justified the Department's immediate removal of the children according to the best interests of the child. **COMAR § 07.02.25.15 contains no such provision**. Subsection (a)(1) notes that, if a foster care worker ―*observes*‖ that a foster child is in ―serious and immediate danger,‖ the worker must

immediately remove the child. *Id*. (emphasis added). In this case, no worker and none of Defendants observed Plaintiff Ross's foster children in serious and immediate danger. Defendants immediately removed the children *without observation* and based only on a report allegedly from Defendant Linkous, (2nd Am. Compl. ¶¶ 17–20) who was working closely with Defendant Klesius in adoption and foster care services, and who was allegedly sent on a four-hour round trip out of her jurisdiction and across state lines into Pennsylvania, where she interviewed the ten-year-old foster child who claimed a lack of pool supervision at Plaintiff Ross's home. These acts were in violation of subsection (a)(1).

Subsection (a)(2) further provides that if an employee ―receives a report or makes a personal observation‖ of suspected abuse or neglect in a foster home, they must "immediately *notify"* the CPS department responsible for the child involved. *Id*. (emphasis added). Although Defendants did have a report of suspected abuse (2nd Am. Compl. ¶ 17), COMAR only authorizes them to notify CPS—it does not allow them to enter a home under duress to remove the child themselves without permission, warrant, or observation of serious, immediate danger to the child.  Contrary to the assertion made by Defendant Ricciuti, Defendants' actions contravened the authority claimed as justification.

Defendants rely heavily on *Wildauer* for the proposition that the "state's interest in examining the neglected children outweigh[s] any attenuated privacy interest of [the foster mother]." *Wildauer*, 993 F.2d at 373.  **In the present case, however, Defendants never examined the children prior to removal; they simply removed the children based on wild and uncredible allegations**. (2nd Am. Compl. ¶¶ 17–20.)  In *Wildauer*, the state's interest in examining the children was based on the first-hand observations of Ms. Cruger, a social worker from Frederick County Department of Social Services, who was present in the home **<u>by the consent of the mother</u>** and **who observed unhygienic conditions** that were unsuitable for the sick and disabled children living there. 993 F.2d at 371.  Ms. Cruger, moreover, properly followed the requirements of Md. Fam. Law § 5-706(a) and initiated an investigation, which included having nurses examine the children in Ms. Wildauer's home and review

their records. *Id*.  None of these steps were followed by Defendants in the present case.

Indeed, in the instant case, the decision to remove the children apparently occurred secretly between Mary Klesius and Tina Linkous prior to Ms. Linkous even following the law of making the neglect report.  (2nd Am. Compl. ¶¶ 17–20.)

Defendants' actions also violated Plaintiffs' interest in privacy by entering the home without investigating the neglect first and without intent to return the children to their natural parents. Defendants again rely on *Wildauer*, for the proposition that a liberty interest in privacy is outweighed. The Fourth Circuit, however, cited United States Supreme Court precedent establishing that the privacy interest of the mother is outweighed only "where the proposed removal from the foster family is to return the child *to his natural parents*." *Id.* at 373 (quoting *Smith v. Organization of Foster Families*, 431 U.S. 816, 847 (1977)) (emphasis added). The removal of the children from Plaintiff Ross's home was not to return them to their natural parents, but to place them in other foster homes. Moreover, Defendants returned Plaintiff K.R. to Plaintiff Ross **within days of the removal**, allowing Plaintiff Ross to finalize her adoption of K.R.

Defendants also rely on *Wildauer* for the proposition that Defendants' actions in removing the children from Plaintiff Ross's home were not unreasonable under the Fourth Amendment and did not violate Plaintiff Ross's rights to due process under the Fourteenth Amendment. (Defs. Mot. Dismiss 2nd Am. Compl. ¶ 10.)  However, in *Wilauder*, the foster parent did not have custody of any of the children, the foster parent had voluntarily returned two of the children to their parents already **and had invited a Sheriff into her house to help her look for the other two children, whom <u>she</u> alleged were missing**. 993 F.2d at 372.  The court noted that the "entry of the deputy sheriffs and Emerson into her home was not unreasonable *under the circumstances*." *Id*. (emphasis added).  These circumstances are not present in this case, where Defendants came into the family home without her consent upon spurious and demonstrably false allegations of neglect, that had supposedly occurred years prior, by a troubled youth

11

upset at being placed out of Ms. Ross' care, and where all the children were safe, available for interview and **not alleged to be missing**, and were not in any way in serious, immediate danger., and were at least in the case of K.R., in her court-ordered custody with arrangement <u>with Defendants written consents already filed</u> with the court, for **permanent adoption finalization three (3) business days later.**

Plaintiff Ross also had rights in her pre-adoptive child, K.R., beyond those simply of a foster child. At the time of the removal, **which occurred a mere three (3) business days before Plaintiff Ross was scheduled to conclude her adoption of K.R. in a hearing on August 20, 2008**, Plaintiff Ross had developed a strong emotional and familial bond with K.R., having been her parent for nearly a year and a half. **Defendants had already filed written consents with the Circuit Court for Cecil County for the legal adoption of K.R. by Plaintiff Ross.** The final act left to complete the final adoption paperwork was the judge's signature at a court appearance. No written revocation of said consent was ever filed by Defendants in the adoption of K.R. by Plaintiff Ross with the Circuit Court for Cecil County.   Defendants removed K.R. from this supportive, permanent custodial environment without any observation of immediate or serious danger, as required by COMAR 07.02.25.15(a), and without interviewing Plaintiff Ross or seeing the children first, as required by Md. Fam. Law § 5-706.

