IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

BETSY ROSS, *et al.*,           *

       Plaintiffs,           *

       v.           *           CIVIL NO.: WDQ-11-0181

CECIL COUNTY DEPARTMENT OF           *
SOCIAL SERVICES, *et al.*,           *

       Defendants.           *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

Betsy Ross, for herself and as next friend of her minor daughter[1] K.R., sued the Cecil County Department of Social Services ("CCDSS") and others (collectively, "the defendants") for federal and state constitutional violations and other claims.  For the following reasons, the defendants' motion to dismiss the complaint or for summary judgment will be granted in part and denied in part.  Ross's unopposed motion for summary judgment on her First Amendment claim will be denied.

---

[1] The complaint does not state that K.R. is Ross's child, but it asserts that an adoption hearing was scheduled to finalize Ross's adoption on October 20, 2008.  ECF No. 46 ¶60.  As the defendants have not challenged Ross's standing to sue on behalf of K.R., the Court will assume that the adoption was finalized.

I.   Background[2]

Ross was a licensed Foster Care Parent through CCDSS; in 2008 she was an active member of the Cecil County Foster Parent Association ("CCFPA").  ECF No. 46 ¶2.  In 2008, Ross had been elected President of CCFPA and was to begin her term on August 15, 2008.  *Id.* ¶125.[3]  At her home she had a swimming pool that CCDSS allowed her foster children to use.  *Id.* ¶19.

In July or August 2008, Ross discovered that Mary Klesius, CCDSS Supervisor of Foster Care Services, was placing unspent state funds into the CCFPA checking account.  *Id.* ¶¶2, 4, 14.  Believing the transactions were unlawful, Ross asked Klesius for copies of all CCFPA bank statements, decided not to expend CCFPA funds--contrary to Klesius's directions--and filed a complaint with the Ombudsman for the Maryland Department of Human Resources ("MDHR"), John Bertulis.[4]  *Id.* ¶14.

In August 2008, Ross was caring for seven children: one biological child, a child she had adopted about two and a half

---

[2] For the motion to dismiss, the well-pled allegations in the amended complaint are accepted as true.  *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011).  In reviewing a motion for summary judgment, the non-movant's evidence "is to be believed, and all justifiable inferences are to be drawn in [his] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[3] The defendants submitted an affidavit stating that elections for CCFPA president were not held until September 2008.  ECF No. 49-8 ¶5 (Aff. of Mary Klesius).

[4] Ross's complaint does not specify the dates of these actions.  *See* ECF No. 46 ¶14.

months earlier, and five foster children. *Id.* ¶¶20-21. Ross
had been preparing to adopt one of the foster children, K.R.;
K.R.'s natural parents' rights had been terminated, CCDSS had
approved Ross as an adoptive parent for K.R., and an adoption
finalization hearing was scheduled for August 20, 2008. *Id.*
¶22, 60.

On August 15, 2008, at 1:30 p.m., Klesius and Tina Linkous,
an adoption coordinator for CCDSS, "decided, based on alle-
gations of neglect," that Ross's foster children would be
removed from her home. *Id.* ¶20. Linkous drove to interview one
of Ross's former foster children in Pennsylvania, to investigate
allegations about Ross, while Klesius and Rebecca Sutton, a
CCDSS social worker, pulled Ross out of a CCFPA meeting and told
her that CCDSS would remove the five foster children, including
K.R., and that Ross "would be further investigated." *Id.* ¶¶15,
18.

At 3:10 p.m. that day, Linkous reported to CCDSS by
telephone that the child claimed that Ross had neglected her
foster children when the child was in Ross's care. *Id.* ¶18.
The child told Linkous that:

> Ross was leaving the children unattended in the family
> pool and one child almost drowned, . . . leaving an 8
> year old child to care for her younger siblings as
> well as other foster care children[;] a Foster Care
> child [had been] exposed to sexual behaviors of . . .
> Ross's teenage daughter[;] a foster care child [had]

fall[en] down the stairs[;] and another child [had]
fall[en] off a couch.

ECF No. 49-5 (neglect report dated September 17, 2008).[5]  The
reporting child was "known to have a habit of telling wild and
imaginative stories not based in any truth."  ECF No. 46 ¶18.

At 4:30 p.m. that day, Sutton, LaTonya Cotton, and Kim
Compton--two other CCDSS social workers--entered Ross's home
without a warrant or Ross's consent, and removed the five foster
children.  *Id.* ¶¶5, 7, 21-24.

On September 10, 2008, Ombudsman Bertulis began an investi-
gation of CCDSS, presumably based on Ross's complaint.  *Id.* ¶17.

On September 17, 2008, CCDSS completed its investigation of
the neglect report, concluding that the neglect was "unsubstan-
tiated . . . which [means] . . .  there is insufficient evidence
of a failure to provide proper care and attention."  ECF No. 49-
5.  "[C]hild neglect could neither be indicated or ruled out."
*Id.*

On September 28, 2008, CCDSS returned K.R. to Ross's care,
and scheduled a new adoption finalization hearing for October
15, 2008.  ECF No. 46 ¶26.[6]

---

[5] Ross states that the report should have been destroyed or
deleted from CCDSS's records because of subsequent events, but
gives no reason this Court may not consider it in this
proceeding.  ECF No. 54-1 at 3.

[6] Later in the complaint, Ross alleged that K.R. had been
returned by August 20, 2008.  ECF No. 46 ¶60.

On June 18, 2009, Ross sent a letter to Maryland Delegate Richard Sossi, noting her complaints about CCDSS.  The letter discussed the August 15, 2008 removal of the children "[b]ased solely on allegations of neglect," and requested Delegate Sossi's help in "holding [CCDSS] accountable."  ECF No. 49-2.

On January 21, 2010, Ross and her attorney, Daniel Cox, Esq., entered a settlement agreement with CCDSS, through the Maryland Office of Administrative Hearings.  ECF No. 46-1.  In exchange for Ross's dismissal of administrative complaints against CCDSS, CCDSS agreed to change the ruling on the neglect allegations from neglect "unsubstantiated" to neglect "ruled out," and "to make no negative statements regarding . . . Betsy Ross."  Id.  The parties agreed "that the terms of this settlement agreement shall remain confidential."  Id.

Though it was not included in the settlement agreement, Ross also agreed to give up her CCDSS foster care home license because she expected to become a private foster care provider with The Arc, a private foster care association.  ECF No. 46 ¶28.

