IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

BETSY ROSS, *et al.*,                          *

        Plaintiffs,                   *

                        *

          v.              *                 CIVIL NO.: WDQ-11-0181

NICHOLAS RICCIUTI, *et al.*,                    *

        Defendants.                   *

                        *

*    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

Betsy Ross, for herself and as next friend of her minor daughter K.R., sued Nicholas Ricciuti and others[1] (collectively "the Defendants"), for constitutional violations and other claims.  Pending are the Defendants' motion for summary judgment on all the remaining claims, and the Plaintiffs' cross-motion for summary judgment on Count Ten.  No hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2011).  For the following reasons, the Defendants' motion for summary judgment will be granted in part and denied in part.  Ross's cross-motion for partial summary judgment will be denied.

---

[1] The Plaintiffs are suing Ricciuti and Barbara Siciliano in their official capacities.  *See* ECF No. 46 ¶¶ 3, 10.  Mary Klesius, Latonya Cotton, Rebecca Sutton, Kim Compton, Tina Linkous, Susan Bailey, and Helen Murray-Miller are being sued in their individual and official capacities.  *Id.* ¶¶ 4-9, 11.

I.   Background[2]

   A.   General Background

In 2008, Ross was a licensed Foster Care Parent through the
Cecil County Department of Social Services ("CCDSS"). *See* ECF
No. 94, Ex. A at 1.  Ross resided with her one biological child,
one adopted child, and five foster children. *See* ECF No. 94,
Ex. A at 8.  Ross was scheduled to adopt K.R., one of the foster
children. *See* ECF No. 94, Ex. A at 9.

   Ricciuti is the Director of CCDSS. *See* ECF No. 94, Ex N;
ECF No. 46 ¶ 3.  Mary Klesius is a social work supervisor at
CCDSS. *See* ECF No. 94, Ex. C at 6:16-20.  At the relevant time,
LaTonya Cotton was a Foster Care Coordinator for CCDSS. *See* ECF
No. 94, Ex. H at 6:20-8:19.  Rebecca Larson[3] was a Child
Protective Services ("CPS") assessor with CCDSS. *See* ECF No.
94, Ex. E at 27:3-8.  Kim Compton was a Foster Care Worker with
CCDSS. *See* ECF No. 94, Ex. A at 9.  Tina Linkous is a pre-
adoption coordinator with CCDSS. *See* ECF No. 94, Ex. B at 6:14-
7:2.  Susan Bailey was the Assistant Director of CCDSS. *See* ECF
No. 94, Ex. N.  Barbara Siciliano was the In-home Services
Administrator at CCDSS at the time, which involved supervision

---

[2] On cross-motions for summary judgment, "each motion [is]
considered individually, and the facts relevant to each [are]
viewed in the light most favorable to the non-movant." *Mellen
v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

[3] At the time, Rebecca Larson went by the name Rebecca Sutton.
*See* ECF No. 94, Ex. E at 6:14-15.

of CPS investigations.  *See* ECF No. 94, Ex. D at 7:15-10:14.
Helen Murray-Miller worked as a licensing coordinator at the
Office of Licensing and Monitoring in the Maryland Department of
Human Resources.  *See* ECF No. 94, Ex. P at 10:9-12:4.

    B.    Events on August 15, 2008

    Tina Linkous, a pre-adoption case worker with CCDSS,
testified that she conducted an interview with T.G., one of
Ross's former foster children, at the Pennsylvania home of
T.G.'s grandparents at 10:00 a.m. on August 15, 2008.  *See* ECF
No. 98, Ex. A.3; ECF No. 98, Ex. B at 155:17-156:20.  T.G. lived
at Ross's home from 2006 to October 2007.  ECF No. 94, Ex. A at
4.  Linkous's interview notes and testimony state that, during
the home visit, T.G. disclosed a number of incidents of neglect
by Ross, including occasions when young children were left in
the swimming pool unsupervised.  *See* ECF No. 94, Ex. A at 4-6;
ECF No. 98, Ex. A3; ECF No. 94, Ex. B at 39:16-41:12.  Linkous
testified that she left the home visit sometime after 11:30 a.m.
and spoke with Katie Horn, a CPS in-take worker, to report the
allegations of neglect over the phone.[4]

    Klesius testified that she then spoke with her supervisor,
Barbara Siciliano, and together they decided that Ross's foster

---

[4] *See* ECF No. 98, Ex. B at 163:20-22, 169:1-5; ECF No. 94, Ex. B
at 55:16-21; ECF No. 94.  Mary Klesius testified that Linkous
called her directly, and she transferred the call to Horn.  *See*
Ex. C at 51:11-52:11.

children should be removed pending the CPS investigation. *See*
ECF No. 94, Ex. C at 46:1-4. At around 12:30 p.m., Rebecca
Larson, a CPS assessor, was assigned to conduct a CPS
investigation. *See* ECF No. 94, Ex. A at 8; ECF No. 94, Ex. E at
27:1-8. Ross testified that around 1:30 p.m. she arrived at the
CCDSS office for a previously-scheduled meeting about the
nominations of officers for the Cecil County Foster Parent
Association (the "Foster Parent Association"). *See* ECF No. 94,
Ex. F at 8:9-12, 21:1-10. After Ross arrived, Klesius and
Larson met with her to discuss the CPS investigation of the
neglect allegations. *See* ECF No. 94, Ex. F at 21:12-23:17; ECF
No. 94, Ex. A at 8.

Ross testified, that in the meeting, Larson informed her
that T.G. had come to the CCDSS offices to make the allegations.
*See* ECF No. 94, Ex. F at 23:7-24:12. Ross testified:

> She said, when we set down in the room she said that
> [T.G.] had come to Social Services that morning and
> made allegations against -- well, I am sorry, she did
> not say [T.G.]. She said that allegations had come in
> that morning in reference to, you know, a former child
> that I had in foster care.

ECF No. 94, Ex. F at 23:9-15. Ross continued:

> I said, so are telling me [T.G.] came here today and
> she said, yes, [T.G.] was here. And she went onto say
> that there are serious safety concerns in your home.
> We are going to have to remove your children. I mean,
> I was just in disbelief. And I kept questioning her,
> 'you are telling me that [T.G.] was here today?' 'Yes,
> [T.G.] was here today. I did not see her but, yes,
> she was here.'

