IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

```
                              *
BETSY ROSS, et al.,
                              *
          Plaintiffs,
                              *
          v.                          CIVIL NO.: WDQ-11-0181
                              *
NICHOLAS RICCIUTI, et al.,
                              *
          Defendants.
                              *
```

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Betsy Ross, for herself and as next friend of her minor

daughter K.R., sued Nicholas Ricciuti and others[1] (collectively

"the Defendants"), for constitutional violations and other

claims.  Pending are the Defendants' motion for reconsideration,

Ross's motion to strike, and Ricciuti's motion for leave to file

a second motion for summary judgment.  No hearing is necessary.

See Local Rule 105.6 (D. Md. 2014).  For the following reasons,

the Defendants' motion for reconsideration will be granted in

part and denied in part.  Ricciuti's motion for leave to file,

construed as a motion for relief from the Court's August 14,

---

[1] The Plaintiffs are suing Ricciuti and Barbara Siciliano in
their official capacities.  See ECF No. 46 ¶¶ 3, 10.  Mary
Klesius, Latonya Cotton, Rebecca Sutton, Kim Compton, Tina
Linkous, Susan Bailey, and Helen Murray-Miller are being sued in
their individual and official capacities.  Id. ¶¶ 4-9, 11.

2014 order, will be granted.  Ross's motion to strike will be denied.

I.   Background[2]

   A.   General Background

   In 2008, Ross was a licensed Foster Care Parent through the Cecil County Department of Social Services ("CCDSS"). *See* ECF No. 94, Ex. A at 1.  Ross resided with her one biological child, one adopted child, and five foster children. *See* ECF No. 94, Ex. A at 8.  Ross was scheduled to adopt K.R., one of the foster children. *See* ECF No. 94, Ex. A at 9.

   Ricciuti is the Director of CCDSS. *See* ECF No. 94, Ex N; ECF No. 46 ¶ 3.  Mary Klesius is a social work supervisor at CCDSS. *See* ECF No. 94, Ex. C at 6:16-20.  At the relevant time, LaTonya Cotton was a Foster Care Coordinator for CCDSS. *See* ECF No. 94, Ex. H at 6:20-8:19.  Rebecca Larson[3] was a Child Protective Services ("CPS") assessor with CCDSS. *See* ECF No. 94, Ex. E at 27:3-8.  Kim Compton was a Foster Care Worker with CCDSS. *See* ECF No. 94, Ex. A at 9.  Tina Linkous is a pre-adoption coordinator with CCDSS. *See* ECF No. 94, Ex. B at 6:14-7:2.  Susan Bailey was the Assistant Director of CCDSS. *See* ECF No. 94, Ex. N.  Barbara Siciliano was the In-home Services

---

[2] The facts are taken from the parties' original summary judgment filings. *See* ECF Nos. 92, 94, 97, 106.

[3] At the time, Rebecca Larson was known as Rebecca Sutton. *See* ECF No. 94, Ex. E at 6:14-15.

Administrator at CCDSS at the time, which involved supervision of CPS investigations. *See* ECF No. 94, Ex. D at 7:15-10:14. Helen Murray-Miller worked as a licensing coordinator at the Office of Licensing and Monitoring in the Maryland Department of Human Resources. *See* ECF No. 94, Ex. P at 10:9-12:4.

B.   Events on August 15, 2008

Tina Linkous, a pre-adoption case worker with CCDSS, testified that she conducted an interview with T.G., one of Ross's former foster children, at the Pennsylvania home of T.G.'s grandparents at 10:00 a.m. on August 15, 2008. *See* ECF No. 98, Ex. A.3; ECF No. 98, Ex. B at 155:17-156:20. T.G. lived at Ross's home from 2006 to October 2007. ECF No. 94, Ex. A at 4. Linkous's interview notes and testimony state that, during the home visit, T.G. disclosed a number of incidents of neglect by Ross, including occasions when young children were left in the swimming pool unsupervised. *See* ECF No. 94, Ex. A at 4-6; ECF No. 98, Ex. A3; ECF No. 94, Ex. B at 39:16-41:12. Linkous testified that she left the home visit sometime after 11:30 a.m. and spoke with Katie Horn, a CPS in-take worker, to report the allegations of neglect over the phone.[4]

---

[4] *See* ECF No. 98, Ex. B at 163:20-22, 169:1-5; ECF No. 94, Ex. B at 55:16-21; ECF No. 94. Mary Klesius testified that Linkous called her directly, and she transferred the call to Horn. *See* Ex. C at 51:11-52:11.