Defendants argue that Plaintiff Ross admitted she had no custody rights in a relationship with K.R., relying on a "Resource Parent Agreement," signed by Plaintiff Ross, which made Plaintiff Ross a resource parent for the CCDSS. (Defs.' Mem. Supp. Mot. Dismiss 2nd Am. Compl. Defs.' Ricciuti and Klesius Ex. B.) Defendants argue this Agreement establishes that ―custody and control‖ of K.R. was with the CCDSS at all times, by the admission of Plaintiff Ross. (Defs.' Mem. Supp. Mot. Dismiss 8–9.)  However K.R. is nowhere mentioned in the agreement, nor does the agreement ever mention pre-adoptive children. (Defs.' Mem. Supp. Mot. Dismiss 2nd Am. Compl. Defs.' Ricciuti and Klesius Ex. B.)  Defendants also rely on a letter between Kristen Puican and Sherlema Quick as evidence that K.R.

is no different than a foster child, (Defs.' Mem. Supp. Mot. Dismiss 9), but this letter was not from Plaintiff Ross and did not admit that she had no potential rights in K.R.   The parental rights Plaintiff Ross possessed are protected by the law and are further indicated by the special bond of a parent and her child that did exist; which ripping apart by her unlawful removal violated.

Moreover, Defendants are not entitled to qualified immunity for entering Plaintiff Ross's home under threat of force because they were not acting according to statutory requirements of which a reasonable person would have known and therefore they violated Plaintiff Ross's reasonable expectation of privacy in her home. Under *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), Defendants are not entitled to immunity if they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 818. In this case, Defendants who removed the children from Plaintiff Ross's home reasonably knew or should have known that COMAR § 07.02.25.15 does not authorize them to remove children immediately based on only a report of suspected abuse or neglect, and that consequently Plaintiff Ross maintained a reasonable expectation of privacy in her home that could *not* be overcome merely with wild, uninvestigated allegations of a previous lack of pool supervision and other baseless suspicions of neglect.  **There is a "firm line at the entrance to the house" that is "also bright" and absolute,** *Kyllo v. United States***, 533 U.S. 27, 40 (2001)** (internal citations omitted), protecting Plaintiff Ross from unjustified intrusions against her reasonable expectation of privacy.

The requirements of COMAR and the Fourth Amendment do not establish a gray area for removing foster children from a home and Defendants did not have to guess as to the requirements. **Parents of foster children do not deed their constitutional privacy rights to social services when they unselfishly agree to raise needy children, nor may such rights be waived by any contract**. Defendants knowingly violated the law, and should not enjoy qualified immunity for removing the children from Plaintiff Ross's home.

Because there is a genuine issue as to the material fact of Defendants' removal of the children from Plaintiff Ross's home and Defendants are not entitled to judgment as a matter of law, and because all elements are properly pled, these counts should be allowed to proceed to a jury.

**II.    The Fourteenth Amendment claims should not be dismissed because Plaintiff Ross had a constitutionally protected due process interest, both substantive and procedural, in continuing her relationship with her foster children and in particular her adoptee child.**

Although Defendants cite to *Wildauer* for their position that foster parents lack due process rights when their foster children are removed, the Fourth Circuit never held that foster parents lack any due process rights in their foster children.   The court in *Wildauer* narrowly noted that the privacy interest of a foster parent "would be... attenuated *where the proposed removal from the foster family is to return the child to his natural parents.*'" *Id.* at 373 (*quoting Smith v. Org. of Foster Families*, 431 U.S. 816, 847 (1977)) (emphasis added).   Defendants in the present case did not return the foster children to their natural parents when removing them from Plaintiff Ross's home, but simply placed them in other foster homes.   The Fourth Circuit in *Wildauer* specifically noted that *other* courts have held that "foster parents do not have a constitutionally protected liberty interest in a continued relationship with their foster child," but the Fourth Circuit in *Wildauer* never so held.   The Fourth Circuit specifically stated that since Ms. Wildauer, who "was not . . . a licensed foster parent for the four children," did not have custody of the four children, "she did not have a constitutionally protected liberty interest." *Id.* At 373.   In the present case, however, Plaintiff Ross **was** licensed as a foster care mother for the children who were removed, she had already received CCDSS's written consent to the adoption of K.R., filed with the Circuit Court of Cecil County, there existed special, close relationships between Plaintiffs Ross, her foster children, and with her adoptee child K.R., and the adoption was very close to being finalized.   **Never did the Department revoke that consent with Plaintiff or the Court.**

14

Therefore Plaintiff Ross had a much stronger interest than did Ms. Wildauer in maintaining the relationship with her foster children and with K.R.

In *Smith*, although the Supreme Court established that the rights of foster care families are insufficient to trump the rights of natural families, the Court nevertheless recognized the rights of foster families. The Court agreed that strong, familial emotional ties may develop between foster care parents and foster children. *Smith*, 431 U.S. at 846. In affirming that a foster relationship cannot acquire an interest that *contravenes* a blood-relationship that is a basic human right, **the Court simultaneously noted that "individuals may acquire a liberty interest against arbitrary governmental interference in the family-like associations into which they have entered, even *in the absence* of biological connection or state-law recognition of the relationship."** *Id*. at 846 (emphasis added).

In this case, Defendants have acted arbitrarily in interfering with the liberty interest of the strong familial relationship built by Plaintiff Ross with her foster children and her child K.R. Defendants did not assert any natural parental rights to trump Plaintiff Ross's rights in her continued relationship with her children and did not return any of the children to their natural parents. Defendants also did not properly follow statutory procedure for responding to allegations of neglect, and consequently **cannot rely upon any state interest as justification for their actions.**

Moreover, regarding the minor child K.R., there are no natural parental rights at issue because K.R. was already in pre-adopt status. On April 2, 2008, the Circuit Court for Cecil County issued a decree terminating the rights of both natural parents of K.R. through mutual consent (attached and incorporated as **Exhibit B**). On July 31, 2008, Plaintiff Ross filed a Petition for Adoption (attached and incorporated as **Exhibit C**) **with the written consent of Defendant Ricciuti,** and on August 1, 2008, the Circuit Court for Cecil County scheduled an adoption hearing regarding K.R. for August 20, 2008, **just three (3) business days after Defendants removed K.R.** from Plaintiff Ross's home (attached and incorporated as **Exhibit D**). Therefore the rights of Plaintiff Ross in her relationship with K.R. are

15

not trumped by any rights of *natural parents*, since the rights of the natural parents were terminated by consent and court order before Defendants' removed K.R. on August 15, 2008.