In March 2010, Helen Murray-Miller, a Licensing Coordinator in the Office of Licensing and Monitoring in the Social Services Administration of Maryland's Department of Human Services, "advised" Dianne Ross, The Arc's Director of Family Services, to tell Betsy Ross that it would be inappropriate to complete a

5

home study--part of The Arc's licensing process--at the time, because Betsy Ross had been "public[ly] critici[zing] CCDSS, largely through letters to the editor published in the local newspaper." ECF No. 49-10 ¶5. Murray-Miller believed that, because CCDSS would work with The Arc in placing foster children in foster homes, the home study should take place after the issues had been resolved. *Id.*

On March 18, 2010, The Arc told Ross that it would not consider Ross's application to foster through The Arc because "[t]he unresolved and high profile nature of your current situation with several entities determines that it is not a good time to proceed with a home study.  Once your issues with [CCDSS] are resolved to our mutual satisfaction," Ross would be allowed to train as a prospective foster parent.  ECF No. 46-2.

On January 21, 2011, Ross, individually and as a representative of minor K.R., sued the CCDSS, Klesius, and Nicholas Riccuiti, CCDSS director, (collectively "the first defendants"), alleging federal civil rights violations, Maryland torts, and breach of contract.  ECF No. 1.[7]

---

[7] On June 6, 2011, the Court ordered Ross to show cause why it should not dismiss the case, because Ross had not served the first defendants.  ECF No. 4.  On June 21, 2011, Ross requested additional time to serve.  ECF No. 5.  The next day, the Court denied the motion.  ECF No. 6.  Ross served the summons on the first defendants on June 23, 2011, ECF No. 7, she served the complaint on them on July 18, 2011, ECF Nos. 10-12.

On August 25, 2011, Ross filed an amended complaint against
Klesius, Riccuiti, Cotton, Sutton, Compton, Linkous, Susan
Bailey, assistant director of CCDSS, Barbara Siciliano, a CCDSS
supervisor, and Murray-Miller (collectively "the defendants").
ECF No. 19.  The new defendants were served on October 3 and 4,
2011.  ECF No. 39.

On January 31, 2012, this Court allowed Ross to file a 10
count second amended complaint ("the complaint") against the
defendants.[8]  ECF No. 46.  On the constitutional claims, Ross
seeks a declaratory judgment that the defendants' "laws,
policies and practices . . . violate the Fourth and Fourteenth
Amendments"; compensatory and punitive damages on the Maryland
claims; an injunction against the defendants preventing them
"from continuing their unconstitutional actions," and payment of
the costs and expenses of the suit.  ECF No. 46 at 18.

---

[8] Ross included these counts in the second amended complaint:
count 1: 42 U.S.C. § 1983; count 2: violation of the plaintiffs'
Fourth Amendment right to privacy; count 3: violation of the
plaintiffs' Fourteenth Amendment procedural due process rights
and violation of Article 24 of the Maryland Declaration of
Rights; count 4: violation of the plaintiffs' Fourteenth
Amendment substantive due process rights and violation of
Article 24 of the Maryland Declaration of Rights; count 5:
breach of confidence, brought under the Maryland Tort Claims Act
("MTCA"); count 6: negligence, brought under the MTCA; count 7:
false light, brought under the MTCA; count 8: defamation,
brought under the MTCA; count 9: breach of contract; count 10:
violation of the First Amendment--retaliation for First
Amendment activity.  ECF No. 46.

On February 21, 2012, the defendants moved to dismiss the second amended complaint, or in the alternative, for summary judgment.  ECF No. 49.  On March 19, 2012, Ross opposed the defendants' motion and cross-moved for summary judgment on count 10 (retaliation for First Amendment activity).  ECF No. 54.  The defendants have not opposed the cross-motion for summary judgment or replied to Ross's opposition to the motion to dismiss. *See* docket.

II.  Analysis

 A.  The Defendants' Motion

  1.  Standards of Review

   i.  Motion to Dismiss

Under Fed. R. Civ. P. 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6) tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  *Migdal v. Rowe Price-Fleming Int'l Inc.,* 248 F.3d 321, 325-26 (4th Cir. 2001).  Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim

8

advanced. *Bass v. E.I. Dupont de Nemours & Co.,* 324 F.3d 761, 764-65 (4th Cir. 2003). These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

This requires the plaintiff to do more than "plead[] facts that are 'merely consistent with a defendant's liability'"; the facts pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting Twombly,* 550 U.S. at 557). The complaint must not only allege but also "show" that the plaintiff is entitled to relief. *Id.* at 679. "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief." *Id.* (internal quotation marks omitted).

ii.  Summary Judgment

Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[9]  In considering the

---

[9] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[10]  *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted). A party opposing summary judgment "may not rest upon the mere allegations or denials of [her] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 525.[11]  For summary judgment purposes, "a

---

[10] The parties may provide affidavits to support or defeat a motion for summary judgment. However, hearsay, conclusionary, and speculative statements that lack an evidentiary basis will not support or defeat a motion for summary judgment. *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

[11] A party opposing summary judgment "cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that

10

verified complaint is the equivalent of an opposing affidavit . . . when the allegations contained therein are based on personal knowledge." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

When cross motions for summary judgment are filed, "each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." *Mellen v. Bunting,* 327 F.3d 355, 363 (4th Cir. 2003) (*citing Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003)).

### 2.  Section 1983 Claims[12]

#### i.  Legal Standard

To state a claim under 42 U.S.C. § 1983, the plaintiffs must "aver that a person acting under color of state law deprived . . . her of a constitutional right." *Green v. Maroules*, 211 F. App'x 159, 161 (4th Cir. 2006).

Government officials performing discretionary functions are shielded from liability for civil monetary damages under § 1983 when their conduct "does not violate clearly established

---

more time was needed for discovery" by filing a Rule 56(d) affidavit. *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).

[12] Count 1, "Relief Under Act of Congress 42 U.S.C. § 1983," ECF No. 46 at 7, states the cause of action through which Ross brings portions of counts 2 through 4 and 10.  It is not an independent claim.

statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).

Qualified immunity must be pled by the defendant official. *Id.* at 815.  Once the official raises a qualified immunity defense, the burden shifts to the plaintiff to show that the official's conduct violated the law.  *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993).  The burden then shifts to the defendant to demonstrate that the right was not clearly established at the time of the incident.  *Henry v. Purnell*, 501 F.3d 374, 378 (4th Cir. 2007).