ECF No. 94, Ex. F at 23:20-24:9.  Larson informed Ross that all
the foster children in her home would be moved to another foster
care home.  *See* ECF No. 94, Ex. A at 8; ECF No. 94, Ex. E at
47:12-18; ECF No. 94, Ex. F at 24:2-4.  Larson asked Ross when
she could have the children ready to be picked up by CCDSS.  *See*
ECF No. 94, Ex. F at 24:15-17; ECF No. 94, Ex. E at 47:15-18;
ECF No. 94, Ex. A at 8.  Ross testified that she told Larson the
children would be ready to be picked up "in a couple hours."
ECF No. 94, Ex. F at 25:3-7.  The CPS investigations records
state "Ms. Ross agreed to allow Ms. [Larson] to come to her home
in one hour and pick up the children."  ECF No. 94, Ex. A at 8.

     At around 4:00 p.m., Larson, Kim Compton, and Latonya
Cotton arrived at Ross's house.  ECF No. 94, Ex. F at 27:2-10.
One of the women opened the storm door and knocked on Ross's
front door.  *See* ECF No. 94, Ex. F at 28:6-15.  Ross testified
that "I am not sure who opened the door for them," and that
"[m]y daughter was there and she had two friends there."  ECF
No. 94, Ex. F at 29:3-16.  Ross testified:  "They came in and
said, you know, 'do you have the kids ready?'  You know, they
are as ready as they are going to be at this point."  ECF No.
94, Ex. F at 29:19-30:1.  The children either packed their own
things or Ross's teenage daughter packed the children's things.
ECF No. 94, Ex. F at 30:6-9.  Ross declined to carry K.R. to the

car.  ECF No. 94, Ex. F at 30:6-16.  The foster children were removed from Ross's home and placed in other licensed foster homes.  *See* ECF No. 94, Ex. A at 9.

C.    Testimony of Karen Edwards

On December 4, 2009, Karen Edwards, a foster parent familiar with Ross testified during a Department of Human Resources administrative hearing.  ECF No. 98, Ex. B at 257-79. Edwards testified that T.G. "had a humongous problem with adults, I guess, in general, and she was a chronic liar."  ECF No. 98, Ex. B at 260:23-24.  Edwards testified that she received a call from CCDSS on August 15, 2008 before 10:00 a.m. asking if she could take in three foster children who were being removed from another foster home.  ECF No. 98, Ex. B at 262:4-13, 263:6-22.  Edwards said she was unable to take in the children.  ECF No. 98, Ex. B at 262:14-22.  During the call, CCDSS did not tell Edwards from which foster parent the children were being removed.  ECF No. 98, Ex. B at 263:8-11.  Edwards further testified:  "Q.  And did you have occasion to learn whose three children these were?  A.  I found out that very afternoon.  Q. And whose were they?  A.  Betsy [Ross]'s."  ECF No. 98, Ex. B at 262:23-263:2.  Edwards testified about how she learned they were Betsy's children:

> Q.   Whether or not you knew that these were Betsy
>      Ross' children and you said at first you thought
>      it was an older couple.

6

> A.  Yes.
> Q.  But then you came to believe that -- you stated
>     earlier that these were actually Betsy Ross'
>     children.
> A.  Yeah.
> Q.  And there were certain DSS or CPS agents that
>     informed you of that, correct?
> A.  That was later.  I found out from DSS agents
>     later that it was Betsy's children.  I found out
>     that afternoon from Dr. Clifford and Betsy
>     herself that they were her children.

ECF No. 98, Ex. B at 277:13-25.  Edwards was asked to clarify

her discussion with the CCDSS agents:

> Q.  I thought your testimony was Sara Ellis and Jen
> Crooks told you about the pool incident.
> A.  They did later, not that day.
> Q.  So, did they tell you that they or someone they
> knew called you at 10:00 in the morning to take Betsy
> Ross' children?
> A.  No, they --

ECF No. 98, Ex. B at 278:9-15.  Edwards was permitted to finish

her statement:

> They talked to me a couple days later and told me that
> Betsy's children were taken and it's because of an
> incident with the pool and the unsafe conditions at
> her home, and then they started talking about my pool
> and that I needed to make sure I was within guidelines
> and that was going to be checked and they went over
> all the guidelines with me and everything was fine.
> But they made a point in telling me why her children
> were taken and that her children were taken.

ECF No. 98, Ex. B at 278:24-279:7.

D.   Foster Parent Association Funds

In December 2007, at a Christmas party Ross had a

conversation with Klesius and others about her reactivating the

Foster Parent Association.  *See* ECF No. 94, Ex. F at 11:11-13-

7

14.    Representatives from the Maryland State Foster Parent Association came to meetings in March, April, and May 2008 to assist in restarting the Cecil County Foster Parent Association. *See* ECF No. 94, Ex. F at 14:3-15:2.  In the May 2008 meeting, they set September 8, 2008 as the date for the Foster Parent Association elections.  *See* ECF No. 94, Ex. F at 15:3-13. During some of these meetings, Ross and others asked Klesius and Rose Caprotti, another CCDSS employee, for the Foster Parent Association's bank account information.  *See* ECF No. 94, Ex. F at 16:9-17.  Klesius informed Ross that Doris Asti, the Foster Parent Association's former Treasurer, had the information, and that either Klesius or Caprotti would get it from Asti "because Doris traveled a lot."  ECF No. 94, Ex. F at 16:9-18:18.

Ross called a representative from the State Association who suggested that Ross contact Asti directly about the bank account information.  *See* ECF No. 94, Ex. F at 33:10-34:8.  At the end of June 2008, Ross went to Asti's home to get the account information.  *See* ECF No. 94, Ex. F at 32:13-15.  Ross testified that Asti stated at the time that "most of the money in this account belongs to social services.  They use this account to hide money from the state."  ECF No. 94, Ex. F at 32:5-15.  Soon after receiving a check and account information from Asti, Ross went to the bank to inquire about the account balance, but the bank would not give her that information.  *See* ECF No. 94, Ex. F

8

at 37:3-8.  Asti was the only person named on the account.  *See*
ECF No. 94, Ex. F at 37:3-6.  After the Foster Parent
Association elections in September 2008, Ross and the other
officers opened a new Association bank account.  *See* ECF No. 94,
Ex. F at 37:16-21; 34:18-36-2.