Klesius testified that she then spoke with her supervisor, Barbara Siciliano, and together they decided that Ross's foster children should be removed pending the CPS investigation. *See* ECF No. 94, Ex. C at 46:1-4.  At around 12:30 p.m., Rebecca Larson, a CPS assessor, was assigned to conduct a CPS investigation. *See* ECF No. 94, Ex. A at 8; ECF No. 94, Ex. E at 27:1-8.  Ross testified that around 1:30 p.m. she arrived at the CCDSS office for a previously-scheduled meeting about the nominations of officers for the Cecil County Foster Parent Association (the "Foster Parent Association"). *See* ECF No. 94, Ex. F at 8:9-12, 21:1-10.  After Ross arrived, Klesius and Larson met with her to discuss the CPS investigation of the neglect allegations. *See* ECF No. 94, Ex. F at 21:12-23:17; ECF No. 94, Ex. A at 8.

Ross testified, that in the meeting, Larson informed her that T.G. had come to the CCDSS offices to make the allegations. *See* ECF No. 94, Ex. F at 23:7-24:12.  Ross testified:

> She said, when we set down in the room she said that
> [T.G.] had come to Social Services that morning and
> made allegations against -- well, I am sorry, she did
> not say [T.G.].  She said that allegations had come in
> that morning in reference to, you know, a former child
> that I had in foster care.

ECF No. 94, Ex. F at 23:9-15.  Ross continued:

> I said, so are telling me [T.G.] came here today and
> she said, yes, [T.G.] was here.  And she went onto say
> that there are serious safety concerns in your home.
> We are going to have to remove your children.  I mean,

4

> I was just in disbelief.  And I kept questioning her,
> 'you are telling me that [T.G.] was here today?'  'Yes,
> [T.G.] was here today.   I did not see her but, yes,
> she was here.'

ECF No. 94, Ex. F at 23:20-24:9.  Larson informed Ross that all

the foster children in her home would be moved to another foster

care home.  *See* ECF No. 94, Ex. A at 8; ECF No. 94, Ex. E at

47:12-18; ECF No. 94, Ex. F at 24:2-4.  Larson asked Ross when

she could have the children ready to be picked up by CCDSS.  *See*

ECF No. 94, Ex. F at 24:15-17; ECF No. 94, Ex. E at 47:15-18;

ECF No. 94, Ex. A at 8.  Ross testified that she told Larson the

children would be ready to be picked up "in a couple hours."

ECF No. 94, Ex. F at 25:3-7.  The CPS investigations records

state "Ms. Ross agreed to allow Ms. [Larson] to come to her home

in one hour and pick up the children."  ECF No. 94, Ex. A at 8.

At around 4:00 p.m., Larson, Kim Compton, and Latonya

Cotton arrived at Ross's house.  ECF No. 94, Ex. F at 27:2-10.

One of the women opened the storm door and knocked on Ross's

front door.  *See* ECF No. 94, Ex. F at 28:6-15.  Ross testified

that "I am not sure who opened the door for them," and that

"[m]y daughter was there and she had two friends there."  ECF

No. 94, Ex. F at 29:3-16.  Ross testified:  "They came in and

said, you know, 'do you have the kids ready?'  You know, they

are as ready as they are going to be at this point."  ECF No.