Even if Defendants somehow stepped into the shoes of the natural parents and were asserting their rights through removing K.R., exceptional circumstances exist that give Plaintiff Ross priority and standing to challenge the actions of Defendants. The rights of an acting parent, such as Plaintiff Ross, over and against the rights of natural parents, may be proven by showing either parental unfitness or exceptional circumstances that would be detrimental to the continued custody with the natural parents. *Koshko v. Haining*, 398 Md. 404, 445 (2007); *Janice M. v. Margaret K.*, 404 Md. 661, 677–80 (2008). In a case-by-case analysis, *Aumiller v. Aumiller*, 183 Md. App. 71, 84–85 (2008), sets forth that exceptional circumstances may include many factors, including:

> [L]ength of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, the stability and certainty as to the child's future in the custody of the parent.
>
> (Citing *Ross v. Hoffman*, 280 Md. 172, 191 (1977)).

In this case, Plaintiff Ross has "strong ties of mutual love and affection" with K.R. (Ex. C ¶ 12.) Such ties were consented to in an unrevoked legal writing filed with the Circuit Court for Cecil County by Defendant Riciutti. Plaintiff had also been with K.R. for over a year and five (5) months, since K.R. was transferred to Plaintiff Ross's home on March 3, 2007 and remained with her until August 15, 2008, and then again until the adoption was finalized. (Ex. C ¶ 12.) Moreover, the natural parents of K.R. both had a history of substance abuse and difficulty coping with life stress, and the natural father

16

said that he was unable to care for K.R. (Verbal and Written Presentation to Prospective Adoptive Parents on [K.R.] 4, incorporated and attached as **Exhibit E, docket no. 41 – previously filed under seal as Ex. E, docket no. 41, incorporated by reference to avoid refiling.   Leave is hereby requested for the Court to maintain docket no. 41 under seal**).    All of these factors show exceptional circumstances that would make it substantially detrimental for K.R. to have returned to her parents, thereby terminating their rights.

These facts demonstrate that Plaintiffs have sufficiently alleged that Plaintiff Ross had a protected liberty interest in maintaining her relationship with K.R. when Defendants removed K.R. from Plaintiff Ross's home.   The liberty interests which Defendants violated were both substantive, because her close, long-standing parental relationship with K.R. was violated by her removal, and procedural, because Maryland State law was not followed in any manner in the removal of both K.R. and the foster chldren.   *See Elwell v. Byers*, *Slip Copy, 2011 WL 1980277At 4 (D.Kan.,2011).*

Defendants conclusively assert that "other circuits are in agreement" that foster parents "do not have the same constitutional rights that natural parents" possess "when it comes to their foster children."   *Citing Renfro* v. *Cuyahoga Cnty. Dep't of Hum. Servs.*, 884 F.2d 943, 944 (6th Cir. 1989); *Kyees* v. *Cnty. Dep't of Public Welfare*, 600 F.2d 693, 695, 697 (7th Cir. 1979)(en banc) and *Drummond* v. *Fulton Cnty. Dep't of Pub. Welfare*, 563 F.2d 1200, 1207 (5th Cir. 1977)(en banc), *cert. Denied*, 437 U.S. 910 (1978).   Defendants cite to cases which are not relevant to the instant case where Plaintiff and the court had already received written consents by Defendants for K.R.'s permanent adoption, after more than a year and a half of being raised by Plaintiff, and where the liberty interest had arisen under State law.   Furthermore, the Supreme Court, as well as other circuits such as the Tenth Circuit have taken a more prudent approach and have held that a liberty interest may exist in a foster parent-foster child context. *Spielman v. Hildebrand,* 873 F.2d 1377, 1384 (10th Cir.1989) (citing *OFFER,* 431 U.S. 816, 844 (1977)); *Rodriguez v. McLoughlin*, 214 F.3d 328 (2nd Cir. 20001)(citing *OFFER* to assert that

17

a foster parent's liberty interest arises under state law).

Sitting in the Ninth Circuit, the court in *Brown v. San Joaquin County,* 601 F.Supp. 653 (D.C.Cal.,1985) upheld the procedural due process liberty interest of foster parents when it wrote:

> In reaching this conclusion, this court necessarily rejects the conclusions of the courts in *Kyees v. County Department of Public Welfare,* 600 F.2d 693 (7th Cir.1979), and *Drummond v. Fulton County,* 563 F.2d 1200 (5th Cir.1977) (en banc). This court finds those decisions unpersuasive for two reasons. First, in both cases the court found that applicable state law, unlike California law, neither created nor sustained the expectation that a mutually rewarding foster family relationship of sufficient duration would, absent good cause, be permitted to endure. Second, in both cases, the court treated the role of the state in the creation of the relationship as dispositive. This court regards such a conclusion as the product of an "over-reading" of *Smith v. OFFER.*

*Id* at 665.

*Kyees* explicitly cited to *Drummond*, *supra,* but in doing so expressly stated that the lack of their finding a liberty interest was because of "the likelihood or virtual certainty of eventual termination of the foster parent-child relationship."  600 F.2d at 698.  It certainly did not address the instant facts where the biological parents had expressed consents for the adoption of K.R. and no objection to the foster relationship between the children and Plaintiff.  Additionally, the Fifth Circuit has distinguished *Drummond*, supra, in *Wooley* v. *City of Baton Rouge*, 211 F.3d 913, 924 (5th Cir. 2000)(noting that a "clearly defined" liberty interest between a foster parent and child in that circuit depends on state law).

Such actions were done by Defendants without following the requirements of state statute and regulation, without asserting any rights on behalf of natural parents, and without rebutting the presence

of exceptional circumstances that give Plaintiff Ross a liberty interest and special standing in asserting

those interests over Defendants *in the absence of any biological parent's objection*.

Because there is a genuine issue as to the material fact of Defendants' removal of K.R. from

Plaintiff Ross's home and Defendants are not entitled to judgment as a matter of law, and because all

elements are properly pled, this issue should proceed to a jury.