Clearly established rights include specifically adjudicated rights as well as those manifestly included within more general applications of the core constitutional principles involved. *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998).  There are three ways in which law becomes clearly established in Maryland: (1) an authoritative decision by the United States Supreme Court; (2) an authoritative decision by the Fourth Circuit Court of Appeals; or (3) an authoritative decision by the Court of Appeals of Maryland.  *Id.*[13]

---

[13] Decisions from other circuits or states are not authoritative for qualified immunity analysis.  *Wilson v. Layne*, 141 F.3d 392, 114 (4th Cir. 2003).

A constitutional right is clearly established "when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."[14]  The defendants bear the burden of proof on whether the constitutional right was clearly established at the time of the alleged violation.[15]

The Fourth Circuit has emphasized "the importance of resolving the question of qualified immunity at the summary judgment stage rather than at trial." *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003). *Wilson* recognizes, however, that "the qualified immunity question can . . . at times require factual determinations respecting disputed aspects of [a defendant's] conduct." *Id.* "The importance of summary judgment in qualified immunity cases does not mean . . . that summary judgment doctrine is to be skewed from its ordinary operation to give substantive favor to the defense, important as may be its early establishment." *Id.*

Qualified immunity analysis generally proceeds in two steps. The Court must decide whether the facts that the

---

[14] *Franklin v. Montgomery Cnty., Md.*, No. 05-0489, 2000 WL 2632298 at *12 *(citing Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006)).  This determination is an objective one. *Id.* (*citing Wilson v. Kittoe*, 337 F.3d 397, 402 (4th Cir. 2003)).

[15] *Henry v. Purnell*, 501 F.3d 374, 378 (4th Cir. 2007) (*citing Wilson,* 337 F.3d at 397).

plaintiff has alleged or shown make out a violation of a constitutional right.  *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).  The Court must also decide whether the right at issue was "clearly established" at the time of the alleged misconduct.  *Id.* at 818 (the district courts may exercise their sound discretion in deciding which part of the qualified immunity analysis should be addressed first).

### ii.  Count 2: Fourth Amendment

Count 2 alleges that Ross and K.R. had a reasonable expectation of privacy in Ross's house, and Sutton, Cotton and Compton--acting on behalf of all defendants--entered the house without probable cause to believe the children were in "immediate danger of serious injury," the entry was an unreasonable intrusion and invasion into Ross's home, and as a result, Ross and K.R. suffered harm.  ECF No. 46 ¶¶46-49.  The second amended complaint concedes that the search was conducted "based on allegations of neglect," but suggests that the allegations were unreliable and pretextual.  *Id.* ¶¶18, 20.

The defendants contend that count 2 should be dismissed because the entry was constitutionally reasonable, and if it was not, the defendants are protected by qualified immunity.  ECF No. 49-1 at 5.  The defendants argue that the Fourth Amendment does not protect foster homes against entry by county officials, and the defendants entered Ross's home based on an allegation of

neglect of noncustodial children.  *Id.* at 6-7.  Ross counters that unsubstantiated allegations of neglect do not justify an entry into a private home under the Fourth Amendment.  ECF No. 54-1 at 6-9.

The Fourth Amendment protects against unreasonable searches and seizures, but the reasonableness of a search depends on the circumstances: "investigative home visits by social workers are not subject to the same scrutiny as searches in the criminal context."  *Wildauer v. Frederick Cnty.*, 993 F.2d 369, 372 (4th Cir. 1993).

"The [Fourth] Circuit . . . has never articulated a clear [constitutional] standard by which social workers' investigations should be judged."  *Word of Faith Fellowship v. Rutherford Cnty. Dep't of Social Servs.*, 329 F. Supp. 2d 675, 688 (W.D.N.C. 2004) (finding that defendants were entitled to qualified immunity on Fourth Amendment claims).  It *is* clear that a "state has a legitimate interest in protecting children from neglect . . . and in investigating situations that may give rise to such neglect and abuse."  *Martin v. Saint Mary's Dep't of Social Servs.*, 346 F.3d 502, 506 (4th Cir. 2003).  A "dependent child's needs are paramount" and almost always take precedence over an adult's asserted rights.  *Wyman v. James*, 400 U.S. 309, 318 (1971).  On the other hand, it is clear that if the state knew there was no reasonable concern for the child's needs, it may

15

not rely on that legitimate interest to justify infringing Ross's constitutional rights.[16]

Ross alleged that the intrusion was "based on" neglect allegations that the defendants should have known were groundless. ECF No. 46 ¶¶18, 20. Accordingly, she has alleged that the defendants knew or should have known that there was no genuine concern for the safety of Ross's foster children. *See id.* Thus, according to the complaint, the defendants--government actors--entered and searched Ross's home without justification. Ross has stated a Fourth Amendment unreasonable search claim.[17]

The defendants' affidavits, stating that Klesius, Compton, Cotton, and Sutton decided to remove the children "solely due to allegations of neglect," do not address Ross's claim that the defendants knew or should have known that the allegations of neglect were unreliable. ECF No. 49-8 ¶2; ECF No. 46 ¶18. Accordingly, the defendants are not entitled to summary judgment based on the affidavits.[18]

---

[16] *See Martin*, 346 F.3d at 507 (no liability for removing children based on "misunderstanding" that was "no more than negligent").

[17] *See Payton v. New York*, 445 U.S. 573, 590 (1980) (absent proper justification, state officer may not enter a house without consent or a warrant).

[18] Though the defendants did not raise the issue of remedies, it appears unlikely that Ross is entitled to injunctive relief

16

### iii. Counts 3 and 4: Due Process

Count 3 alleges that the defendants should have notified her, investigated the allegations, and required "evidence of abuse or immediate danger" before removing the foster children from Ross's home and taking K.R. from Ross.  It also alleges that Murray-Miller took Ross's "property right to be considered as an applica[nt] for a private foster care license."  ECF No. 46 ¶56.  Count 4 alleges that Ross "had a protected liberty interest in her relationship with K.R." when the defendants took K.R. from Ross's home.  *Id.* ¶60.

The defendants argue that Ross and K.R. had no property interest in a continued relationship.  ECF No. 49-1 at 9.  Ross argues, but did not allege in the complaint, that the defendants did not afford her procedural due process because they ignored Maryland's procedural rules when removing the children.  *Compare* ECF No. 54-1 at 17 (The "[d]efendants violated . . . procedural [due process] because Maryland State law was not followed in any manner in the removal of . . . K.R. and the foster children.") *with* ECF No. 46 (complaint, silent as to Maryland procedure for removing foster child).

---

based on this isolated event years ago.  *See* ECF No. 46 ¶43 and page 18 (alleging that the plaintiffs "continue to suffer ongoing and irreparable harm . . .  [and] are under threat of future, repeated conduct," and seeking injunctive relief).