In July 2008, Ross reported the information she had heard
from Asti to Michelle Burnette, President of the Maryland State
Foster Parent Association.  *See* ECF No. 98, Ex. M ¶¶ 5-6; ECF
No. 98, Ex. N ¶¶ 8-12.  Ross "raised questions and concerns
about who was in control of the money in the bank account at
[the Association], and that the Treasurer had told her that
CCDSS funds were being placed in the account."  ECF No. 94, Ex.
N ¶ 9.  Burnette informed her that the newly hired State Foster
Care Ombudsman, John Bertulis, would look into the matter in
September.  *See* ECF No. 98, Ex. M ¶ 6; ECF No. 98, Ex. N. ¶¶ 6-
12.  Burnette referred the matter to Bertulis.  *See* ECF No. 98,
Ex. N ¶¶ 10-11.  In his affidavit, Bertulis states that on
August 27, 2008 he became the Foster Parent Ombudsman for the
Maryland Department of Human Resources.  *See* ECF No. 94, Ex. I ¶
2.  On September 5, 2008, he "received a complaint from Betsy
Ross alleging that [CCDSS] had misappropriated funds that the
Maryland State Foster Parent Association intended for the Cecil
County Foster Parent Association."  ECF No. 94, Ex. I ¶ 3.  On
September 29, 2009, Bertulis concluded his investigation and

determined that there had been no impropriety or mismanagement of funds. *See* ECF No. 94, Ex. I ¶ 5.

E.   Foster Home Closure

The interviews of Ross's foster children during the CPS investigation confirmed incidents of lack of supervision; however, because "the nature and extent of being left unsupervised varied among their disclosures" child neglect could neither be indicated nor ruled out. *See* ECF No. 94, Ex. A at 1. On September 17, 2008, CPS issued a Child Neglect Report following the CPS investigation of Ross, finding that the neglect was Unsubstantiated. *See* ECF No. 94, Ex. A at 1.  Ross appealed CPS's unsubstantiated finding. *See* ECF No. 94, Ex. M at 4.  On September 26, 2008, K.R. was returned to Ross and her adoption was finalized on October 15, 2008.  ECF No. 94, Ex. M at 4.  In October 2008, Linkous recommended that Ross's foster home be closed. *See* ECF No. 94, Ex. B at 70:7-71:15.  Larson also recommended that the foster home be closed. *See* ECF No. 94, Ex. E at 116:3-18.  On November 13, 2008, Klesius made the recommendation that Ross's foster home be closed based on numerous violations of the Resource Parent Agreement discovered during the CPS investigation, including inappropriate boundaries with birth families, threats of corporal punishment, and lack of supervision. *See* ECF No. 94, Ex. L at 1.

Between March 5, 2009 and June 2, 2009, Cotton conducted an annual reconsideration of Ross's foster care approval. *See* ECF No. 94, Ex. M.  Cotton's re-evaluation report recommended that Ross's foster home should not be re-licensed, and the foster home should be closed. *See* ECF No. 94, Ex. M at 6.  The re-evaluation provided a number of bases for this recommendation, including that Ross "blatantly and purposely broke foster care rules and regulations;" "displayed inappropriate boundaries with birth families and an inability to set boundaries with her own children;" and "was dishonest with the local Department in regards to individuals who had a regular presence in her home." ECF No. 94, Ex. M at 6.  The re-evaluation also noted the potential dangers of Ross's lack of supervision, Ross's "lackadaisical" parenting style, and concluded that Ross "has shown poor judgment and lacks the expected knowledge and skill level of an experienced licensed foster parent."  ECF No. 94, Ex. M at 6-7.

On July 2, 2009, Ricciuti approved the denial of re-licensing and the official closing of Ross's foster home. *See* ECF No. 94, Ex. N.  Ross also appealed this decision and on January 21, 2010, Ross and CCDSS reached an agreement settling both pending appeals. *See* ECF No. 94, Exs. J, O.  Ross agreed to voluntarily surrender her CCDSS foster care license, and withdrew her requests for appeal. *See* ECF No. 94, Exs. J, O.

11

CCDSS agreed to change the unsubstantiated neglect finding to a "ruled out" finding, and to make no negative statements about Ross. *See* ECF No. 94, Exs. J, O.

F.   Arc Foster Home Application

In early 2010, Ross applied to be a foster parent through The Arc, a private foster care provider. *See* ECF No. 94, Ex. F at 129:16-132:19. On March 16, 2010, The Arc sent Ross a letter stating that "we have decided not to continue the certification process." ECF No. 94, Ex. R at 1. The letter explained The Arc's decision by emphasizing that its main consideration is serving the children in its care, which requires a partnership with CCDSS:

> With that focus in mind we are concerned about your ongoing willingness and interest in making this a public discussion. We need to maintain a positive relationship with DSS and protect the privacy of foster children in our custody. We cannot risk knowingly placing them in the midst of such a contentious and unresolved situation that has become a public forum. We respect your desire to resolve the discrimination that you felt and the concerns you have with DSS. However, to place a child in the middle of this public fray would not be in the best interest of that child and would not make us as an agency responsible caretakers.

ECF No. 94, Ex. R at 1. An official from The Arc, Diane Ross, contacted Helen Murray-Miller, a license coordinator at the Department of Human Resources after Ross requested an appeal of The Arc's decision. *See* ECF No. 94, Ex. P at 27:6-29:6. Murray-Miller's role as a license coordinator was to make sure

that agencies were following regulations. *See* ECF No. 94, Ex. P at 13:8-21. Murray-Miller testified that Diane Ross informed her about the circumstances of Betsy Ross's foster home application, and Murray-Miller requested all The Arc's documentation associated with the case "because what they were doing didn't seem like it was coinciding with COMAR [regulations] as far as the Appeal." *See* ECF No. 98, Ex. K at 29:12-30-21. The Arc provided Murray-Miller with documents and communications about Betsy Ross's case, including three letters to the editor -- in a local publication -- written by Betsy Ross that were critical of CCDSS. *See* ECF No. 94, Ex. P at 30:13-32-16; ECF No. 94, Ex. Q. The letters were published between December 2009 and March 2010. *See* ECF No. 98, Ex. L ¶ 24.