94, Ex. F at 29:19-30:1.  The children either packed their own

things or Ross's teenage daughter packed the children's things. ECF No. 94, Ex. F at 30:6-9. Ross declined to carry K.R. to the car. ECF No. 94, Ex. F at 30:6-16. The foster children were removed from Ross's home and placed in other licensed foster homes. *See* ECF No. 94, Ex. A at 9.

C.   Testimony of Karen Edwards

On December 4, 2009, Karen Edwards, a foster parent familiar with Ross testified during a Department of Human Resources administrative hearing. ECF No. 98, Ex. B at 257-79. Edwards testified that T.G. "had a humongous problem with adults, I guess, in general, and she was a chronic liar." ECF No. 98, Ex. B at 260:23-24. Edwards testified that she received a call from CCDSS on August 15, 2008 before 10:00 a.m. asking if she could take in three foster children who were being removed from another foster home. ECF No. 98, Ex. B at 262:4-13, 263:6-22. Edwards said she was unable to take in the children. ECF No. 98, Ex. B at 262:14-22. During the call, CCDSS did not tell Edwards from which foster parent the children were being removed. ECF No. 98, Ex. B at 263:8-11. Edwards further testified: "Q. And did you have occasion to learn whose three children these were? A. I found out that very afternoon. Q. And whose were they? A. Betsy [Ross]'s." ECF No. 98, Ex. B at 262:23-263:2. Edwards testified about how she learned they were Betsy's children:

> Q.   Whether or not you knew that these were Betsy
>       Ross' children and you said at first you thought
>       it was an older couple.
> A.   Yes.
> Q.   But then you came to believe that -- you stated
>       earlier that these were actually Betsy Ross'
>       children.
> A.   Yeah.
> Q.   And there were certain DSS or CPS agents that
>       informed you of that, correct?
> A.   That was later.   I found out from DSS agents
>       later that it was Betsy's children.   I found out
>       that afternoon from Dr. Clifford and Betsy
>       herself that they were her children.

ECF No. 98, Ex. B at 277:13-25.   Edwards was asked to clarify

her discussion with the CCDSS agents:

> Q.   I thought your testimony was Sara Ellis and Jen
> Crooks told you about the pool incident.
> A.   They did later, not that day.
> Q.   So, did they tell you that they or someone they
> knew called you at 10:00 in the morning to take Betsy
> Ross' children?
> A.   No, they --

ECF No. 98, Ex. B at 278:9-15.   Edwards was permitted to finish

her statement:

> They talked to me a couple days later and told me that
> Betsy's children were taken and it's because of an
> incident with the pool and the unsafe conditions at
> her home, and then they started talking about my pool
> and that I needed to make sure I was within guidelines
> and that was going to be checked and they went over
> all the guidelines with me and everything was fine.
> But they made a point in telling me why her children
> were taken and that her children were taken.

ECF No. 98, Ex. B at 278:24-279:7.

        D.   Foster Parent Association Funds

7

In December 2007, at a Christmas party Ross had a
conversation with Klesius and others about her reactivating the
Foster Parent Association. *See* ECF No. 94, Ex. F at 11:11-13-
14.  Representatives from the Maryland State Foster Parent
Association came to meetings in March, April, and May 2008 to
assist in restarting the Cecil County Foster Parent Association.
*See* ECF No. 94, Ex. F at 14:3-15:2.  In the May 2008 meeting,
they set September 8, 2008 as the date for the Foster Parent
Association elections. *See* ECF No. 94, Ex. F at 15:3-13.
During some of these meetings, Ross and others asked Klesius and
Rose Caprotti, another CCDSS employee, for the Foster Parent
Association's bank account information. *See* ECF No. 94, Ex. F
at 16:9-17.  Klesius informed Ross that Doris Asti, the Foster
Parent Association's former Treasurer, had the information, and
that either Klesius or Caprotti would get it from Asti "because
Doris traveled a lot." ECF No. 94, Ex. F at 16:9-18:18.