**III.    The breach of confidence claim should not be dismissed because all elements were properly pled and it is recognized by Maryland courts.**

Although an action for "breach of confidence" is based on common law, it has been recognized

by Maryland appellate courts, contrary to Defendants' assertion. *See Hooper v. Gill*, 79 Md. App. 437,

445 (1989) (noting that an alternative theory of recovery in that case would be for "breach of

confidence").

Defendants attempt an elaborate and artful distancing of the Maryland Social Services

Adminstration and consequently Defendant Murray-Miller, from its subsidiaries such as Cecil County

Department of Social Services.  (Defs. Mot. Dism. pps. 11-13).  Utilizing a theory of "authority" and

"control" Defendants argue upon Ms. Murray-Miller's affidavit that she was not bound by

confidentiality and consequently could not be held liable for a breach of confidence.  *Id.*  However,

these arguments miss the point.  Plaintiff Ross was to have her allegations removed from CHESSIE and

Ms. Murray-Miller affirms that "I was unaware of any settlement agreement between CCDSS and

Betsy Ross." (Affdv't of Murray-Miller, ¶ 4).  Allegedly not being aware of an agreement of

confidentiality, and not being "controlled" by CCDSS, does not permit her to communicate false

statements to private foster care officials in order to deprive her of being a foster care home.  Nor may

Defendant hide behind her affidavit alleging ignorance since nowhere does Ms. Murray-Miller affirm

she did not have communications with CCDSS about Betsy Ross and her application to be a foster care

parent with The Arc.  Indeed, it is likely that she had to communicate with that foster care department in performing the background check.  This is likely the means by which she learned of Betsy Ross exercising her First Amendment right to write letters to the newspaper criticizing CCDSS.

Moreover, the settlement agreement clearly stated that the Cecil County Department of Social Services would make **no "negative statements" about Betsy Ross.** (2nd Am. Compl. Ex. A.)  This agreement was precisely required and understood by CCDSS as necessary to preserve Plaintiff Ross's rights in pursuing the private special needs foster case license with The Arc. The statement that there were "unresolved issues" with Plaintiff Ross, made to the The Arc regarding Plaintiff Ross's eligibility to participate in foster care services with that organization, is clearly a negative statement covered by the settlement agreement. Moreover, because the settlement agreement's terms changed the CPS finding to "ruled out," the statement that Plaintiff Ross still had "unresolved issues" surrounding the incident that caused the CPS investigation implies that the CCDSS/CPS is in violation of the statute requiring the Department to expunge all Ruled Out information or issues. COMAR § 07.02.07.17. Such a statement clearly relates to the "terms" of the settlement agreement and is therefore inherently confidential.

Even CPS regulations require that when an allegation of neglect is ruled out, all parts of the file must be destroyed, *id*., implying that that information is fundamentally confidential.  A statement that implies that Plaintiff Ross's issues with CPS were not entirely "ruled out" for some reason is a statement that infringes on the confidentiality recognized by CPS itself in how it conducts the investigation, and deprives Plaintiffs of due process.

Defendants also argue that Defendant Murray-Miller is the only person alleged to have disclosed this information, and that she did not breach the settlement agreement because she does not work for CCDSS.  However, Plaintiffs alleged that "Defendants" were responsible for disclosing the confidential information, in breach of the trust created by the settlement agreement. (2nd Am. Compl. ¶

20

65.)   Plaintiffs' allegation that Defendant Murray-Miller participated in that disclosure in no way supports Defendant's contention that Defendant Murray-Miller was the only party responsible for the disclosure, particularly because Plaintiffs' allegation under Count 5 includes more than just Defendant Murray-Miller.

Plaintiffs' count clearly avers a genuine dispute over the material fact of who was responsible for disclosing this information in breach of confidence, whether it was disclosed, as Defendants appear to admit happened (*see* Defs.'s Mot. Dismiss 2nd Am. Compl. 15), and whether it was confidential, and therefore must not be decided under summary judgment.   Moreover, Plaintiffs' count is more than "threadbare recitals" or "conclusory statements," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), and therefore cannot be dismissed.        Plaintiffs set forth averments with exhibits that a confidential relationship existed between CCDSS, its agents, and Plaintiff Ross, to which the Defendant was a signatory.   Defendants have admitted to revealing "unresolved issues" in violation of that confidence, which act is a gravamen of this case, as it destroyed Plaintiff Ross's ability to be a private foster care licensee without due process or any recourse at law.

Because all elements of defamation have been pled and Defendants are not entitled to judgment as a matter of law, this count should be allowed to proceed to a jury.


**IV.     The negligence claim should not be dismissed because Defendants acted with malice and/or gross negligence and are not protected by sovereign immunity.**


Defendants were acting with malice and/or gross negligence and under Md. Courts & Judicial Proceedings 5-522(a)(4)(ii),   and do not merit the protection of sovereign immunity.   Under *Young v. City of Mount Ranier*, 238 F.3d 567, 578–79 (4th Cir. 2001), malice must be a motive or an affirmative intent to injure the Plaintiff, and gross negligence requires actions arising from wanton or reckless disregard for the safety of others.

Defendants entered a private home without a warrant or probable cause, under threats and duress, and removed children in contravention to State law.   These acts were negligent and stand uncontraverted by any affidavits because an assertion that they acted "solely by a concern for the safety of the foster chidlren" does not answer the particular charge by Plaintiffs that they were acting illegally without any basis for the alleged "concern" for safety, no safety issues actually existed, and because of Plaintiff Ross taking steps to whistleblow likely improper use of State funds by CCDSS foster care workers.  Furthermore, there is no affidavit of Tina Linkous or other Defendants who participated in the entry and removal of the children.     Defendants acted with malice and/or gross negligence by knowingly breaching the confidence owed to Plaintiffs, and by knowingly removing the children only based on allegations and not on observations of abuse. Plaintiffs alleged that Defendants' actions were taken close on the heels of Plaintiff Ross's express intention to investigate the alleged financial misconduct of Defendants (2nd Am. Compl. ¶¶ 14–17), illustrating that Defendants had a motive and/or affirmative intent to retaliate and injure Plaintiff by removing her children from her home and revealing confidential information to her detriment.