The Fourteenth Amendment protects against the deprivation, without proper pre-deprivation proceedings, of "life, liberty, or property."  U.S. Const. Amend. XIV § 1.  Accordingly, to state a procedural or substantive due process claim, Ross must establish that she and K.R. have been deprived of a liberty or property interest.[19]  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).  To show a protected property interest, Ross "must be entitled to a benefit created and defined by a source independent of the Constitution, such as state law."  *Huang v. Bd. of Governors*, 902 F.2d 1134, 1141 (4th Cir. 1990).

a.    Property Interest in Foster Parenting

"[I]n the Fourth Circuit it is settled that a foster parent does not have a liberty . . . interest protected by the Due Process Clause in a continued relationship with a foster child [because a] liberty interest attaches only to a custodial relationship."  *Lee v. Children's Servs. of Va., Inc.*, No. 05-0153, 2005 WL 1279173, *2 (E.D. Va. May 27, 2005), *aff'd*, No. 05-1639, 2007 WL 174715 (4th Cir. Jan. 24, 2007).[20]  To the

---

[19] A substantive due process claim asserts that the "government's actions in depriving a person of life, liberty, or property are so unjust that no amount of fair procedure can rectify them."  *Love v. Pepersack*, 47 F.3d 120, 123 (4th Cir. 1995).  Accordingly, the plaintiff must assert a property or liberty interest to succeed on a substantive due process claim.  *See id.*

[20] Dismissing foster parent's due process claims against state children's services agency based on removal of foster children from the plaintiff's home "without court order and in the

extent state law gives the foster parent custodial rights over the foster child, the state confers a protected property interest in the relationship. *Id.*

Maryland does not confer custodial rights on foster parents. *See* Md. Code, Fam. Law § 5-504 (Rights of Foster Parents). Ross did not have custodial rights over the foster children, including K.R., because K.R. had not yet been adopted and Maryland had not conferred parental rights on Ross as to K.R. *See id.*; ECF No. 46 ¶55 (K.R. had not been adopted, though she was in Ross's physical custody and under her "full legal care"). CCDSS, which obtained termination of K.R.'s natural parents' rights, ECF No. 46 ¶60.b-.c, maintained legal custody[21]

---

absence of any allegations of abuse or neglect." *Lee*, 2005 WL 1279173, *2. The court noted that Virginia grants to foster parents caring for children in "permanent foster care status" rights similar to a custodial parent, such as authority to consent to surgery and marriage, conferring a property interest that implicates the Due Process Clause. The plaintiff, however, did not show that she had permanent foster care status over the child taken from her. *Id.* Therefore, she had no protected property interest in her relationship with the child. *Id.* at *2-3.

[21] Ross contends that in Maryland "[t]he rights of an acting parent . . . over and against the rights of natural parents [or those taking the place of natural parents, such as CCDSS], may be proven by showing . . . exceptional circumstances that would be detrimental to . . . continued custody with the natural parents." ECF No. 54-1 (*citing Koshko v. Haining*, 398 Md. 404 (2007), *Janice M. v. Margaret K.*, 404 Md. 661 (2008), *Aumiller v. Aumiller*, 959 A.2d 849 (Md. Ct. Spec. App. 2008)). The cases relied on address the standard for limiting a natural or adoptive parent's liberty interest in controlling her child's interactions with third parties such as former partners and grandpar-

over K.R. until the adoption was finalized.   Md. Code, Fam. Law
§ 5-325(a)(3), (b)(1).[22]

Ross has not shown that she had a property interest in
continuing as a foster parent to K.R., the other foster children
in her care, or for The Arc.   *See Lee*, 2005 WL 1279173, \*2.

>    b.   K.R.'s Property Interest in Staying
>         With Ross

Ross identifies no authority for the principle that K.R.
had a protectable property interest in maintaining a
relationship with Ross.   *See* ECF No. 54-1 at 14-19.   The Supreme
Court has said that "individuals may acquire a liberty interest
against arbitrary governmental interferences in the family-like
associations into which they have freely entered, even in the
absence of biological connection or state-law recognition of the

---

ents.   *See, e.g., Janice M.*, 404 Md. at 683.   They do not demon-
strate that third parties--foster parents, grandparents, or
others--have a liberty interest in a relationship with the
children.   *See Koshko*, 398 Md. at 439 (noting the "State's
interest in encouraging" positive relationships between
grandparents and grandchildren because of benefit to children).
*Janice M.* undermines Ross's concept of an "acting parent," as
*Janice M.* refused to recognize a "*de facto* parent status . . .
as a legal status in Maryland."   *Janice M.*, 404 Md. at 685.

[22] In Maryland, the juvenile court could have awarded legal
custody to another person, such as Ross, Md. Code, Fam. Law § 5-
325(b)(1), but Ross has not alleged that it did so for K.R., *see*
ECF No. 46 ¶¶55-60.   That K.R.'s natural parents could not
assert competing parental rights did not confer those rights on
Ross--it conferred them on CCDSS, the agency that petitioned for
termination of K.R.'s natural parent's parental rights.   *See* Md.
Code, Fam. Law § 5-325(b)(1).

relationship." ECF No. 54-1 at 15 (*quoting Smith v. Org. of Foster Families for Equality and Reform*, 431 U.S. 816, 846 (1977)). It cautioned, however, that a court should "ascertain from state law the expectations and entitlements of the parties." *Smith*, 431 U.S. at 845-46.[23] The Court has found no Maryland law creating a property or liberty interest for foster children in maintaining a relationship with the foster parent of their choice.[24]

### c. Conclusion

Because Ross did not have a protected liberty interest in foster parenting or continuing her relationship with K.R., and K.R. had no property or liberty interest in a continued relationship with Ross, when the defendants took the foster

---

[23] In addition to considering the natural parents' paramount liberty interest in the relationship with the children, the Supreme Court relied on "the limited recognition accorded to the foster family by the [state] statutes and contracts," which "argue[d] against any but the most limited constitutional 'liberty' in the foster family." *Id.* at 846; *see also Spielman v. Hildebrand*, 873 F.2d 1377, 1384 (10th Cir. 1989) (holding that pre-adoptive relationship between plaintiffs and child did not create protected liberty interest because it arose from "an arrangement in which the State has been a partner from the outset," and was "derive[d] from a knowingly assumed contractual relation with the State" (*quoting Smith*, 431 U.S. at 845-46)).