Murray-Miller testified that she informed Diane Ross that The Arc could not prohibit Betsy Ross from proceeding with the home study process:

> I told her that she could not do that. There was no reason why this person should not have been able to continue on with the home study. And although there was, you know, other issues she was dealing with, she still should have been able to have that opportunity. So I told her that she needed to write a letter basically saying that she should be allowed to do a home study with The Arc.

ECF No. 94, Ex. P at 63:8-64:2. In an email to Diane Ross at The Arc about Betsy Ross's application, Murray-Miller stated: "When den[y]ing an applicant make sure your denial is based in

13

COMAR [regulations].  Ms. Ross situation did not have any COMAR

[regulation] reasons for denial.  Place the home study on hold

until the Cecil County issue is resolved."  ECF No. 98, at K13.

On March 18, 2010, The Arc sent Betsy Ross another letter,

approved by Murray-Miller:

> Following consultation with our licensing monitor from
> Department of Human Resources I am further clarifying
> our position with regard to your ongoing relationship
> with The Arc Northern Chesapeake Region and its
> Treatment Foster Care program.  The unresolved and
> high profile nature of your current situation with
> several entities determines that it is not a good time
> to proceed with a home study.  Once your issues with
> Cecil County Department of Social Services are
> resolved to our mutual satisfaction you are welcome to
> contact our trainer/recruiter Kathy Pitrat and attend
> the next available training class for prospective
> foster parents.  At this point you may proceed with
> the home study process.

ECF No. 94, Ex. S; ECF No. 94, Ex. P at 103:11-104:15.  Murray-

Miller did not have contact with CCDSS about Betsy Ross.  *See*

ECF No. 94, Ex. P at 121:11-18.  Murray-Miller testified that

"[a]ll the information I got was from the Arc."  ECF No. 94, Ex.

P at 121:17-18.  Ross has not reapplied to be a foster parent at

The Arc, and has not applied to any other private provider to be

a foster parent.  *See* ECF No. 94, Ex. F at 129:21-130:11,

132:13-16.

    G.   Procedural History

    On January 21, 2011, Ross sued CCDSS, Ricciuti in his

official capacity, and Klesius in her individual and official

capacities for violations of her Fourth Amendment rights and

other claims.  ECF No. 1.  On August 25, 2011, Ross filed an

amended complaint against Klesius, Ricciuti, Cotton, Sutton,

Compton, Linkous, Susan Bailey, Siciliano, and Murray-Miller

(collectively "the Defendants").  ECF No. 19.  On January 31,

2012, the Court granted Ross's motion to file a second amended

complaint.  ECF No. 44.  On January 31, 2012, Ross filed a

second amended complaint.[5]  On February 21, 2012, the Defendants

moved to dismiss the second amended complaint, or in the

alternative, for summary judgment.  ECF No. 49.  On March 19,

2012, Ross opposed the Defendants' motion and moved for partial

summary judgment.  ECF No. 54.  On July 12, 2012, the Court

---

[5] Ross's second amended complaint seeks injunctive and
declaratory relief from the Defendants in their official
capacities, and money damages from the Defendants in their
official capacities.  The second amended complaint asserts the
following claims:

- Relief Under Act of Congress 42 U.S.C. § 1983 (Count One)
- Violation of the Fourth Amendment (Count Two)
- Violation of the Fourteenth Amendment and Article 24 of the
  Maryland Constitution, Procedural Due Process (Count
  Three); Substantive Due Process (Count Four);
- Breach of Confidence (Count Five);
- Negligence (Count Six);
- False Light (Count Seven);
- Defamation (Count Eight);
- Breach of Contract (Count Nine);
- Violation of the First Amendment (Count Ten).

ECF No. 46.  Count One states the cause of action through which
Ross brings Counts Two through Four, and Count Ten.  It is not
an independent claim.

granted the Defendants' motion to dismiss Counts Three, Four,
and Five; denied the Defendants' motion to dismiss Counts Two,
Six, and Ten; granted the Defendants' motion for summary
judgment for Counts Seven, Eight, and Nine; and denied Ross's
cross-motion for summary judgment.  ECF Nos. 57, 58.

On October 22, 2013, the Defendants moved for summary
judgment on the remaining claims:  Counts Two, Six, and Ten.
ECF No. 92.  On November 22, 2013, Ross filed an opposition to
the Defendants' motion and a cross-motion for partial summary
judgment on Count Ten.  ECF No. 97.  On December 16, 2013, the
Defendants replied.  ECF No. 106.

II.  Analysis

A.  Legal Standard

The Court "shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).[6]  In considering the motion, the judge's function
is "not . . . to weigh the evidence and determine the truth of
the matter but to determine whether there is a genuine issue for
trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249
(1986).  A dispute about a material fact is genuine "if the

---

[6] Rule 56(a), which "carries forward the summary-judgment stan-
dard expressed in former subdivision (c)," changed "genuine
'issue' [to] genuine 'dispute,'" and restored the word "'shall'
. . . to express the direction to grant summary judgment."  Fed.
R. Civ. P. 56 advisory committee's note.

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

When cross-motions for summary judgment are filed, "each motion must be considered individually, and the facts relevant to each must be reviewed in the light most favorable to the nonmovant." *Mellen*, 327 F.3d at 363 (*citing Rossignol v. Voohaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

    B.    The Defendants' Motion for Summary Judgment

        1.    Eleventh Amendment Immunity

The Defendants argue that they are immune from suit in their official capacities under the Eleventh Amendment. *See* ECF No. 92-1 at 22. The Eleventh Amendment bars federal suits by private citizens against an unconsenting State. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). A suit against state personnel acting in their official capacities

17

is a suit against the State. *See Weller v. Dep't of Social Servs. for City of Baltimore*, 901 F.2d 387, 398 (4th Cir. 1990). In Maryland, county department of social services employees are state personnel. *See* Md. Code Ann., State Gov't § 12-101(a)(7); *Keller v. Prince George's Cnty.*, 923 F.2d 30, 32 (4th Cir. 1991). Although Maryland has waived immunity for certain actions brought in state court under the Maryland Torts Claims Act, it has not waived its immunity under the Eleventh Amendment for suits in federal court. *See Weller*, 901 F.2d at 397-98.