Ross called a representative from the State Association who
suggested that Ross contact Asti directly about the bank account
information. *See* ECF No. 94, Ex. F at 33:10-34:8.  At the end
of June 2008, Ross went to Asti's home to get the account
information. *See* ECF No. 94, Ex. F at 32:13-15.  Ross testified
that Asti stated at the time that "most of the money in this
account belongs to social services.  They use this account to
hide money from the state." ECF No. 94, Ex. F at 32:5-15.  Soon

after receiving a check and account information from Asti, Ross went to the bank to inquire about the account balance, but the bank would not give her that information.  *See* ECF No. 94, Ex. F at 37:3-8.  Asti was the only person named on the account.  *See* ECF No. 94, Ex. F at 37:3-6.  After the Foster Parent Association elections in September 2008, Ross and the other officers opened a new Association bank account.  *See* ECF No. 94, Ex. F at 37:16-21; 34:18-36-2.

In July 2008, Ross reported the information she had heard from Asti to Michelle Burnette, President of the Maryland State Foster Parent Association.  *See* ECF No. 98, Ex. M ¶¶ 5-6; ECF No. 98, Ex. N ¶¶ 8-12.  Ross "raised questions and concerns about who was in control of the money in the bank account at [the Association], and that the Treasurer had told her that CCDSS funds were being placed in the account."  ECF No. 94, Ex. N ¶ 9.  Burnette informed her that the newly hired State Foster Care Ombudsman, John Bertulis, would look into the matter in September.  *See* ECF No. 98, Ex. M ¶ 6; ECF No. 98, Ex. N. ¶¶ 6-12.  Burnette referred the matter to Bertulis.  *See* ECF No. 98, Ex. N ¶¶ 10-11.  In his affidavit, Bertulis states that on August 27, 2008 he became the Foster Parent Ombudsman for the Maryland Department of Human Resources.  *See* ECF No. 94, Ex. I ¶ 2.  On September 5, 2008, he "received a complaint from Betsy Ross alleging that [CCDSS] had misappropriated funds that the

Maryland State Foster Parent Association intended for the Cecil County Foster Parent Association." ECF No. 94, Ex. I ¶ 3.  On September 29, 2009, Bertulis concluded his investigation and determined that there had been no impropriety or mismanagement of funds.  *See* ECF No. 94, Ex. I ¶ 5.

    E.   Foster Home Closure

The interviews of Ross's foster children during the CPS investigation confirmed incidents of lack of supervision; however, because "the nature and extent of being left unsupervised varied among their disclosures" child neglect could neither be indicated nor ruled out.  *See* ECF No. 94, Ex. A at 1. On September 17, 2008, CPS issued a Child Neglect Report following the CPS investigation of Ross, finding that the neglect was Unsubstantiated.  *See* ECF No. 94, Ex. A at 1.  Ross appealed CPS's unsubstantiated finding.  *See* ECF No. 94, Ex. M at 4.  On September 26, 2008, K.R. was returned to Ross and her adoption was finalized on October 15, 2008.  ECF No. 94, Ex. M at 4.  In October 2008, Linkous recommended that Ross's foster home be closed.  *See* ECF No. 94, Ex. B at 70:7-71:15.  Larson also recommended that the foster home be closed.  *See* ECF No. 94, Ex. E at 116:3-18.  On November 13, 2008, Klesius made the recommendation that Ross's foster home be closed based on numerous violations of the Resource Parent Agreement discovered during the CPS investigation, including inappropriate boundaries

10

with birth families, threats of corporal punishment, and lack of supervision. *See* ECF No. 94, Ex. L at 1.

Between March 5, 2009 and June 2, 2009, Cotton conducted an annual reconsideration of Ross's foster care approval. *See* ECF No. 94, Ex. M.  Cotton's re-evaluation report recommended that Ross's foster home should not be re-licensed, and the foster home should be closed. *See* ECF No. 94, Ex. M at 6.  The re-evaluation provided a number of bases for this recommendation, including that Ross "blatantly and purposely broke foster care rules and regulations;" "displayed inappropriate boundaries with birth families and an inability to set boundaries with her own children;" and "was dishonest with the local Department in regards to individuals who had a regular presence in her home." ECF No. 94, Ex. M at 6.  The re-evaluation also noted the potential dangers of Ross's lack of supervision, Ross's "lackadaisical" parenting style, and concluded that Ross "has shown poor judgment and lacks the expected knowledge and skill level of an experienced licensed foster parent."  ECF No. 94, Ex. M at 6-7.