Defendants appear to attempt in a footnote to argue that gross negligence cannot apply since malice is required, and malice must be particular to an intentional tort and not negligence. (Defs. Mot. Dism. pg. 14).  Such reasoning is circular and without substance, and Defendants appear to cite to that court's "malice" discussion in  402 Md. at 182, not the court's gross negligence discussion.  *Id. a*t 187. Gross negligence may be had by a wanton and reckless disregard for others such that the state officials may be held liable by Plaintiffs for their actions.  *Id. a*t 188.

Because there is a genuine issue as to the material fact of Defendants' negligence in entry into and the removal of children from Plaintiff Ross's home, Defendants are not entitled to judgment as a matter of law, and because all elements are properly pled, this count should be allowed to proceed to a jury.

**V.      The false light claim should not be dismissed because all elements are properly pled.**

Plaintiffs have properly alleged all elements of the false light claim. A false light claim is only viable if one "gives publicity to a matter concerning another that places the other before the public in a false light . . . if (a) the false light in which the other person was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Ostrzenski v. Seigel*, 177 F.3d 245, 252 (4th Cir. 1999) (internal citations omitted).

Plaintiffs have properly alleged each element. Under the first element, it is alleged that Defendants communicated false information to The Arc (2nd Am. Compl. ¶ 87), which serves hundreds of individuals in several counties in Maryland and is part of The Arc of the United States.  It is one of the largest volunteer organizations in the world with its specific focus.[1]   Communication of this information to such an organization is more than a disclosure "to a single person or even to a small group of people." *Henderson v. Claire's Stores, Inc.*, 607 F. Supp. 2d 725, 733 (D. Md. 2009) (*citing Pemberton v. Bethlehem Street Corp.*, 66 Md. App. 133, 166 (1986)). In *Pemberton*, the court applied this requirement to find that mailing excerpts from a report to the wife of a party to the case did not constitute publication. *Pemberton*, 66 Md. App. at 166.  Defendants' disclosure in this case, however, was far broader since the information was sent to a large organization with many members and national affiliations.

Next, Plaintiffs have also properly alleged that the statement and ensuing assumption of "unresolved issues," that would prohibit an experienced and competent foster care provider from receiving a standard home study, are "embarrassing to reasonable persons." (2nd Am. Compl. ¶ 89.)

---

[1] History, The Arc, Northern Chesapeake Region (November 18, 2011) http://www.arcncr.org/history.aspx.

Plaintiff Ross lost her ability to serve as a foster care parent with The Arc, and therefore lost her position as a community leader of the Cecil County Foster Parent Association.    She came under the extreme negative stigma of not clearing the OLM background check that The Arc initiated with Ms. Murray-Miller.  As such, in the face of the signed confidentiality agreement and state statute requiring that the Department expunge the records, the acts of communicating such false information was at least wanton and reckless, and likely malicious, with reckless disregard to the laws and the rights of Plaintiff.   Defendants were bound by the agreement not to disclose negative information regarding Plaintiff Ross, Defendants knew that the CPS investigation was "Ruled Out" and concluded, and yet they still allowed the information to be disclosed to The Arc (2nd Am. Compl. ¶ 86.) This shows that Defendants knew of the falsity of the information disclosed and yet allowed it to be disclosed.

Because there is a genuine issue as to the material fact of Defendants' disclosure of the confidential information and because all elements are properly pled, this count should be allowed to proceed to a jury.

**VI.    The defamation claim should not be dismissed because all of the elements were pleaded in the Amended Complaint.**

Plaintiffs have alleged all four required elements for a defamation claim. Defendants cite to *Samuels v. Tschechtelin*, 135 Md. App. 483 (2000). As cited in *Haskin v. Baylis*, 440 F. Supp. 2d 455 (D. Md. 2006), *Samuels* established that defamation is based on showing: "(1) that the defendant made a defamatory communication to a third person; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm." *Haskin*, 440 F. Supp. 2d at 461 (*quoting Samuels*, 135 Md. App. at 544).   Plaintiffs have alleged each of these elements with plausible allegations that are more than threadbare recitals or conclusory statements.

24

The statement that Ms. Ross had "unresolved issues" with CCDSS was a discriminatory statement that would tend to expose Plaintiff Ross to "contempt or ridicule," and thereby discourage "others in the community from having a good opinion of, or associating with, that person." *Offen v. Brenner*, 402 Md. 191, 198–99 (2007). The statement was false (2nd Am. Compl. ¶ 98) and "served to reflect negatively on Plaintiff and served to present harm to Plaintiff's reputation." (2nd Am. Compl. ¶ 99.)  Maryland law requires and the Administrative Judge had ruled that the allegations, being Ruled Out, must be expunged and all records destroyed.  Those records are not destroyed, as evidenced by Defendants' Exhibit D filed with their Motion to Dismiss 2nd Amended Complaint.  Moreover, the statement was made to The Arc, a third party, and prevented "The Arc from granting Plaintiff a private license." (2nd Am. Compl. ¶ 24.) Finally, the statement was allowed by Defendant Ricciuti, and/or his inter-office agent. (2nd Am. Compl. ¶ 95.)

Defendants incorrectly argue that Plaintiffs must prove that the recipient of the statement - in this case, The Arc—perceived the statement to be defamatory.   The analysis of perception, however, only comes to play when the defamatory statement is an opinion that implies or may imply undisclosed facts on which the opinion is based.  When the alleged defamatory statement is such a mixed opinion, the speaker is liable "if the recipient draws the reasonable conclusion" that the opinion must have been based on undisclosed defamatory facts. *Samuels*, 135 Md. App. at 548 (internal citations omitted).  This type of comment is not at play in the present case, since the statement was a statement of the clear "fact" that there were "unresolved issues" between CCDSS and Plaintiff Ross.   This was not a statement of opinion or even mixed opinion, and the conclusion or response of the recipient of the statement is irrelevant.   Because there is a genuine issue as to the material fact of Defendants' disclosure of the confidential information and because all elements are properly pled, this count should be allowed to proceed to a jury.