[24] Instead, social services agencies maintain the power to determine where to place foster children. *See, e.g.*, Md. Code, Fam. Law § 5-525.1 (child placement agency has the right to decide whether a foster child should be adopted); *id.* § 5-524 (Social Services Administration "develop[s] and implement[s]" care and welfare plan for child when the child cannot return to his or her parent).

children, they have not stated Fourteenth Amendment substantive
or procedural due process claims.

> iv.   Count 10: Retaliation for Exercise of First
>       Amendment

Count 10 alleges that the "[d]efendants' actions of
removing . . . Ross's children and promulgating false,
confidential, and damaging information against her were in
retaliation against . . . Ross's expression of her opinion of
the financial conduct of CCDSS that she believed was illegal."
ECF No. 46 ¶124.

The defendants contend that they are entitled to summary
judgment because count 10 only specifically mentions Klesius,
and Klesius's affidavit shows that she decided to remove the
foster children from Ross's care "out of concern for the[ir]
safety," not in retaliation for Ross's speech.   ECF No. 49-1 at
18-19.   Ross responds that Murray-Miller's advice to The Arc not
to license Ross was retaliatory, and Klesius's removal of the
foster children "the day . . . Ross was to be seated in her
newly elected position as President of the Foster Care
Association" supports an inference of retaliation, regardless of
Klesius's affidavit.   ECF No. 54-1 at 26-27.

To succeed on a claim for retaliation under § 1983, a
plaintiff must show that: (1) she engaged in protected speech;
(2) the defendant took an allegedly retaliatory action which

22

adversely affected the plaintiff's constitutionally protected
speech; and (3) "a causal relationship exists between [her]
speech and the defendant's retaliatory action." *Suarez Corp.
Indus. v. McGraw*, 202 F.3d 676, 687-88 (4th Cir. 2000).

When a public official's alleged retaliation takes the form
of speech, the retaliation does not adversely affect a
plaintiff's First Amendment rights unless it involves "a threat,
coercion, or intimidation intimating that punishment, sanction,
or adverse regulatory action will imminently follow." *Suarez*,
202 F.3d at 687 (distinguishing between public official's
retaliatory termination of public benefits--which affects the
speaker's First Amendment rights--with official's retaliatory
recommendation that a third party end or withhold private
benefits for the speaker--which does not).[25]

---

[25] In *Suarez*, the plaintiff, a jewelry company, was a member of
the Better Business Bureau ("BBB"). Suarez placed an
advertisement in the local newspaper criticizing McGraw--West
Virginia Attorney General--and his co-defendant, Rodd--a Deputy
Attorney General. 202 F.3d at 681. Later, Rodd told the BBB
that the Attorney General's office would "have a hard time sort
of respecting the integrity of [the BBB]" if the BBB allowed
Suarez to remain a member. *Id.* at 689. Soon after, the BBB
expelled Suarez. *Id.* at 690. Suarez sued Rodd and McGraw for
retaliation. The Fourth Circuit held that "whe[n] a public
official's alleged retaliation is in the nature of speech, in
the absence of a threat, coercion, or intimidation intimating
that punishment, sanction, or adverse regulatory action will
imminently follow, such speech does not adversely affect a
citizen's First Amendment rights." *Id.* at 687. The court
concluded that Rodd's comments to the BBB did not "intimat[e]
that McGraw and Rodd would punish or take an adverse action
against SCI or the BBB," and "allowed the BBB to determine its

The defendants challenge Ross's allegation that the removal of the children was retaliatory. ECF No. 49-1 at 18-19. "Proof of . . . retaliatory intent rarely will be supported by direct evidence of such intent. Accordingly, claims involving proof of a defendant's intent seldom lend themselves to summary disposition." *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010) (internal quotation marks and citations omitted).[26] Temporal proximity "provides some circumstantial support for a causal connection," but usually additional evidence is necessary "to permit [an] inference" of retaliatory motive, even on a summary judgment motion. *Id.* at 526.

---

own course of action." *Id.* at 690. Thus, the retaliation claim failed. *Id.; see also R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 89 (3d Cir. 1984) (borough's letter to landowner encouraging--without threatening, intimidating, or coercing--the landlord to terminate its leases with billboard owner did not violate the billboard owner's First Amendment rights); *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 38-39 (2d Cir. 1983) (public official who asked stores not to sell a controversial board game did not violate the board game maker's First Amendment rights).

[26] "Resolution of questions of intent often depends upon the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross examination." *Ross v. Commc'ns Satellite Grp.*, 759 F.2d 355, 364 (4th Cir. 1985) *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). "[I]t is impossible to weigh the credibility of witnesses based on their affidavits," and the Court "at summary judgment [does] not have . . . the benefit of cross examination to evaluate biases and to establish the ability of witnesses to observe what occurred." Moore v. Morton, 958 F.2d 368 (table), 1992 WL 46292, *4 n.3 (4th Cir. 1992).

Here, it is undisputed that the defendants removed the
foster children from Ross's home on August 15, 2008, within one
and one half months of her complaint to Ombudsman Bertulis.  ECF
No. 46 ¶¶14, 21.  The defendants have not addressed Ross's
allegation that their asserted justification, a neglect concern,
was so unreliable that the defendants could not have believed it
genuine, and the defendants' intent was retaliatory.  *See id*.
¶¶18, 127.  Accordingly, a dispute of material fact remains; the
defendants are not entitled to summary judgment on count 10.

   3.   Maryland Declaration of Rights Claims

Article 24 due process claims are read *in pari materia* with
Fourteenth Amendment due process claims, except in limited
circumstances in which Article 24 may be interpreted more
broadly.  *Koshko*, 398 Md. at 444 n.22.  It has not been
interpreted more broadly with respect to the liberty interest of
foster parents in relationships with their foster children.  *See
id*. (listing examples of broader interpretation of Article 24).
As she has not stated Fourteenth Amendment due process claims,
Ross has not stated claims under Article 24 of the Maryland
Declaration of rights for substantive or procedural due process
deprivations.

   4.   Count 5: Breach of Confidence

Count 5 alleges that Murray-Miller, acting on behalf of the
defendants, disclosed false information to The Arc related to an

25

issue which the defendants agreed to keep confidential, in breach of Ross's confidence.  ECF No. 46 ¶¶68-73.

The defendants contend that count 5 should be dismissed because Maryland has not recognized a cause of action for breach of confidence, no confidential information was revealed, and Murray-Miller did not owe a duty to Ross.  ECF No. 49-1 at 11. Ross counters that *Hooper v. Gill*, 557 A.2d 1349 (Md. Ct. Spec. App. 1989), recognized a cause of action for breach of confidence, and Ross pled all elements of the tort.  ECF No. 54-1 at 19.