There are several exceptions to the Eleventh Amendment bar. *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 107 n.13 (4th Cir. 2011). Relevant here, the U.S. Supreme Court has held that the Amendment does not prevent private individuals from bringing suit against State officials for prospective or declaratory relief for ongoing violations of federal law.[7]

Here, Ross has alleged that the Defendants are committing ongoing constitutional violations by preventing her from operating a foster home and placing her Arc application on hold indefinitely. *See* ECF No. 97-1 at 25. "[T]o fall within the *Ex*

---

[7] *See Ex parte Young*, 209 U.S. 123 (1908); *Litman v. George Mason Univ.*, 186 F.3d 544, 549-50 (4th Cir. 1999); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (a court examining the *Ex parte Young* doctrine must conduct "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" (alteration in original) (internal quotation marks omitted)).

*parte Young* exception, it is sufficient for Plaintiffs' suit to *allege* an ongoing violation of federal law; actually *proving* such an ongoing violation is unnecessary." *D.T.M. ex rel. McCartney v. Cansler*, 382 F. App'x 334, 337-38 (4th Cir. 2010) (emphasis in original) (unpublished).  She also seeks prospective relief by requesting that the Defendants be enjoined "from continuing their unconstitutional actions and enforcing their unconstitutional policies." *See* ECF No. 46 at 18. Because Ross has alleged an ongoing violation of federal law and requests prospective relief, the claims against the Defendants in their official capacities are not barred by the Eleventh Amendment.

> 2.   Section 1983 Claims

Section 1983 provides a remedy against any person who, acting under color of law, deprives another of constitutional rights.  42 U.S.C. § 1983.  The Defendants argue that they are entitled to qualified immunity on Ross's § 1983 claims.  *See* ECF No. 92-1 at 15, 21.

Government officials performing discretionary functions are shielded from liability for civil monetary damages under § 1983 when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).

19

Determining whether an official is entitled to qualified immunity is a two-part inquiry, the Court must decide:  (1) whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time of the alleged misconduct.  *Pearson*, 555 U.S. at 232.  When the defendant asserts qualified immunity, the plaintiff bears the burden of showing that a constitutional violation occurred. *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007).  The defendant bears the burden of proof on whether a constitutional right was clearly established at the time of the alleged violation.  *Purnell*, 501 F.3d at 378.

There are three ways in which law becomes clearly established in Maryland: (1) an authoritative decision by the United States Supreme Court; (2) an authoritative decision by the Fourth Circuit Court of Appeals; or (3) an authoritative decision by the Court of Appeals of Maryland. *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998).  A constitutional right is clearly established "when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006) (internal citation and quotation marks omitted).

The Fourth Circuit has emphasized "the importance of resolving the question of qualified immunity at the summary judgment stage rather than at trial." *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003). Wilson recognizes, however, that "the qualified immunity question can . . . at times require factual determinations respecting disputed aspects of a defendant's conduct." *Id.* (*quoting Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992) (internal quotations and punctuation omitted)). "The importance of summary judgment in qualified immunity cases does not mean . . . that summary judgment doctrine is to be skewed from its ordinary operation to give substantive favor to the defense, important as may be its early establishment." *Id.*

    i. First Amendment Claim (Count Ten)

To prevail on her claim for First Amendment retaliation, Ross must show that:  (1) she engaged in constitutionally protected speech; (2) the Defendants engaged in a retaliatory action which adversely affected her protected speech right; and (3) there is a causal relationship between her protected speech and the Defendants' actions. *See Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).

    a. Initial Removal of the Foster Children

Ross alleges that the Defendants removed her foster children and closed her foster home in retaliation for her

complaints about the Foster Parent Association's finances. *See*
ECF No. 46 ¶¶ 124-26; No. 97-1 at 24. Ross's complaints about
CCDSS's mismanagement of funds and her general criticisms of
CCDSS are protected speech. *See Trulock v. Freeh*, 275 F.3d 391,
404 (4th Cir. 2001) (holding that plaintiff's article
criticizing the government and government officials was
protected speech). Because the removal of Ross's foster
children and the closure of her foster home would tend to chill
a reasonable person's exercise of First Amendment rights, such
conduct is an adverse action. *See Constantine* v. *Rectors &
Visitors of George Mason Univ.*, 411 F.3d 474, 500-01 (holding
that the university's conduct in giving a student minimal notice
to re-take an exam and pre-determining that she would receive a
failing grade was adverse action).

To satisfy the third element of a First Amendment
retaliation claim, the plaintiff must show a causal relationship
between the protected speech and the adverse action. *See Huang
v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th
Cir. 1990). To survive summary judgment, a plaintiff "must have
evidence from which a reasonable factfinder could conclude that
a causal connection exists between the protected activity and
the adverse action." *See Dowe v. Total Action Against Poverty
in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). "In order
to establish this causal connection, a plaintiff in a

22

retaliation case must show, at the very least, that the
defendant was aware of her engaging in protected activity."
*Constantine*, 411 F.3d at 501.  Knowledge of the protected
activity is "absolutely necessary" to establish a causal
relationship.  *See Dowe*, 145 F.3d at 657.  However,
"[k]nowledge alone, however, does not establish a causal
connection between the protected activity and the adverse
action."  *Constantine v. Rectors & Visitors of George Mason
Univ.*, 411 F.3d 474, 501 (4th Cir. 2005).  "There also must be
some degree of temporal proximity to suggest a causal
connection."  *Id.*

Here, there is a material dispute of fact whether the
Defendants had knowledge of her complaints before the removal of
her foster children.  In June 2008, Ross informed Burnette, a
state foster parent association officer, of her concerns about
CCDSS's use of the Association's funds, and Burnette referred
the issue to Bertulis.  *See* ECF No. 98, Ex. M ¶¶ 5-6; ECF No.
98, Ex. N ¶¶ 8-12.  Bertulis became Foster Parent Ombudsman and
met with Ross about her complaints after her children were
removed on August 15, 2008.  *See* ECF No. 94, Ex. I ¶¶ 2-3.
Before the removal of Ross's foster children, Ross and others
asked Klesius for the Association's account information during
meetings in March, April, and May 2008 in order to restart the
Association.  *See* ECF No. 94, Ex. F at 16:9-18.  Klesius

informed Ross that Asti, the former Association treasurer, had
the information. *See* ECF No. 94, Ex. F at 16:9-18.  Based on
these inquires, a reasonable jury could infer that the
Defendants were aware of Ross's complaints about the
mismanagement of funds or criticism of CCDSS before August 15,
2008 when the foster children were initially removed.