On July 2, 2009, Ricciuti approved the denial of re-licensing and the official closing of Ross's foster home. *See* ECF No. 94, Ex. N.  Ross also appealed this decision and on January 21, 2010, Ross and CCDSS reached an agreement settling both pending appeals. *See* ECF No. 94, Exs. J, O.  Ross agreed

to voluntarily surrender her CCDSS foster care license, and withdrew her requests for appeal. *See* ECF No. 94, Exs. J, O. CCDSS agreed to change the unsubstantiated neglect finding to a "ruled out" finding, and to make no negative statements about Ross. *See* ECF No. 94, Exs. J, O.

F.   Arc Foster Home Application

In early 2010, Ross applied to be a foster parent through The Arc, a private foster care provider. *See* ECF No. 94, Ex. F at 129:16-132:19. On March 16, 2010, The Arc sent Ross a letter stating that "we have decided not to continue the certification process." ECF No. 94, Ex. R at 1. The letter explained The Arc's decision by emphasizing that its main consideration is serving the children in its care, which requires a partnership with CCDSS:

> With that focus in mind we are concerned about your ongoing willingness and interest in making this a public discussion. We need to maintain a positive relationship with DSS and protect the privacy of foster children in our custody. We cannot risk knowingly placing them in the midst of such a contentious and unresolved situation that has become a public forum. We respect your desire to resolve the discrimination that you felt and the concerns you have with DSS. However, to place a child in the middle of this public fray would not be in the best interest of that child and would not make us as an agency responsible caretakers.

ECF No. 94, Ex. R at 1. An official from The Arc, Diane Ross, contacted Helen Murray-Miller, a license coordinator at the Department of Human Resources after Ross requested an appeal of

12

The Arc's decision. *See* ECF No. 94, Ex. P at 27:6-29-6.

Murray-Miller's role as a license coordinator was to make sure

that agencies were following regulations. *See* ECF No. 94, Ex. P

at 13:8-21. Murray-Miller testified that Diane Ross informed

her about the circumstances of Betsy Ross's foster home

application, and Murray-Miller requested all The Arc's

documentation associated with the case "because what they were

doing didn't seem like it was coinciding with COMAR

[regulations] as far as the Appeal." *See* ECF No. 98, Ex. K at

29:12-30-21. The Arc provided Murray-Miller with documents and

communications about Betsy Ross's case, including three letters

to the editor -- in a local publication -- written by Betsy Ross

that were critical of CCDSS. *See* ECF No. 94, Ex. P at 30:13-32-

16; ECF No. 94, Ex. Q. The letters were published between

December 2009 and March 2010. *See* ECF No. 98, Ex. L ¶ 24.

Murray-Miller testified that she informed Diane Ross that

The Arc could not prohibit Betsy Ross from proceeding with the

home study process:

> I told her that she could not do that. There was no
> reason why this person should not have been able to
> continue on with the home study. And although there
> was, you know, other issues she was dealing with, she
> still should have been able to have that opportunity.
> So I told her that she needed to write a letter
> basically saying that she should be allowed to do a
> home study with The Arc.

ECF No. 94, Ex. P at 63:8-64:2.  In an email to Diane Ross at The Arc about Betsy Ross's application, Murray-Miller stated: "When den[y]ing an applicant make sure your denial is based in COMAR [regulations].  Ms. Ross situation did not have any COMAR [regulation] reasons for denial.  Place the home study on hold until the Cecil County issue is resolved."  ECF No. 98, at K13. On March 18, 2010, The Arc sent Betsy Ross another letter, approved by Murray-Miller:

> Following consultation with our licensing monitor from Department of Human Resources I am further clarifying our position with regard to your ongoing relationship with The Arc Northern Chesapeake Region and its Treatment Foster Care program.  The unresolved and high profile nature of your current situation with several entities determines that it is not a good time to proceed with a home study.  Once your issues with Cecil County Department of Social Services are resolved to our mutual satisfaction you are welcome to contact our trainer/recruiter Kathy Pitrat and attend the next available training class for prospective foster parents.  At this point you may proceed with the home study process.