**VII.   The breach of contract claim should not be dismissed because Defendants had control of and responsibility for the information that was revealed in breach of the contract signed by Defendants.**

Plaintiffs have alleged all necessary elements of a breach of contract claim.   Defendants argue that Defendant Murray-Miller is the only person alleged to have disclosed this information, and that she did not breach the settlement agreement because she does not work for CCDSS.   However, Plaintiffs clearly alleged that "an agent of the CCDSS" breached the agreement by disclosing the confidential information, in breach of the contract. (2ⁿᵈ Am. Compl. ¶ 65.)   The settlement agreement clearly applies to CCDSS and any of its agents or employees.   Plaintiffs' allegation that Defendant Murray-Miller participated in the disclosure in no way supports Defendant's contention that Defendant Murray-Miller was the only party responsible for the disclosure, particularly because Plaintiffs' allegation under Count 9 includes more than just Defendant Murray-Miller.

Because there is a genuine issue as to the material fact of Defendants' disclosure of the confidential information and because all elements are properly pled, this count should be allowed to proceed to a jury.

**VIII.   The First Amendment claim should not be dismissed because the Amended Complaint alleges a causal connection between the retaliatory action and the protected speech.**

Defendants argue that their newly submitted "affidavit of Defendant Klesius," which is nearly a carbon-copy of each of the other submitted Defendant affidavits, "reveals that any actions by her undertaken [sic] not in retaliation for her expression of opinion...". (Defs. Mot. Dism. ¶ 2, pg. 18).   Yet, the affidavit of Ms. Murray-Miller states that she was made aware of "letters to the editor," presumably by Mary Klesius or another Defendant at CCDSS, where Betsy Ross "criticized CCDSS" and therefore told The Arc she was not cleared for her private foster care license.   **Summary judgment must be**

26

**denied to the Defendants on this point and granted to Plaintffs.**

Plaintiffs have alleged in detailed and plausible form all elements of the cause of action for speech-based retaliation.   Under *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676 (4th Cir. 2000), a speech retaliation claim must include allegations of a causal relationship between the speech and the retaliatory action. *Id.* at 685. Plaintiffs have alleged that Plaintiff Ross' reporting of Defendant Klesius' allegedly illegal financial behavior —initiated‖ Defendants' action in promulgating false information about Plaintiff Ross to The Arc. (2ⁿᵈ Am. Compl. ¶ 130.) Defendants' actions were motivated after Plaintiff —began taking steps‖ to report the allegedly unlawful conduct of Defendant Klesius. (2ⁿᵈ Am. Compl. ¶ 14.)  Plaintiff Ross began taking steps to report the allegedly unlawful conduct in or around July 2008, and Defendants' retaliation began on or around August 15, 2008, the day Plaintiff Ross was to be seated in her newly elected position as President of the Foster Care Association, with attendant plenary powers to observe the Association's checkbook and bank accounts, intersecting to the minute with Plaintiff Ross's protected speech and new Association authority. (2ⁿᵈ Am. Compl. ¶¶ 14–15.) **(Exhibit F, Affidavit of Betsy Ross, attached hereto and incorporated herewith).** The retaliation continued after the settlement of January 21, 2010 to include the false statements from Defendant Murry-Miller to The Arc, thereby preventing her from becoming licensed as a private foster care home. The closeness in time between each of the several events creates a plausible explanation of cause and effect and particularly alleges a causal relationship as required by *Suarez*.

The retaliation by Defendants also "adversely affected . . . plaintiff's constitutionally protected speech." *Suarez*, 202 F.3d at 685.  The retaliatory actions by Defendants took away the foster children in Plaintiff Ross's home without first verifying the reports of neglect or observing any dangerous conditions, and broadcast false information about her to another private foster care organization, depriving her of her ability to continue to serve as a foster parent.   These actions are plausibly interpreted as disapproval of and retaliation for Plaintiff Ross's speech, and would reasonably chill the

speech rights of even a person of "ordinary firmness." *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

Plaintiffs have also properly alleged that Defendants are responsible for a policy of taking agency action against individuals to protect the agency from whistle-blowing. (2nd Am. Compl. ¶ 29.) Plaintiffs have properly alleged a specific causal connection between the speech in Plaintiff Ross' case and the actions of Defendants in response. (2nd Am. Compl. ¶¶ 14–15.)  Plaintiffs have also properly alleged that Defendants Ricciuti and Bailey were and are responsible for the policies of CCDSS. (2nd Am. Compl. ¶ 28.)    Finally, Plaintiffs have also alleged that Defendant Ricciuti maintained these policies to protect the agency from allegations precisely of the type initiated by Plaintiff. (2nd Am. Compl. ¶ 29.)  All of these allegations, taken as true and taken together, create the plausible explanation that Defendants acted unlawfully in maintaining this policy, and therefore this claim must be permitted to proceed to a jury.

Because there is a genuine issue as to the material fact of Defendants' disclosure of the confidential information and because all elements are properly pled, this count should be allowed to proceed to a jury, or, alternatively, summary judgment may be granted for Plaintiffs as to this Count.