*Hooper v. Gill* considered the standard for finding a breach of fiduciary duty based on alleged legal malpractice.  557 A.2d at 1351.  Dr. Hooper sued his former attorney, Gill, after Gill allegedly revealed confidential information about Hooper to the Maryland Assistant Attorney General while the Assistant Attorney General was prosecuting Hooper for Medicaid fraud.  *Id.*  After holding that Hooper's claims failed because he did not prove damages, the Court of Special Appeals noted that, arguably, "even though actual damages were not shown, [Hooper] is nevertheless entitled to nominal damages as a result of the breach of confidence" by Gill.  *Id.* at 1353.  The Court of Special Appeals implied that Hooper "is nevertheless entitled to nominal damages" in the breach of fiduciary duty action, not an independent breach of confidence cause of action.  *See id.*  It

26

did not recognize a cause of action for breach of confidence. *See id.*

Further, if Maryland had recognized a cause of action for breach of confidence, Ross has not alleged all the elements of such a claim, because she relies solely on a contractual obligation for the duty of confidentiality. *See* ECF No. 46 ¶¶69-71. In Maryland, a "contractual obligation, by itself, does not create a tort duty. Instead, the duty giving rise to a tort action must have some independent basis." *Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 253, 725 A.2d 1053, 1058 (1999).[27] Ross relies solely on the settlement agreement--a contract--for the defendants' alleged duty. She alleged that CCDSS and the defendants "voluntarily accepted the terms of the agreement that the information . . . would remain confidential," and CCDSS could have "reject[ed] the terms of the settlement agreement" if it did not want to be bound to confidentiality.[28] ECF No. 46 ¶¶70-71.[29] Ross has not stated a claim for breach of confidence.

---

[27] *See also Nat'l Labor Coll., Inc. v. Hillier Grp. Architecture N.J., Inc.*, 739 F. Supp. 2d 821, 827 (D. Md. 2010) (same).

[28] That Ross, her attorney, and the administrative court "made clear to . . . Klesius" that information about Ross's dispute with CCDSS was confidential does not create a *duty* of confidentiality; Ross cites only the settlement agreement as creating the duty. ECF No. 46 ¶¶69, 71.

[29] In opposing the motion to dismiss, Ross argued that Maryland "regulations require that when an allegation of neglect is ruled out, all parts of the file must be destroyed . . . implying that

     5.   Count 6: Negligence

Count 6 alleges that the defendants owed Ross a duty not to violate K.R.'s and Ross's constitutional rights, and breached that duty when they: entered Ross's property and took the foster children, relying on an unsubstantiated neglect allegation "to advance the scheme of [the] Defendants to retaliate against . . . Ross," and violated Ross's due process rights.   ECF No. 46 ¶¶82-87.

The defendants contend that they are entitled to statutory immunity because Maryland state employees enjoy immunity from negligence claims unless gross negligence is alleged.[30]   ECF No. 49-1 at 13-14.   Ross counters that the defendants acted with gross negligence.   ECF No. 54-1 at 21.

---

that information is . . . confidential."   ECF No. 54-1 at 20 (*citing* Md. Code Regs. 07.02.07.20.17).   Ross did not rely on that duty in the complaint.   *See* ECF No. 46.   The regulations also state that "[a]ll records and reports concerning . . . neglect and the information contained in them are confidential." *Id.* 07.02.07.19.A.   The complaint alleges that Murray-Miller told The Arc that Ross "still had 'unresolved issues'" with CCDSS.   ECF No. 46 ¶73.   Ross did not allege that Murray-Miller disclosed information about the neglect investigation; Ross acknowledges that she also had "issues" with CCDSS regarding her discovery of misuse of state funds, *id.* ¶14, and Murray-Miller indicated that it was the latter "issue" that she discussed with The Arc, ECF No. 46-10 ¶5.

[30] In Maryland, county Department of Social Services employees are state employees.   Md. Code Ann., Hum. Servs. § 3-201; Md. Code Ann., State Gov't § 12-101; *Keller v. Prince George's Cnty. Dep't of Social Servs.*, 923 F.2d 30, 32 (4th Cir. 1991).

In Maryland, state employees "are immune from . . .
liability in tort for a tortious act or omission that is within
the scope of the[ir] public duties . . . and is made without
malice or gross negligence." Md. Code Ann., Courts & Jud. Proc.
§ 5-522(b). "[W]ell-pled facts showing ill-will or evil or
wrongful motive are sufficient to take a claim outside of the
immunity and non-liability provisions of the MTCA." *Barbre v.
Pope*, 402 Md. 157, 182, 935 A.2d 699, 714 (2007) (internal
quotation marks omitted). The complaint need not expressly
assert that the defendants acted with malice or gross negligence
if it "alleges facts that . . . could establish actual malice if
ultimately supported by evidence and believed by a fact finder."
*Muhammad v. Maryland*, No. 11-3761-ELH, 2012 WL 987309, *2 (D.
Md. Mar. 20, 2012).[31]

The complaint does not state that the defendants acted
maliciously or were grossly negligent. *See* ECF No. 46 ¶¶83-87.
However, the well-pled facts "show[] ill-will or . . . wrongful
motive." *Barbre*, 402 Md. at 182, 935 A.2d at 714. The
complaint alleges that the defendants used a neglect report
which they should have known was unreliable, as a pretext for
retaliating against Ross for her whistleblowing activities. ECF

---

[31] *See also Barbre v. Pope*, 402 Md. 157, 182, 935 A.2d 699, 714
(2007) ("[W]ell-pled facts showing ill-will or evil or wrongful
motive are sufficient to take a claim outside of the immunity
and non-liability provisions of the MTCA.").

No. 46 ¶¶14, 18, 84.  That demonstrates wrongful motive.

Accordingly, the complaint is not subject to dismissal based on

statutory immunity.[32]

> 6.   Counts 7 and 8: False Light/Defamation

Counts 7 and 8 allege that the defendants are liable for

the torts of false light and defamation because their agent,

Murray-Miller, told The Arc that Ross had "unresolved issues"

with CCDSS that would prevent The Arc from granting Ross a

foster parent license, knowing that information to be false.

ECF No. 46 ¶94.  The defendants contend that counts 7 and 8

should be dismissed because the communication would not have

been defamatory, or "highly offensive to a reasonable person,"

and count 7 should be dismissed because Ross has not alleged

that the information became public knowledge.  ECF No. 49-1 at

15-16.