Additional evidence also lends support to Ross's argument
that the neglect allegations were pretextual.  Larson, the CPS
investigator, told Ross that T.G. reported the neglect at the
CCDSS office, although she did not see her, rather than that
T.G. reported neglect during a home visit.[8]  Also, Edwards,
another foster parent testified that she received a morning call
from CCDSS requesting that she take in three foster children,
and there is a dispute as to whether she was later told by CCDSS
agents that the call related to Ross's foster children.  *See* ECF
No. 98, Ex. B at 277:13-25; 278:9-15; 278:24-279:7.  This
evidence creates a reasonable inference that the allegations
were manufactured by CCDSS as retaliation.

There also exists a temporal proximity between the
protected activity and the alleged adverse actions.  Ross made
inquiries into the Association's account information in the
spring of 2008, and she informed Burnette of her concerns in

_____

[8] *See* ECF No. 94, Ex. F at 23:9-24:9.

June 2008.  *See* ECF No. 94, Ex. F at 16:9-18; ECF No. 98, Ex. M
¶¶ 5-6; ECF No. 98, Ex. N ¶¶ 8-12.  Ross's foster children were
removed from her home on August 15, 2008, less than two months
later.  *See* ECF No. 94, Ex. A at 8; ECF No. 94, Ex. E at 47:12-
18; ECF No. 94, Ex. F at 24:2-4.  Accordingly, Ross has
presented evidence from which a reasonable factfinder could
infer a causal connection between her protected activity and the
initial removal of her foster children.  Taken together, these
facts raise a reasonable inference that the initial removal of
the foster children was in retaliation for Ross's criticism of
CCDSS.

In determining whether government officials are entitled to
qualified immunity, the constitutional right that was allegedly
violated must also be clearly established.  *See Pearson*, 555
U.S. at 232.  Generally, the First Amendment's bar on
retaliation for protected speech "has long been clearly
established."  *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998).
However, "[t]he contours of the right must be sufficiently clear
that a reasonable official would understand that what he is
doing violates that right."  *Anderson v. Creighton*, 483 U.S.
635, 640 (1987).  "[T]he unlawfulness must be apparent in light
of pre-existing law."  *Trulock*, 275 F.3d at 400.

Here, the law is well established that a public official
cannot take adverse action against an individual for voicing

criticism.  *See Trulock*, 275 F.3d at 405-06.  A reasonable
official would have known that retaliation for Ross's statements
was impermissible.  The Defendants have not asserted that Ross's
First Amendment protection against retaliation was not clearly
established.  Accordingly, the Defendants are not entitled to
qualified immunity for this retaliation claim.[9]  Because Ross has
demonstrated a material dispute of fact, summary judgment on
Ross's First Amendment retaliation claim based on the initial
removal of her foster children will be denied.

    b. Closure of the Foster Home

  However, Ross has failed to show causation with respect to
CCDSS's decision to close Ross's foster care home.  "The
causation requirement is rigorous; it is not enough that the
protected expression played a role or was a motivating factor in
the retaliation; claimant must show that 'but for' the protected
expression [the defendant] would not have taken the alleged
retaliatory action."  *Huang*, 902 F.2d at 1140; *Tobey v. Jones*,
706 F.3d 379, 390 (quoting *Huang* and noting that 'but for'
causation is required when considering a motion for summary
judgment).  The record shows that the decision to close Ross's
foster home was made for a variety of reasons unrelated to
Ross's complaints about CCDSS's finances.  Klesius recommended

---

[9] When the plaintiff demonstrates that a constitutional right has
been violated, the defendant must demonstrate his entitlement to
qualified immunity.  *Purnell*, 501 F.3d at 378.

closure based on the violations uncovered by the CPS investigation, including inappropriate boundaries with birth families, threats of corporal punishment, and lack of supervision. *See* ECF No. 94, Ex. L at 1. These findings are supported by the CPS investigation records. *See* ECF No. 94, Ex. A. CCDSS's re-evaluation report recommended that Ross's home be officially closed based on Ross's violation of rules, lack of supervision, and poor judgment, among other reasons. *See* ECF No. 94, Ex. M at 6-7. Based on these findings, a jury could not reasonably find that Ross's criticisms of CCDSS's finances were the "but for" cause of CCDSS's decision to close her foster home. Accordingly, the Defendants' motion for summary judgment on Ross's retaliation claim related to the closure of her foster home will be granted.

         c.    The Arc's Denial of Ross's Application

Ross argues that Murray-Miller also violated her First Amendment rights by "instructing The Arc to indefinitely deny" her application to be an Arc foster parent based on her letters to the editor expressing dissatisfaction with CCDSS. *See* ECF No. 97-1 at 22. Ross wrote letters to the editor for a local publication criticizing the CCDSS, and Murray-Miller reviewed the letters when providing licensing advice to The Arc. *See* ECF No. 94, Ex. P at 30:13-32-16; ECF No. 94, Ex. Q. "[P]ublic criticism of governmental policy, government operations, and

government officials is at the very core of the constitutionally protected free speech area." *Bradley v. Computer Sciences Corp.*, 643 F.2d 1029, 1033 (4th Cir. 1981) (internal quotation marks and citations omitted).