ECF No. 94, Ex. S; ECF No. 94, Ex. P at 103:11-104:15.  Murray-Miller did not have contact with CCDSS about Betsy Ross.  *See* ECF No. 94, Ex. P at 121:11-18.  Murray-Miller testified that "[a]ll the information I got was from the Arc."  ECF No. 94, Ex. P at 121:17-18.  Ross has not reapplied to be a foster parent at The Arc, and has not applied to any other private provider to be a foster parent.  *See* ECF No. 94, Ex. F at 129:21-130:11, 132:13-16.

G.    Procedural History

On January 21, 2011, Ross sued CCDSS, Ricciuti in his
official capacity, and Klesius in her individual and official
capacities for violations of her Fourth Amendment rights and
other claims.  ECF No. 1.  On August 25, 2011, Ross filed an
amended complaint against Klesius, Ricciuti, Cotton, Sutton,
Compton, Linkous, Susan Bailey, Siciliano, and Murray-Miller
(collectively "the Defendants").  ECF No. 19.  On January 31,
2012, the Court granted Ross's motion to file a second amended
complaint.  ECF No. 44.  On January 31, 2012, Ross filed a
second amended complaint.[5]  On February 21, 2012, the Defendants
moved to dismiss the second amended complaint, or in the
alternative, for summary judgment.  ECF No. 49.  On July 12,
2012, the Court granted the Defendants' motion to dismiss Counts

---

[5] Ross's second amended complaint sought injunctive and
declaratory relief from the Defendants in their official
capacities, and money damages from the Defendants in their
official capacities.  The second amended complaint asserted the
following claims: relief under act of Congress 42 U.S.C. § 1983
(Count One); violation of the Fourth Amendment (Count Two);
violation of the Fourteenth Amendment and Article 24 of the
Maryland Constitution, procedural due process (Count Three);
substantive due process (Count Four); breach of confidence
(Count Five); negligence (Count Six); false light (Count Seven);
defamation (Count Eight); breach of Contract (Count Nine);
violation of the First Amendment (Count Ten).  ECF No. 46.

Three, Four, and Five; denied the Defendants' motion to dismiss Counts Two, Six, and Ten; granted the Defendants' motion for summary judgment for Counts Seven, Eight, and Nine; and denied Ross's cross-motion for summary judgment.  ECF Nos. 57, 58.

On October 22, 2013, the Defendants moved for summary judgment on the remaining claims:  Counts Two, Six, and Ten. ECF No. 92.  On August 14, 2014, the Court granted summary judgment on Counts Two and Six, as well as on Count Ten with respect to Ross's claim based on the closure of her foster home. ECF No. 113.  The Court denied summary judgment as to Count 10 "with respect to Ross's claims based on the initial removal of her foster children and her application to The Arc."  *Id*.  The Court reasoned that "there is a material dispute of fact whether the Defendants had knowledge of [Ross's] complaints before the removal of her foster children."  ECF No. 112 at 23.

On September 2, 2014, the Defendants moved for reconsideration.[6]  ECF No. 116.  On September 19, 2014, Ross opposed the motion and moved to strike the Defendants' affidavits.  ECF No. 199.  On October 6, 2014, the Defendants replied.  ECF No. 124.  On October 16, 2014, Ricciuti moved for leave to file a second motion for summary judgment.  ECF No. 125.  Ross has not opposed the motion.

---

[6] On September 5, 2014, Compton moved to correct the affidavit attached to the motion for reconsideration.  ECF No. 118.  The Court will grant the motion.