**IX.    The Fourth and Fourteenth Amendment Claims by Plaintiff K.R. should not be dismissed because K.R. has a privacy interest against arbitrary intrusions and Defendants are not entitled to qualified immunity.**

Given the same reasoning as above in Section II, Plaintiff K.R. has a right to have Defendants investigate the reports of neglect without removing the children simply based on reports. Both COMAR 07.02.25.15 and Md. Fam. Law § 5-706 require investigation procedures that were not followed by Defendants. COMAR 07.02.25.15(a)(1) notes that, if a foster care worker "*observes*" that a foster child is in "serious and immediate danger," the worker must immediately remove the child. *Id.*

28

(emphasis added).   In this case, no worker and none of Defendants observed Plaintiff K.R. in serious and immediate danger. Defendants immediately removed K.R. *without observation* and based only on a report (2nd Am. Compl. ¶¶ 17–20), in violation of subsection (a)(1). Subsection (a)(2) further provides that if an employee "receives a report or makes a personal observation" of suspected abuse or neglect in a foster home, they must "immediately *notify*" the CPS department responsible for the child involved. *Id*. (emphasis added). Although Defendants did have a report of suspected abuse (Am. Compl. ¶ 17), COMAR only authorizes them to notify CPS - it does not allow them to remove the child themselves after calling the director of foster care.   Contrary to the assertion made by Defendant Ricciuti, Defendants' actions clearly contravened the authority claimed as justification.

Moreover, Defendants are not entitled to qualified immunity because they were not acting according to policy and procedure.   Under *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), Defendants are not entitled to immunity if they violate "clearly established statutory . . . rights of which a reasonable person would have known." *Id*. at 818.   In this case, Defendants who removed Plaintiff K.R. should have reasonably known that COMAR § 07.02.25.15 does not authorize them to remove children immediately based on only a report of suspected abuse. The requirements of COMAR do not establish a gray area and Defendants did not have to guess as to the requirements. They knowingly violated the law, and should not enjoy qualified immunity for removing Plaintiff K.R. from Plaintiff Ross's home.

Moreover, Defendants' citation to *Drummond v. Fulton County Dep't of Family & Children's Servs.*, 563 F.2d 1200 (5th Cir. 1977), and to *Darryl H. v. Coler*, 801 F.2d 893 (7th Cir. 1986) is not controlling because these decisions are not from this Court's jurisdiction. Moreover neither of these cases should be controlling or persuasive for this Court. In *Drummond*, the Fifth Circuit ruled narrowly in finding that the parents did not have an interest in their relationship with the foster child, noting that their conclusion "does not necessarily control every...foster family situation." *Drummond*, 563 F.2d at 1207.   The Drummond family was also merely a temporary, emergency placement for the foster child,

29

and had only requested to adopt the foster child, *id.* at 1203–04, unlike Plaintiff Ross, who had nearly finalized her adoption of K.R. and had three other children who on track to become adopted. *Darryl H.* is also not controlling because it does not deal with foster children at all. The facts in that case involved case-workers who followed procedures for examining a child after receiving tips of child abuse. The case-workers investigated that abuse and followed procedures established by the Illinois Department of Children and Family Services.

Because there is a genuine issue as to the material fact of Defendants' intrusion and removal of K.R., this count should be allowed to proceed to a jury.


**X.     The federal claims against Defendants should not be barred as untimely because the Amended Complaint relates back to the original Complaint.**

The Amended Complaint relates back to the date of the original Complaint under Fed. R. Civ. Proc. 15(c)(1)(B), which allows an amendment to relate back to the date of the original pleading when ―the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out― or attempted to be set out―in the original pleading.‖ All of the claims added to the Amended Complaint and brought against the new defendants arose out of the same ―conduct, transaction, or occurrence‖ that was set out in the original Complaint, namely the entry into and removal of Plaintiff Ross's foster children and adoptee-child from her home, the bringing of false allegations and improper administrative prosecution of Plaintiff Ross, and the disclosure of confidential information to The Arc.

Under Fed. R. Civ Proc. 15(c)(1)(c), because of their direct involvement with events and occurrences giving rise to the complaint, and because of the naming of the Department and its agents involved in the matters averred, and because of the service of process provided to the Defendants first named, all seven (7) of the newly added Defendants ―knew or should have known that the action would have been brought against [them], but for a mistake concerning the proper party's identity.‖ Fed.

R. Civ. Proc. 15(c)(1)(c).   Defendants rely upon *Krupski v. Costa Crociere S. p. A.*, 130 S. Ct. 2485 (2010), to argue that the Amended Complaint could not relate back if Plaintiffs made a fully-informed choice not to name the now-named Defendants.   However, Defendants wrongly characterize Plaintiffs' knowledge of the appropriate parties. The Supreme Court of the United States stated in *Krupski* that the Federal Rule ―asks what the prospective *defendant* knew or should have known . . . not what the *plaintiff* knew or should have known at the time of filing her original complaint.  *Krupski*, 130 S. Ct. at 2493 (emphasis original). The plaintiff's knowledge is only relevant as to whether the proper defendants knew that the plaintiff made a mistake about the proper parties. *Id.*  Defendants Compton, Cotton and Larson assert that "because of Ms. Ross' knowledge of their roles, ...[they] had every reason to believe that they were never going to be named as defendants."  (Defs. Mot. Dism., ¶ 3, pg. 24).  <u>Yet nowhere in their affidavits do Defendants so state</u>.   Indeed, Ms. Larson avers in her affidavit to this Court "I knew nothing about the Association other than it existed."  (Aff. Rebecca Larson, ¶ 5).  **But in her very next sentence she states she knew Ms. Ross came to Cecil County Department of Social Services [on August 15, 2008] "to talk about the upcoming Foster Parent Association elections." (Aff. Rebecca Larson, ¶ 6).**   Clearly Defendant Larson and her associates *did* know about the elections, that Ms. Ross was coming to a meeting about the elections, and that Ms. Klesius, the director of Foster Care for Cecil County Department of Social Services and chief liason with the Foster Parent Association for the Department had already ordered the removal of the children from Betsy Ross' home *prior to* any investigation which Ms. Larson was supposedly charged with handling and *prior to* the meeting about the upcoming elections to which Betsy Ross was slated by the group to be president.

Moreover, the fact that a plaintiff knew about the existence of a potential party does not automatically mean the plaintiff made no identity mistake in failing to name that party. *Id.* at 2494 (―That a plaintiff knows of a party's existence does not preclude her from making a mistake with respect to that party's identity.‖). The plaintiff In *Krupski*, for example, sued the wrong party even

though she possessed a ticket naming the proper defendant and tying them to the circumstances of her claim. Nevertheless, the Court explained that the fact that ―Krupski may have known the contents of the ticket does not foreclose the possibility that she nonetheless misunderstood crucial facts regarding the two [defendant] companies‗ identities.‖ *Id.* at 2497.