In Maryland, to succeed on a claim for false light, the

plaintiff must show that: (1) the defendant "g[ave] publicity to

a matter concerning [the plaintiff] that place[d] the

[plaintiff] before the public in a false light," (2) the false

light "would be highly offensive to a reasonable person," and

---

[32] Because Ross and K.R. had no liberty or property interest in
their relationship at the time, and Ross had no interest in
continuing as a foster parent, the defendants could not have
breached any duty not to violate their due process rights based
on the removal.  Accordingly, her negligence claim based on that
theory fails.

(3) the defendant knew of or recklessly disregarded "the falsity of the publicized matter and the false light in which the [Plaintiff] would be placed." *Ostrzenski v. Seigel*, 177 F.3d 245, 252 (4th Cir. 1999) (internal citations omitted). A false light claim "may not stand unless the claim also meets the standards for defamation." *Crowley v. Fox Broad. Co.*, 851 F. Supp. 700, 704 (D. Md. 1994).

To recover for defamation in Maryland, a plaintiff must show, among other things, that the defendant made a defamatory statement about the plaintiff to a third person.[33] *Rosenberg v. Helinski*, 328 Md. 664, 675, 616 A.2d 866, 871 (1992). A statement is defamatory if it "tends to expose a person to public scorn, hatred, contempt or ridicule." *Id.* (labeling plaintiff "a child sex abuser" was defamatory). A statement that is "at most . . . merely offensive" is not defamatory. *Crowley*, 851 F. Supp. at 703-04. If the statement, taken alone, is ambiguous, the complaint must identify circumstances that make clear that the statement exposed the plaintiff to public scorn. *Gallardo v. FedEx Kinko's Office & Print Servs., Inc.*, No. 08-0392-JFM, 2008 WL 2143011, *6 (D. Md. May 12, 2008).

---

[33] The plaintiff must also show that the statement was false, the defendant was legally at fault in making the statement, and the plaintiff suffered harm. *Rosenberg v. Helinski*, 328 Md. 664, 675, 616 A.2d 866, 871 (1992).

31

Murray-Miller's statements that Ross had "unresolved issues" with CCDSS, and the State of Maryland did not think a private foster home license was appropriate, do not "tend[] to expose [Ross] to public scorn"[34] and would not be "highly offensive to a reasonable person."[35]  *Compare Crowley*, 851 F. Supp. at 703-04 (television broadcast suggesting that plaintiff was well-meaning but not a hero was not defamatory) *with Rosenberg*, 328 Md. at 675, 616 A.2d at 871 (calling plaintiff a "child sex abuser" was defamatory).  Ross has not alleged that Murray-Miller told The Arc that Ross abused or neglected her foster children--an accusation which might result in public scorn, *cf. Rosenberg*, 328 Md. at 675, 616 A.2d at 871--or that she was unfit as a foster parent.  That Ross had "unresolved issues" is so ambiguous that finding defamation would require the Court to "manufacture[]" defamatory meaning "from words not reasonably capable of sustaining such meaning."  *See Crowley*, 851 F. Supp. at 703 (*quoting White v. Fraternal Order of Police*, 909 F.2d 512, 519 (D.C. Cir. 1990)).  The defendants are entitled to summary judgment on counts 7 and 8.[36]

---

[34] *Rosenberg*, 328 Md. at 675, 616 A.2d at 871.

[35] *Ostrzenski*, 177 F.3d at 252.

[36] The defendants are also entitled to summary judgment on count 7 because the evidence is that Murray-Miller did not disclose the "ongoing issues" in such a way that they became public knowledge.  *Henderson v. Claire's Stores, Inc.*, 607 F. Supp. 2d

7.   Count 9: Breach of Contract

Count 9 alleges that "Murray-Miller, acting as an agent of
. . . MDDHR and the CCDSS foster care authority, communicated to
The Arc the false information, supplied to her by CCDSS," that
Ross had unresolved issues with CCDSS, breaching CCDSS's
settlement agreement with Ross, and the "Maryland Foster Parents
Bill of Rights."[37]   ECF No. 46 ¶¶113, 114, 116.   The defendants

---

725, 733 (D. Md. 2009).   The communication must "reach[], or
[be] sure to reach, the public."   Restatement (Second) of Torts,
§ 652D, cmt. a, *cited in Henderson*, 607 F. Supp. 2d at 733.
    The verified complaint alleges that Murray-Miller "communi-
cated to The Arc the false information," and "The Arc . . . is a
large, regional organization."   ECF No. 46 ¶¶94, 96.   Murray-
Miller--who, unlike Ross, personally knows to whom she
communicated the allegedly false information (the complaint
notes that this allegation was made on Ross's "information and
belief," not her personal knowledge.   ECF No. 46 ¶94)--submitted
an affidavit stating that she told one person, Dianne Ross, to
deny Ross's home study.   ECF No. 49-10 ¶5.   Ross has not
identified contrary evidence or filed a Rule 56(d) affidavit
seeking discovery.   As Ross lacks personal knowledge of the
recipient of Murray-Miller's communication, there is no real
dispute of fact: the evidence is that Murray-Miller communicated
the information to one person, not every member of The Arc.
There is also no dispute that Dianne Ross--the recipient of the
communication--also wrote the letter to Ross denying the home
study.   ECF No. 46-2.   Accordingly, there is no evidence that
the information was disclosed to anyone other than Dianne Ross;
it did not reach the public.   The defendants are entitled to
summary judgment.

[37] Ross has argued that she "clearly alleged that 'an agent of
the CCDSS' breached the agreement by disclosing the confidential
information, in breach of the contract."   ECF No. 54-1 at 26
(*quoting* ECF No. 46 ¶65).   However, paragraph 65 of the second
amended complaint requests injunctive and declaratory relief
under count 4, deprivation of Ross's substantive due process
rights; it does not mention "an agent of the CCDSS" or relate to
disclosure of confidential information.   ECF No. 46 ¶65.

33

contend that Murray-Miller was not a CCDSS agent, was not bound by the settlement agreement, and thus could not have breached it.  ECF No. 49 at 17.

To succeed on a breach of contract claim, the defendant must owe--and have breached--a contractual obligation to the plaintiff.  *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012).  Thus, if a defendant is not bound by a contract with the plaintiff, she cannot be liable for breach of contract.  *See id.*

The settlement agreement states that CCDSS will "make no negative statements regarding . . . Ross," and that the parties agreed to keep the terms of the settlement agreement confidential.  ECF No. 46-1.  The evidence is that: (1) in March 2010, Murray-Miller worked in Maryland's Office of Licensing and Monitoring in the Department of Human Resources, Social Services Administration division, and (2) the "unresolved issues" that Murray-Miller mentioned to Dianne Ross were "[Betsy] Ross's recent public criticism of CCDSS, largely through letters to the editor published in the local newspaper."[38]  ECF No. 49-10 ¶¶2, 5.