The Defendants argue that Ross's retaliation claim fails because she did not demonstrate that she had been adversely affected. *See* ECF No. 92-1 at 20.  The court's determination of "whether a plaintiff's First Amendment rights were adversely affected by the retaliatory conduct is a fact intensive inquiry." *Suarez*, 202 F.3d at 686.  "[T]he nature of the retaliatory acts impacts whether those acts are actionable when a private citizen is the speaker and a public official is the retaliator." *Id.*

Here, Murray-Miller advised, that given the ongoing issues with CCDSS, The Arc could place the home stay process on hold. *See* ECF No. 98, at K13; ECF No. 94, Ex. P at 63:8-64:2; ECF No. 94, Ex. S.  There is a dispute of fact whether Murray-Miller's actions caused The Arc to indefinitely place the process on hold. *See* ECF No. 94, Ex. S.  Ross has also demonstrated causation.  There is evidence from which a jury could reasonably conclude that Murray-Miller's advice was the direct and "but for" cause of The Arc's decision to place Ross's home stay process on hold indefinitely.  As discussed above, Ross's First Amendment right against retaliation for her criticism of CCDSS

28

was clearly established.  Accordingly, Murray-Miller is not
entitled to qualified immunity.  The Defendants' motion for
summary judgment on Count Ten as to her application with The Arc
will be denied.

ii.   Fourth Amendment Claim (Count Two)

Ross argues that her Fourth Amendment rights were violated
when the Defendants entered her home "without valid consent, a
warrant, exigent circumstances, or probable cause that the
children were in immediate danger of serious injury, and removed
the children."  ECF No. 46 ¶ 47.  The Defendants contend that
they did not violate the Fourth Amendment because Ross consented
to the entry of her home, and alternatively, the Defendants
acted reasonably in entering Ross's home to remove the foster
children.  ECF No. 92-1 at 11-13.

The Fourth Amendment prohibits unreasonable searches and
seizures.  *See* U.S. Const. Amend. IV.  Fourth Amendment
protections apply when the government is conducting civil, as
well as criminal, investigations.  *See Marshall v. Barlow's,
Inc.*, 436 U.S. 307, 312 (1978).  However, the Fourth Circuit has
held that "investigative home visits by social workers are not
subject to the same scrutiny as searches in the criminal
context."  *Wildauer v. Frederick Cnty.*, 993 F.2d 369, 372 (4th
Cir. 1993).  In *Wildauer*, the Fourth Circuit also held that,
although officers executing a criminal search might be required

29

to disclose that the search could be refused, "the non-criminal
nature of this visit makes such disclosure unnecessary."
*Wildauer*, 993 F.2d at 372.  Voluntary consent is an exception to
the Fourth Amendment's general prohibition on warrantless
searches of a home. *See U.S. v. Hylton*, 349 F.3d 781, 785 (4th
Cir. 2003).  "Consent may be inferred from actions as well as
words." *Hylton*, 349 F.3d at 786.  In determining whether
consent was freely and voluntarily given, the Court must
consider the totality of the circumstances. *See U.S. v.
Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996).

Here, CCDSS had legal custody of the foster children in
Ross's care. *See Ross v. CCDSS*, 878 F. Supp. 2d 606, 619; Md.
Code Ann., Fam. Law §§ 5-504, 5-325(a)(3), (b)(1).  Earlier on
August 15, 2008, Ross had discussed the removal of her foster
children with Larson, a CCDSS employee. *See* ECF No. 94, Ex. A
at 8; ECF No. 94, Ex. E at 47:12-18; ECF No. 94, Ex. F at 24:2-
4.  Ross agreed to have the children ready to be picked up by
CCDSS later that day at her home. *See* ECF No. 94, Ex. F at
24:15-17, 25:3-7, ECF No. 94, Ex. E at 47:15-18; ECF No. 94, Ex.
A at 8.  When Larson and two other CCDSS employees arrived at
Ross's home that afternoon, they knocked and entered the home.
*See* ECF No. 94, Ex. F at 28:6-15, 29:19-30:1.  It is not clear
from the record who in the home, if anyone, opened the door.
ECF No. 94, Ex. F at 29:3-16.  Ross was present when the CCDSS

employees entered her home, and stated that the children were "as ready as they are going to be at this point."  ECF No. 94, Ex. F at 29:19-30:1.  The children either packed their own things or Ross's teenage daughter packed the children's things. ECF No. 94, Ex. F at 30:6-9.  The CCDSS employees then removed the foster children from Ross's home, and Ross chose not to carry K.R. to the car.  *See* ECF No. 94, Ex. A at 9; ECF No. 94, Ex. F at 30:6-16.

A reasonable jury could conclude that Ross did not consent to the CCDSS employees' entry into her home.  CCDSS employees told Ross that they would remove the foster children from her home that day.  When the CCDSS employees arrived to retrieve the children as agreed, the children were inside the home.  There is a material dispute of fact about how the CCDSS employees gained entry to Ross's home.  The circumstances arguably support an inference that Ross did not consent to the CCDSS employees' entry into her home.

However, even without valid consent, the Defendants are entitled to qualified immunity because they did not violate a clearly established constitutional right "of which a reasonable person would have known."  *Wildauer*, 993 F.2d at 372 (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Defendants correctly understood that the CCDSS had legal custody of the children.  *See Ross v. CCDSS*, 878 F. Supp. 2d 606, 619; Md. Code

31

Ann., Fam. Law §§ 5-504, 5-325(a)(3), (b)(1).  The CCDSS
employees who entered Ross's home removed the foster children
from Ross's care pending a CPS investigation into allegations of
neglect, including lack of supervision that endangered the
children.  *See* ECF No. 94, Ex. C at 46:1-4; ECF No. 94, Ex. A at
4-6; ECF No. 98, Ex. A3; ECF No. 94, Ex. B at 39:16-41:12.
Although the Fourth Circuit has not articulated a clear
constitutional standard to judge social workers'
investigations,[10] it has made clear that the "state has a
legitimate interest in protecting children from neglect . . .
and in investigating situations that may give rise to such
neglect and abuse." *Martin v. Saint Mary's Dep't of Social
Servs.*, 346 F.3d 502, 506 (4th Cir. 2003).  Additionally, Ross's
previous discussion with CCDSS employees about retrieving the
children from her home justified the Defendants' reasonable
belief that they had to enter the house to remove the children
pending an investigation into allegations of abuse.[11]  There was
no clearly established right to prevent CCDSS from entering
Ross's home to recover the foster children pending an

---

[10] *See Word of Faith Fellowship v. Rutherford Cnty. Dep't of
Social Servs.*, 329 F. Supp. 2d 675, 688 (W.D.N.C. 2004).

[11] *Cf. Wildauer*, 993 F.2d at 372-73 (defendants were entitled to
qualified immunity for their entry into the plaintiff's home to
retrieve children to return them to their legal parents even if
the plaintiff had not given consent).

investigation of neglect allegations.  Accordingly, the

Defendants are entitled to qualified immunity from Ross's Fourth

Amendment claim.