II.  Analysis

    A.  Legal Standard

The Federal Rules of Civil Procedure do not recognize a motion for reconsideration. *Auto Services Co. v. KPMG, LLP,* 537 F.3d 853, 855 (8th Cir. 2008).[7]  A party may move to alter or amend a judgment under Rule 59 (e), or for relief from a judgment or order under Rule 60 (b).  *See* Fed. R. Civ. P. 59 (e), 60 (b).  A motion to alter or amend filed within 28 days of the judgment is analyzed under Rule 59(e); if the motion is filed later, Rule 60(b) controls. *See* Fed. R. Civ. P. 59 (e); *MLC Auto., LLC v. Town of S. Pines,* 532 F.3d 269, 280 (4th Cir. 2008); *In re Burnley,* 988 F.2d. 1, 2-3 (4th Cir. 1992).  Because the Defendants filed their motion for reconsideration on September 2, 2014, Rule 59(e) governs.

    Under Federal Rule of Civil Procedure Rule 59(e), the Court will grant a motion to alter or amend an earlier judgment "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir. 1998); *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 485 n.5,

---

[7] *But see* Local Rule 105.10 (D.Md.2014) ("Except as otherwise provided in Fed. R. Civ. P. 50, 52, 59, or 60, any motion to reconsider issued by the Court shall be filed with the clerk not later than fourteen (14) days after entry of the order.").

128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008); *Hill v. Braxton*, 277
F.3d 701, 708 (4th Cir. 2002).  Rule 59(e) allows the district
court to correct its errors and thereby avoid burdening the
parties and appellate courts with unnecessary appellate
proceedings.  *Pac. Ins.*, 148 F.3d at 403 (*citing Russell v.
Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir.
1995)).  "Rule 59(e) motions may not be used, however, to raise
arguments which could have been raised prior to the issuance of
the judgment, nor may they be used to argue a case under a novel
legal theory that the party had the ability to address in the
first instance."  *Id.*; *see also Projects Mgmt. Co. v. DynCorp
Int'l, LLC*, 17 F. Supp. 3d 539, 541 (E.D. Va. 2014) ("Important-
ly, however, a Rule 59(e) motion for reconsideration may not be
used to 'reargue[] the facts and law originally argued in the
parties' briefs.'") (quoting *United States v. Smithfield Foods,
Inc.*, 969 F.Supp. 975, 977 (E.D. Va. 1997)).  "In other words, a
motion for reconsideration under Rule 59(e) is inappropriate if
it asks the court to 'reevaluate the basis upon which it made a
prior ruling' or 'merely seeks to reargue a previous claim.'"
*Projects Mgmt. Co.*, 17 F. Supp. 3d at 541 (quoting *Smithfield
Foods*, 969 F.Supp. at 977).  A party's disagreement with the
Court's decision is also not a basis for granting a Rule 59(e)

motion.   *Hutchinson v. Staton*, 994 F.2d 1076, 1082 (4th Cir. 1993).[8]

   B.   The Motions for Reconsideration

   The Defendants argue that they were entitled to summary judgment because "the undisputed facts do not demonstrate that they violated a clearly established right . . . ."   ECF No. 116 at 1.   In support of their assertions that the Defendants either did not participate in the decision-making process or did not know of Ross's protected speech, the Defendants attached an affidavit from each Defendant.   *See* ECF No. 116-2.

   The original motion for summary judgment was extensively briefed and carefully considered by the Court in a 37-page opinion.   In their motion for reconsideration, the Defendants do not address the Rule 59(e) standard or argue that there is new information or legal opinions that require reexamination of the Court's decision.   Nor do they explain why their affidavits were not attached to their original motion.