The Court also rejected the position that ―any time a plaintiff is aware of the existence of two parties and chooses to sue the wrong one, the proper defendant could reasonably believe that the plaintiff made no mistake. *Id.* at 2494. Even when the plaintiff makes a deliberate choice to sue a defendant, while knowing of another defendant and choosing not to sue that defendant, the plaintiff may still ―harbor a misunderstanding about [the other defendant‗s] status or role in the events giving rise to the claim at issue, and . . . may mistakenly choose to sue a different defendant based on that misimpression. *Id.* at 2494.

In this case, Plaintiff Ross originally sued Defendants Riccuti, Klesius, and Cecil County Department of Social Services ("CCDSS") because of a misunderstanding about the status and/or role of the other, now-named Defendants. Plaintiffs made allegations in their original Complaint against "agents" of CCDSS, including Defendant Klesius and Defendant Riccuti. (Compl. ¶¶ 11, 18, 25, 33, 38, 50, 59, 66, 74, 84.) This pleading was made in order to include other Defendants, including now-named Defendants, that were not then known to have participated in a specific role in the matters averred. Moreover, Defendants‗ Second Motion to Dismiss Complaint argued that Plaintiffs‗ references to the "agents of CCDSS" in the original Complaint were in fact referring to persons other than those Defendants [Riccuti and Klesius]. (Defs.‗ Second Mot. Dismiss Compl. 9.) This argument also served to notify Plaintiffs that other individuals, namely the now-named Defendants, were also responsible for the actions averred in the Complaint and Second Amended Complaint. Plaintiffs originally refrained from suing the new Defendants because Plaintiffs lacked knowledge of the individual roles played by those Defendants.

Indeed, in her affidavit to the Court, Helen Murray-Miller states under oath for the first time evidence that her actions to inform Dianne Ross at The Arc foster care association to <u>not</u> permit Plaintiff Betsy Ross to obtain a home study and proceed as a private foster care home were in concert with the interests of CCDSS and **were a brazen attempt to silence Plaintiff from exercising her First Amendment right to free speech and association**.  Ms. Murray-Miller states **the "issues were Ms. Ross' recent public criticism of CCDSS, largely through letters to the editor published in the local newspaper**...Because any placements of foster children would **most likely** come **from CCDSS, which she was publicly criticizing**, I believed that any home study should take place later once those issues has [sic] been resolved."  (Aff. Helen Murray-Miller, ¶ 5)(bold added).  Although Ms. Murray-Miller takes pains to try to distance herself at the Social Services Administration office from the Cecil County Department of Social Services, her office, the Office of Licensing and Monitoring ("OLM"), oversees entries into and promulgates policies and instructions to those local agencies concerning the State child abuse and neglect database system called CHESSIE. (see http://dhr.maryland.gov/ssa/adoption/olm/chessie.php, accessed on March 15, 2012 at 9:21pm).  Local agencies, including CCDSS, report monthly updates "by the 10th of the month" of all changes and updates in confidential information of individuals like Plaintiff for entry into the State CHESSIE system. *Id.*    That is apparently one reason Ms. Murray-Miller oversees back-ground clearances for foster parents.  With her direct access to all the data listing Plaintiff as a child neglector in the State database "Chessie," **it is telling that she swears in her affidavit "until the filing of this litigation, I was unaware of any settlement agreement between CCDSS and Betsy Ross."**  (Aff. Helen Murray-Miller, ¶ 4).  It is therefore categorically possible, in fact likely, that CCDSS disobeyed the law and court order regarding removing and destroying files, involving Plaintiff Betsy Ross from the CHESSIE or other State database immediately upon the "RULED OUT" settlement and entry of order.  **This was likely done in order to prevent her from becoming a foster care home until she stopped writing**

33

**letters of criticism of CCDSS to the editor or otherwise exercising her natural and constitutional rights as an American citizen.**   What is still to be determined through discovery are the alleged conversations and information conveyed to Ms. Murray-Miller and by whom, since her affidavit wholly avoids those allegations by Plaintiffs other than to appear to dismiss them without explanation by stating "no-one who works for CCDSS has any supervisory authority over me."   (Aff. Helen Murray-Miller, ¶ 3).   Such is insufficient to show lack of discussion with CCDSS, and a chilling of Plaintiff's free speech and association rights in concert with CCDSS.   These are genuine issues of material fact in Plaintiffs' Second Amended Complaint that stand in direct opposition to Defendants' allegations in their responsive pleadings, and discovery of these issues are therefore necessary to permit Plaintiffs to protect their civil and constitutional rights under law.

Plaintiffs' Second Amended Complaint should relate back to the date of the original Complaint and their claims should not be barred as untimely.

Because there is a genuine issue concerning the material fact that Plaintiffs' Second Amended Complaint added new parties because of lack of proper knowledge of their role, the new federal counts should be allowed to proceed to a jury.

**WHEREFORE**, for the reasons stated above, Defendants' Motions to Dismiss Amended Complaint or for Summary Judgment should be **DENIED**, and Plaintiffs' request for summary judgment as to their First Amendment claim should be **GRANTED.**

Respectfully Submitted,

THE COX LAW CENTER
BY _____/s/_____
Daniel L. Cox
Fed. Bar No. 28245
The Cox Law Center
104 N. Court Street
Frederick, MD 21701

34

301.631.9454 (office)
301.631.9358 (facsimile)
dcox@coxlawcenter.com
*Attorney for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 16th day of March, 2012, a copy of the foregoing Response was served, via electronic mail, upon Bradley J. Neitzel, Assistant Attorney General, 311 West Saratoga Street, Suite 1015, Baltimore, Maryland 21201, e-mail: bneitzel@dhr.state.md.us.


_____/s/_____
Daniel L. Cox

35