---

[38] The complaint is verified, and the allegations based on personal knowledge are treated as an affidavit, *Williams*, 952 F.2d at 823, but Ross's claim that Murray-Miller's communication was related to the settlement agreement is based "on information and belief," not personal knowledge, ECF No. 46 ¶114.  Therefore, the evidence in Murray-Miller's affidavit--which is based

Like the Department of Human Resources, CCDSS is a state agency within the Maryland Department of Human Services.  Md. Code Ann., Hum. Servs. § 3-201; Md. Code Ann., State Gov't § 12-101.  However, CCDSS, not the entire Department of Human Services, agreed to be bound by the settlement agreement.  *See* ECF No. 46-1.  As Murray-Miller was not an agent of CCDSS, the settlement agreement's "no negative statements" clause did not bind her, and she could not have breached the settlement agreement.[39]  *Polek*, 424 Md. at 362, 36 A.3d at 416.  As she disclosed Ross's public criticism of CCDSS, not the neglect investigation, ECF No. 49-10 ¶5, Ross has identified no facts showing that a CCDSS agent must have leaked confidential information to Murray-Miller.[40]

Ross has also alleged that the Maryland Foster Parents Bill of Rights was a contract between CCDSS and Ross.  ECF No. 46 ¶116.  The defendants contend that the Bill of Rights is not a contract and, if it is, they are entitled to sovereign immunity

---

on her personal knowledge of her employer and the conversation she had with Dianne Ross--is undisputed.

[39] Ross appears to concede this point in her opposition to the defendants' motion, stating that "an agent of the CCDSS" could have breached the agreement by disclosing confidential information--presumably to Murray-Miller.  ECF No. 54-1 at 26.

[40] *See Bouchat*, 346 F.3d at 525 (once defendants present evidence that there is no genuine dispute of material fact, party opposing the motion for summary judgment must identify specific facts showing there is a genuine issue).

because no state employee executed the contract.  ECF No. 49-1 at 17.  Ross abandoned her Bill of Rights contract claim when she did not respond to the defendants' argument.  *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (a party abandons her claim by failing to respond to an argument).

The defendants are entitled to summary judgment on the breach of contract claim.

8.   Timeliness of Federal Claims

Finally, the defendants contend that the federal claims against the defendants not sued in the original complaint must be dismissed as untimely because the original complaint would not have put the later-added defendants on notice that they might be sued, and the First Amended Complaint was filed beyond the limitations period for federal claims.  ECF No. 49-1 at 22.

Under Fed. R. Civ. P. 15(c)(1), an amendment to a pleading relates back to--and is treated, for timeliness purposes, as if it was filed on--the date of the original pleading if an amendment: (1) adds defendants and asserts a claim that arose out of the same conduct, transaction, or occurrence set out in the original pleading, (2) the new defendants received notice of the action such that they will not be prejudiced, and (3) knew or should have known that the action would have been brought against them, but for a mistake about the proper party's

identity.   "[R]elation back under Rule 15(c)(1)(C) depends on
what the party to be added knew or should have known, not on the
amending party's knowledge or its timeliness in seeking to amend
the pleading."   *Krupski v. Costa Crociere S. p. A.*, 130 S. Ct.
2485, 2490 (2010).

The original complaint states all the conduct alleged in
the second amended complaint, and gives fair notice to "agent[s]
of CCDSS" and the person who communicated with The Arc that they
were the alleged wrongdoers and may be sued in the action.   *See*
ECF No. 1 ¶¶ 8-87.[41]   The amendments relate back to the filing of
the original complaint, which the defendants concede was timely.
ECF No. 49-1 at 22.   Dismissal is not appropriate on this
ground.

B.   Ross's Motion for Summary Judgment on Count 10

Ross moves for summary judgment on Count 10 based on
Murray-Miller's statement that, because of Ross's "recent public
criticism of CCDSS,"[42] Murray-Miller told The Arc that issuing
Ross a foster home license was inappropriate.   ECF No. 54-1 at
26.   The complaint alleges that Murray-Miller violated Ross's

---

[41] *See Krupski*, 130 S. Ct. at 2495-96 (relation back was
appropriate when original complaint "made clear that [the
plaintiff] meant to sue the company that 'owned, operated,
managed, supervised and controlled the ship on which she was
injured").

[42] ECF No. 46-10 ¶5.

First Amendment rights by telling Dianne Ross at The Arc that Betsy Ross had "unresolved issues" that would prevent The Arc from licensing Betsy Ross.  ECF No. 46 ¶73.[43]

Ross is not entitled to summary judgment because there is a genuine dispute of material fact: based on the limited evidence before the court, it is not clear whether Murray-Miller's speech was coercive: she says that she "told" Dianne Ross, of The Arc, that a home study was "not . . . appropriate" for Betsy Ross. ECF No. 49-10 ¶5; *Suarez*, 202 F.3d at 687-88.  There is no evidence of Murray-Miller's exact words--whether she forbade The Arc from issuing a license or merely stated her opinion that a license was not a good idea--or, more importantly, her office's authority--if any--over The Arc's licensing decisions.[44]  Whether Murray-Miller's comment was coercive depends on those

---

[43] Count 10 does not discuss Murray-Miller or The Arc, but it alleges that the "[d]efendants' actions of . . . promulgating false, confidential, and damaging information against her were in retaliation against . . . Ross's expression of her opinion." ECF No. 46 ¶124.  The defendants have not challenged Ross's argument that count 10 encompasses Murray-Miller's acts.

[44] The Court will not rely solely on Murray-Miller's self-serving affidavit to grant summary judgment against Ross, for "it is impossible to weigh the credibility of witnesses based on their affidavits," and the Court "at summary judgment [does] not have . . . the benefit of cross examination to evaluate biases and to establish the ability of witnesses to observe what occurred." *Moore v. Morton*, 958 F.2d 368 (table), 1992 WL 46292, *4 n.3 (4th Cir. 1992).

circumstances; coerciveness is a question of fact not properly resolved on the ambiguous evidence before the Court.

III. Conclusion

For the reasons stated above, the defendants' motion to dismiss or for summary judgment will be granted in part and denied in part.  Ross's motion for summary judgment on count 10 will be denied.

_7/11/12_
Date

_____
William D. Quarles, Jr.
United States District Judge