       3.   Negligence Claim (Count Six)

To establish negligence under Maryland law,[12] a plaintiff

must prove that: 1) the defendant was under a duty to protect

the plaintiff from injury; 2) the defendant breached that duty;

(3) the plaintiff suffered actual injury or loss; and (4) the

loss or injury proximately resulted from the defendant's breach

of the duty.  *Valentine v. On Target, Inc.*, 353 Md. 544, 549

(Md. 1999).

In her complaint, Ross argues that the Defendants had a

duty not to violate her Fourth Amendment rights.[13]  However,

---

[12] Maryland applies the rule of *lex loci delicti* to determine the
law to apply in tort cases.  *See, e.g., Philip Morris Inc. v.
Angeletti*, 358 Md. 689, 750 n. 28 (Md. 2000).  Under that rule,
the court applies the law of the state "where the injury-the
last event required to constitute the tort-occurred."  *Lab.
Corp. of America v. Hood*, 395 Md. 608, 615 (Md. 2006). All the
events at issue in this suit occurred in Maryland.  *See, e.g.*,
ECF No. 46 ¶¶ 4-35.  Accordingly, Maryland law governs Ross's
negligence claim.

[13] *See* ECF No. 46 ¶ 82.  Ross also argues that the Defendants had
a duty not to violate her Fourteenth Amendment rights; however,
the Court held previously that Ross and K.R. had no liberty or
property interest in their relationship at the time, and Ross
had no protected interest in continuing as a foster parent.  *See
Ross v. Cecil Cnty. Dep't of Social Servs.*, 878 F. Supp. 2d 606,
624 n.32 (D. Md. 2012).  Accordingly, the Court held that the
Defendant did not breach a duty not to violate their due process
rights by removing K.R.  *See id.*

claims for violations of constitutional rights sound under §

1983 and not negligence. *See Baker v. McCollan*, 443 U.S. 137,

144 91979). Ross also argues that the Defendants were negligent

for removing K.R. from Ross and for failing to thoroughly

investigate the neglect report before removing her. *See* ECF No.

97-1 at 19-20. However, Maryland law does not recognize such a

duty to persons investigated by social services for child

abuse.[14] Accordingly, because the Defendants did not violate a

duty to Ross or K.R., they are entitled to summary judgment on

Ross's negligence claim.

    C.   Ross's Cross-Motion for Summary Judgment on Count Ten

    Ross argues that she is entitled to summary judgment on her

First Amendment Retaliation claim. *See* ECF No. 97-1 at 24. To

succeed in her claim for First Amendment retaliation, Ross must

show that:  (1) she engaged in constitutionally protected

speech; (2) the Defendants engaged in a retaliatory action which

adversely affected her protected speech right; and (3) there is

a causal relationship between her protected speech and the

Defendants' actions. *See Suarez Corp. Indus. v. McGraw*, 202

F.3d 676, 686 (4th Cir. 2000).

---

[14] *See Hayes v. State*, 183 Md. App. 742, 756 (Md. Ct. Spec. App.
2009) (holding that social services did not have a duty to a
parent accused of abuse, and that, although failing to respond
to an report of suspected abuse was not within the agency's
discretion, the breadth of the investigation is discretionary,
and therefore, not actionable).

With respect to the initial removal of her foster children, there is a material dispute of fact whether CCDSS had knowledge of her criticisms before they initially removed her foster children.  In the summer of 2008, Ross contacted a state foster parent association officer about her concerns that CCDSS was misusing funds, and she inquired into the Association's account information.  *See* ECF No. 98, Ex. M ¶¶ 5-6; ECF No. 98, Ex. N ¶¶ 8-12; ECF No. 94, Ex. F at 16:9-18.  Based on these facts, a reasonable jury could conclude that the Defendants were unaware of Ross's complaints about the mismanagement of funds or criticism of CCDSS before August 15, 2008; this would support a determination that the removal of her foster children had not been retaliatory.  Accordingly, summary judgment will not be granted on this claim.

However, with respect to the foster home closure, Ross has not shown a causal relationship between that action and her criticisms of the CCDSS.  A plaintiff must show that the retaliation was more than a motivating factor in the retaliation.  *Huang*, 902 F.2d at 1140.  The uncontradicted evidence is that the decision to close Ross's home was made for a variety of reasons unrelated to Ross's statements, including inappropriate boundaries with birth families and lack of supervision.  *See* ECF No. 94, Ex. L at 1; ECF No. 94, Ex. M at 6-7.  Ross has not established that "but for" her complaints

about CCDSS's finances, the Defendants would not have closed her foster home.[15]

Ross's final First Amendment retaliation claim relates to The Arc's decision to place her foster home application on hold after receiving advice from Murray-Miller.  Ross wrote several letters to the editor of a local publication that were critical of CCDSS.  *See* ECF No. 94, Ex. Q.  Murray-Miller reviewed these letters, and other materials provided by The Arc, when providing The Arc with licensing advice.  *See* ECF No. 94, Ex. P at 30:13-32-16.  She advised The Arc that it should place the home stay evaluation process on hold.  *See* ECF No. 98, at K13; ECF No. 94, Ex. P at 63:8-64:2; ECF No. 94, Ex. S.  There is a dispute of fact whether Murray-Miller's advice caused The Arc to place the home stay process on hold.  *See* ECF No. 94, Ex. S.[16] Accordingly, Ross is not entitled to summary judgment on this claim.

---

[15] *cf. Huang*, 902 F.2d at 1140; *Tobey v. Jones*, 706 F.3d 379, 390 (quoting *Huang* and noting that 'but for' causation is required when considering a motion for summary judgment).

[16] *Cf. Amer. Civil Liberties Union of Md., Inc. v. Wicomico Cnty. Md.*, 999 F.2d 780, 786 (4th Cir. 1993) (the detention center's actions in withdrawing the accommodations initially made for an ACLU paralegal's visits was not sufficiently adverse to support a constitutional claim).

## III. Conclusion

For the reasons stated above, the Defendants' motion for summary judgment will be granted in part and denied in part. Ross's cross-motion for partial summary judgment will be denied.

_____  *8/14/14*
Date

_____
William D. Quarles, Jr.
United States District Judge