   In their reply, the Defendants state that the Court "reconfigured" the case by not granting summary judgment on the First Amendment retaliation claim and "[t]his new configuration

---

[8] *See also Pritchard v. Wal Mart Stores, Inc.*, 3 F. App'x 52, 53 (4th Cir. 2001). ("When the motion raises no new arguments, but merely requests the district court to reconsider a legal issue or to 'change its mind,' relief is not authorized."); *Medlock v. Rumsfeld*, 336 F. Supp. 2d 452, 470 (D. Md. 2002).

of the case ma[de] it incumbent on defense counsel to treat the

[] defendants individually in order to demonstrate the lack of

involvement in the alleged retaliation . . . ." ECF No. 124 at

2.  Despite this assertion, however, the Court did not add a

claim or reconfigure the case in any way.  The Court merely

denied summary judgment on a single claim.  The Defendants'

counsel made the decision not to address the Defendants

individually in the original motion and now seeks to relitigate

summary judgment to correct that error.  This is not a

sufficient basis for reconsideration.[9]

In the same motion, Larson and Siciliano "move[d] for

judgment on the official capacity claims asserted against them

because they are no longer employed by Cecil County Department

of Social Services . . . ." ECF No. 116-1 at 2.  In his motion

for leave to file a second motion for summary judgment, Ricciuti

asserts that he has retired from the Department of Social

Services, and is therefore entitled to summary judgment.  ECF

No. 125 at 1.[10]  Larson's, Siciliano's, and Ricciuti's change in

employment is a sufficient basis for relief under Rule 59(e).

_____

[9] "Rule 59(e) motions may not be used, however, to raise
arguments which could have been raised prior to the issuance of
the judgment, nor may they be used to argue a case under a novel
legal theory that the party had the ability to address in the
first instance." *Pac. Ins.*, 148 F.3d at 403.

[10] Larson, Siciliano, and Ricciuti attached affidavits attesting
to their change in employment.  Ross has not presented any
contradictory evidence.

As these individuals are no longer employed by the Cecil County Department of Social Services, all official capacity claims against them must be dismissed.

    C.    Ross's Motion to Strike the New Affidavits

Ross argues that the "Defendants new affidavits should be stricken from the record as impermissible testimonial hearsay after the close of summary judgment review." ECF No. 119-1 at 1. However, in only one instance does Ross argue that a specific part of one of the affidavits contains hearsay--she states that Bertulis's affidavit contained hearsay conversations and "paragraph 7 therein contains inadmissible statements of speculation." ECF No. 119-1 at 13.

    Under Federal Rule of Civil Procedure 56(c)(4) affidavits supporting a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." "Thus, under Rule 56(c), a court may strike portions of affidavits that contain legal or factual argument, are not based on personal knowledge, contain hearsay, or rest on conclusionary statements." *Glass v. Anne Arundel Cnty.*, 38 F. Supp. 3d 705, 712 (D. Md. 2014). However, in analyzing a motion to strike, courts are warned to use "'a scalpel, not a butcher knife' to strike portions of an affidavit that do not satisfy the requirements of Rule 56[c]." *Gardner v.*

*Grp. Health Plan,* 5:09-CV-00152-BO, 2011 WL 1321403, at *3
(E.D.N.C. Apr. 4, 2011) (*quoting Upshaw v. Ford Motor Co.,*576
F.3d 576, 593 (6th Cir.2009)).

Reviewing Bertulis's affidavit, he mentions receiving a
phone call from Burnette about Ross's complaint, and the actions
he took in response to this information.  ECF No. 116-2 at 8-9.
In paragraph seven, he states that he does not remember
communicating with any of the other Defendants "prior to the
initiation of [his] review of [] Ross's complaint after August
27, 2008."  *Id.*  The Court does not see the impermissible
hearsay and speculation to which Ross objects and will not
strike the affidavit.  Further, because Ross only made a general
objection to the affidavits as hearsay, and cited no other
example besides Bertulis's affidavit, the Court will deny her
motion to strike on the other affidavits as well.
III. Conclusion

For the reasons stated above, the Defendants' motion for
reconsideration will be granted in part and denied in part.
Ricciuti's motion for leave to file, construed as a motion for

relief from the Court's August 14, 2014 order, will be granted.

Ross's motion to strike will be denied.

_____
Date   6/24/15

_____
William D. Quarles, Jr.
United States District Judge