**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| BETSY ROSS | : | |
| | : | |
| | : | |
| v. | : | Civil No. CCB-11-0181 |
| | : | |
| | : | |
| NICHOLAS RICCIUTI | : | |

**MEMORANDUM**

On January 21, 2011, Betsy Ross, for herself and as next friend of her minor daughter K.R., filed suit in this court. On January 31, 2012, Ross filed a second amended complaint against Nicholas Ricciuti, Mary Klesius, Latonya Cotton, Rebecca Larson (formerly known as Rebecca Sutton), Kim Compton, Tina Linkous, Sue Bailey, Barbara Siciliano, and Helen Murray-Miller (collectively, "the defendants"). The only claims that remain are Ross's First Amendment retaliation claims, alleged under 42 U.S.C. § 1983, based on the removal of her foster children and the denial by The Arc, a private agency, of her application to be a foster parent. The claims against Ricciuti and Siciliano, and the official capacity claim against Larson, have been dismissed. Now pending is the defendants' second motion for reconsideration of the denial of summary judgment on all remaining claims. Oral argument on the motion for reconsideration was heard on August 3, 2016. For the reasons that follow, the defendants' second motion for reconsideration will be granted.

**BACKGROUND**

I.     August 15, 2008 Events

In 2008, Ross was a licensed foster care parent through the Cecil County Department of Social Services ("CCDSS"). (Child Neglect Report 1, ECF No. 94.) Linkous, a pre-adoption case worker with CCDSS, testified that she conducted an interview with T.G., one of Ross's former

foster children, at the Pennsylvania home of T.G.'s grandparents, at 10 a.m. on August 15, 2008. (Admin. Hr'g Tr. 155:17-156:20, ECF No. 98-2.) Linkous's interview notes and testimony state that, during the home visit, T.G. disclosed a number of incidents of neglect by Ross, including occasions when young children were left in the swimming pool unsupervised. (Linkous Dep. 40:17-18, ECF No. 94-1; Child Neglect Report 3.) Linkous testified that she left the home visit sometime after 11:30 a.m. and called Klesius, a social work supervisor at CCDSS, who transferred the call to Katie Horn, a Child Protective Services ("CPS") in-take worker, to report the allegations of neglect over the phone. (Admin. Hr'g Tr. 163:10-25, 169:1-5; Linkous Dep. 55:16-21; Klesius Dep. 51:14-52:11, ECF No. 94-2.) Klesius testified that she spoke with her supervisor, Siciliano, and together they decided that Ross's foster children should be removed pending a CPS investigation. (Klesius Dep. 46:1-4.) At around 12:30 p.m., Larson, a CPS assessor with CCDSS, was assigned to conduct the investigation. (Larson Dep. 27:1-4, ECF No. 94-4.)

Ross testified that, around 1:30 p.m. that day, she arrived at the CCDSS office for a previously scheduled meeting about the nominations of officers for the Cecil County Foster Parent Association ("CCFPA"). (Ross Dep. 8:9-12, ECF No. 94-5.) After Ross arrived, Klesius and Larson met with her to discuss the neglect allegations. (*Id.* at 22:3-24:4.) Ross testified that, in the meeting, Larson informed her that T.G. had come to CCDSS's offices to make the neglect allegations. (*Id.*) Larson informed Ross that all the foster children in her home would be removed. (*Id.*) Larson, Compton, and Cotton arrived at Ross's house around 4 p.m. and removed the children. (*Id.* at 27:2-10; Summ. of Contacts 9, ECF No. 94.)

On December 4, 2009, Karen Edwards, a foster parent familiar with Ross, testified during a Department of Human Resources administrative hearing. (Admin. Hr'g Tr. 256-79.) She

testified that T.G. was "a chronic liar." (*Id.* at 260:24.) She also testified that she received a call from CCDSS on August 15, 2008, before 10 a.m., asking if she could take in three foster children who were being removed from another home. (*Id.* at 262:4-13, 263:5-22.) Edwards said she later found out that those children were Ross's. (*Id.* at 262:23-263:4, 277:20-279:7.)

II.   Foster Parent Association Funds

Representatives from the Maryland State Foster Parent Association ("MSFPA") attended meetings in March, April, and May 2008 to assist in restarting the CCFPA. (Ross Dep. 14:3-20.) At the May 2008 meeting, they set September 8, 2008, as the date for CCFPA elections. (*Id.* at 15:3-15.) During some of these meetings, Ross and others asked Klesius for CCFPA's bank account information. (*Id.* at 16:9-14.) Klesius informed Ross that Doris Asti, CCFPA's treasurer, had the information. (*Id.* at 16:15-17, 18:6-18, 19:7-9.) At the end of June 2008, Ross went to Asti's home to get the account information because Klesius had not given it to her. (*Id.* at 32:5-34:11.) Ross testified that Asti stated that "most of the money in this account belongs to social services. They use this account to hide money from the state." (*Id.* at 32:5-10; *see also* Ross Aff. ¶ 4, ECF No. 98-13.) On July 7, 2008, Ross met with Klesius about a back-to-school picnic for foster care children. (Ross Aff. ¶ 3.) Klesius instructed that the CCFPA would pay for the picnic, and Ross said that she could not make that decision without approval from the CCFPA. (*Id.*)

In July 2008, Ross reported the information she had heard from Asti to Michele Burnette, MSFPA's President. (*Id.* ¶¶ 5-6.) Burnette informed her that the new State Foster Care Ombudsman, John Bertulis, would look into the matter in September. (*Id.* ¶ 6; Burnette Aff. ¶¶ 8-10, ECF No. 98-14.) In his affidavit, Bertulis states that he became the Foster Parent Ombudsman for the Maryland Department of Human Resources on August 27, 2008. (Bertulis Aff. ¶ 2, ECF No. 94-8.) On September 5, 2008, he received a claim from Ross alleging that CCDSS had misappropriated funds that the MSFPA intended for the CCFPA. (*Id.* ¶ 3.) Bertulis

concluded his investigation on September 29, 2009, and found that there had been no impropriety or mismanagement of funds. (*Id.* ¶ 5.)

III.    Arc Foster Home Application

In early 2010, Ross applied to be a foster parent through The Arc, a private foster care provider. (Ross Dep. 129:16-132:19.) On March 16, 2010, Dianne Ross at The Arc sent Betsy Ross a letter stating that it had decided not to continue the certification process, citing to Ross's disagreements with CCDSS. (March 16 Arc Letter, ECF No. 94-16.) Dianne Ross contacted Murray-Miller, a license coordinator at the Maryland Department of Human Resources, after Betsy Ross requested an appeal of The Arc's decision. (Murray-Miller Dep. 27:12-29:6, ECF No. 98-11; *id.* Ex. 12, Feb. 9, 2010 Email.) The Arc provided Murray-Miller, whose role as a license coordinator was to make sure that agencies followed state regulations, with documents and communications about Betsy Ross's case, including three letters to the editor critical of CCDSS that Betsy Ross had written in a local publication between December 2009 and March 2010. (Murray-Miller Dep. 13:8-21, 30:7-21.) Murray-Miller did not have contact with CCDSS about Ross. (*Id.* at 121:11-122:10.) Murray-Miller told The Arc that there were no reasons based on state regulations for denying Betsy Ross's application, and she said to place Betsy Ross's home study on hold until the CCDSS issue was resolved. (*Id.* at 63:8-64:2; *id.* Ex. 13, March 16, 2010 Email.) The Arc sent a follow-up letter to Betsy Ross on March 18, 2010, informing her that the home study process was being put on hold. (March 18 Arc Letter, ECF No. 94-17.) Ross has not reapplied to be a foster parent at The Arc, and has not applied to any other private provider. (Ross Dep. 129:21-130:11, 132:13-16.)

IV.    Procedural History

On January 21, 2011, Ross filed suit in this court. (Compl., ECF No. 1.) On January 31, 2012, she filed a second amended complaint against the defendants. (Second Am. Compl., ECF

No. 46.) On July 11, 2012, the court dismissed counts 3, 4, and 5, and granted the defendants'
motion for summary judgment on counts 7, 8, and 9, of the amended complaint. (*See* July 11,
2012 Mem., ECF No. 57; July 11, 2012 Order, ECF No. 58.) On August 14, 2014, the court
granted the defendants' motion for summary judgment on counts 2 and 6, and part of count 10,
of the amended complaint. (*See* Aug. 14, 2014 Mem., ECF No. 112; Aug. 14, 2014 Order, ECF
No. 113.) At that point, the only claims that remained were the portions of Ross's First
Amendment claim, brought under 42 U.S.C. § 1983, alleging that CCDSS's removal of her
foster children, and The Arc's denial of her application to be a foster parent, were in retaliation
for her protected speech. On September 2, 2014, the defendants moved for reconsideration of the
partial grant of summary judgment. (Mot. Recons., ECF No. 116.) On June 24, 2015, the court
granted the defendants' motion for reconsideration as to the official capacity claims against
Larson, Siciliano, and Ricciuti, due to the fact that they were no longer employed by CCDSS,
and dismissed Siciliano and Ricciuti from the case. (*See* June 24, 2015 Mem., ECF No. 128;
June 24, 2015 Order, ECF No. 129.) The remainder of the motion for reconsideration was
denied. (*Id.*) On December 31, 2015, this case was reassigned to me upon the retirement of Judge
William D. Quarles, Jr. On May 16, 2016, a jury was sworn in this case. (Jury Trial, ECF No.
176.) On May 19, 2016, after plaintiff's counsel was hospitalized and requested a postponement,
the court declared a mistrial. (Mistrial Order, ECF No. 178.) After the mistrial, the court agreed
to allow the State to file a second motion for reconsideration. (Order, ECF No. 179.) That motion
was filed on July 15, 2016. (Second Mot. Recons., ECF No. 181.) Ross filed a response in
opposition on July 29, 2016. (Resp. Opp'n, ECF No. 182.) Oral argument on the motion for
reconsideration was heard on August 3, 2016. (Mot. Hearing, ECF No. 183.)

## STANDARD OF REVIEW

Where the entry of partial summary judgment fails to resolve all claims in a suit, Federal Rule of Civil Procedure 54(b) governs a motion to reconsider an interlocutory order. *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003). The district court "retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted." *Id.* Although the Fourth Circuit has not identified the precise standard for resolving such a motion, courts frequently look to the standards applicable to motions under Rules 59(e) or 60(b) for guidance. *See Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F. Supp. 2d 470, 480 (D. Md. 2013). Courts generally will reconsider an interlocutory order in the following situations: "(1) there has been an intervening change in controlling law; (2) there is additional evidence that was not previously available; or (3) the prior decision was based on clear error or would work manifest injustice." *Id.* at 481 (quoting *Akeva, LLC v. Adidas Am., Inc.*, 385 F. Supp. 2d 559, 565-66 (M.D.N.C. 2005)). Because the defendants point to no change in the law or any new evidence, their motion depends on proof of "clear error" or "manifest injustice."

## ANALYSIS

It is in the interests of justice and judicial economy for the court to grant the defendants' second motion for reconsideration. When this case was reassigned to me on December 31, 2015, the parties had failed to reach a settlement and the case was, therefore, ready for trial. Accordingly, I declined the defendants' unofficial request to reconsider the court's partial denial of their summary judgment motion, (*see* Substantive Legal Issues, ECF No. 139), and set May 16, 2016, for trial, (*see* Scheduling Order, ECF No. 140). It became clear during the pretrial conference and from the pretrial motions in limine, however, that there was insufficient evidence to support Ross's remaining claims against the defendants. Until that point, neither Judge

Quarles when he confronted the defendants' first motion for reconsideration, nor I when addressing the defendants' unofficial request for reconsideration, could have realized the extent to which Ross's First Amendment retaliation claims were unsupported by the record. When a mistrial was declared, therefore, I permitted the defendants to file a second motion for reconsideration. (*See* Order, ECF No. 179.) Ross—despite having opportunities at the pretrial conference, in her motions in limine, during our telephone conferences, and at oral argument on August 3, 2016—has failed to convince me that there is evidence in the record to allow a reasonable jury to return a verdict in her favor. Accordingly, given the procedural posture of the case and for the reasons that follow, I find it necessary to grant the defendants' second motion for reconsideration.

I.    <u>Individual Capacity Claims</u>

Ross brings her First Amendment retaliation claims against the defendants in their individual capacities under 42 U.S.C. § 1983. The defendants argue they are entitled to qualified immunity. Government actors are entitled to qualified immunity "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Because qualified immunity is an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (internal quotation and citation omitted). Accordingly, the Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 232 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)). The qualified immunity analysis involves two inquiries: (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and (2)

"whether the right at issue was 'clearly established' at the time of a defendant's alleged misconduct." *Id.* "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right," and "existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (alteration, citation, and internal quotation omitted). "A court may exercise its discretion to determine which of the two steps of the qualified immunity analysis 'should be addressed first in light of the circumstances in the particular case at hand.'" *Williams v. Ozmint*, 716 F.3d 801, 805-06 (4th Cir. 2013) (quoting *Pearson*, 555 U.S. at 236).

Ross alleges that the defendants removed her foster children in retaliation for her complaints about the CCFPA's finances, and that her foster parent application to The Arc was denied based on her letters to the editor that were critical of CCDSS. To state a claim for First Amendment retaliation, Ross must establish that: (1) her speech was protected; (2) the defendants' retaliation adversely affected her constitutionally protected speech; and (3) there was a causal connection between her speech and the retaliation. *See Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).

### a.  Removal of Foster Children

Ross appears to allege that the defendants removed her foster children in retaliation for three instances of First Amendment-protected speech. First, Ross testified that, at the May 2008 meeting about restarting the CCFPA, she and others asked Klesius for CCFPA's bank account information. (Ross Dep. 16:9-17.) Second, Ross told Klesius on July 7, 2008, that she needed CCFPA's approval before committing to pay for the back-to-school picnic, (Ross Aff. ¶ 3), and that Klesius's "countenance towards [her] changed" after this meeting, "showing a lack of

friendliness," (*id.* ¶ 8). Third, Ross reported that Asti, CCFPA's treasurer, told her that CCDSS used CCFPA's bank account to "hide" unused state funds.[1] (*Id.* ¶ 4; Ross Dep. 32:5-10.)

Citizens "have a right to voice dissent from government policies." *Tobey v. Jones*, 706 F.3d 379, 391 (4th Cir. 2013). Matters of public concern are "at the heart of the First Amendment's protection." *Occupy Columbia v. Haley*, 738 F.3d 107, 122 (4th Cir. 2013) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59 (1985)). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). Ross's report that CCDSS was using CCFPA's bank account to hide unused state funds dealt with a matter of public concern and, therefore, was protected speech. Questions about an organization's bank account, without more, and statements that an association must vote to approve expenses, even if that allegedly upset the listener, are not matters of public concern. Accordingly, the court will consider Ross's First Amendment retaliation claim only as it relates to her report of Asti's allegation.

Of the remaining defendants, only Klesius participated in the allegedly retaliatory act, the decision to remove Ross's children, that could have adversely affected Ross's constitutionally protected speech.[2] As Klesius testified during her deposition, she and Siciliano, her supervisor,

[1] It is worth noting that there is no direct, reliable evidence of Asti's allegation. Asti, who was 81 years old at the time of her deposition, repeatedly testified that she remembered very little from the time period at issue. (*See, e.g.*, Asti Dep. 14:8-21, ECF No. 98-7 (stating that she did not remember receiving a subpoena in Ross's administrative case, or meeting with and providing documents to plaintiff's counsel in January 2010); *id.* at 34:9-21 (stating that she did not remember being interviewed by Bertulis for an audit of the CCFPA); *id.* at 37:18-19 ("I don't remember having problems with any of the workers [at CCDSS and CCFPA]."); *id.* at 38:5-8 (noting that she does not remember the details of her allegations about CCDSS hiding funds in CCFPA's accounts); *id.* at 41:7-12 (stating that she "ha[d] no idea" whether she was told that the funds CCDSS was hiding were supposed to be returned to the State).)
[2] Ross has made many arguments, in her briefs and at the motion hearing, about whether CCDSS's investigation of her and her foster home was justified. Questions about the substantive removal decision, and the subsequent investigation, are no longer in the case. The only issue in front of this court is whether the removal of Ross's children was in retaliation for protected speech, in violation of the First Amendment. Given, however, that Ross continues to raise the substance of the investigation itself, it is worth noting that CCDSS ultimately found problems

together decided that Ross's foster children should be removed pending a CPS investigation.[3] (*See* Klesius Dep. 46:1-4.) In contrast, even viewing the evidence in the light most favorable to her, Ross has not presented any evidence to create a genuine dispute that the other defendants were involved in that decision. Linkous's involvement was limited to her role as reporter of T.G.'s allegations of neglect, which she was required to do under state law.[4] *See Horridge v. St. Mary's Cty. Dep't of Soc. Servs.*, 854 A.2d 1232, 1239 (Md. 2004); *see also* Md. Code Ann., Fam. Law §§ 5-704(a), 5-706(b). She neither made the decision to remove the foster children based on the report, nor assisted in moving the children. Larson, as CPS assessor, was assigned to conduct the CPS investigation. She met with Ross, who was at CCDSS for the CCFPA meeting, at 1:30 p.m. on August 15 to discuss the investigation, and she went to Ross's home that afternoon to remove Ross's foster children. Ross has provided no evidence to show that Larson was involved in the decision to remove the foster children. (*See* Larson Dep. 19:5-12, 22:6-15, ECF No. 98-6 (stating that Klesius, Siciliano, and Alison Kinney authorized the removal and gave Larson instructions).) Compton also went to Ross's house on the afternoon of August 15, 2008, to help remove the foster children, and participated in a meeting before the removal, the purpose of which appears to have been to discuss the operating procedures for the removal.[5] (*See* Compton Dep. 15:8-19, ECF No. 120-5 ("Siciliano was our Administrator and

---

[3] Ross argues that Siciliano was "errantly dismissed" from the case. (Resp. Opp'n 2.) Judge Quarles dismissed Siciliano from the case more than a year ago, (*see* June 24 Order), and her response is the first time Ross has raised this argument.

with Ross's foster home, (*see* Decision Mem., ECF No. 94-13), which she agreed to relinquish as part of a settlement agreement with CCDSS, (*see* Settlement Agreement, ECF No. 94-14).

[4] In her response in opposition, Ross says that *Linkous* and Siciliano together decided that Ross's foster children should be removed. (*See* Resp. Opp'n 2.) Her citation for that proposition, however, is to Klesius's deposition. At oral argument, plaintiff's counsel maintained—without citation—that there was other evidence in the record to show that Linkous participated in the decision to remove Ross's foster children, and he said he would inform the court by August 4, 2016, of that evidence. Mr. Cox has not provided the court with that information.

[5] Siciliano testified that, when CCDSS receives allegations of abuse or neglect in a foster home, they "immediately call a meeting of any of the workers involved that had foster children in the home, the investigator that was going to go to the investigation, the Foster Home Recruiter, any of the supervisors that are available and we would meet and we would develop a plan on how to proceed." (Siciliano Dep. 16:1-7, ECF No. 94-3.)

she would have directed [the meeting prior to the removal] based on Standard Operating Procedures."); *id.* at 43:4-11 ("My involvement at the time was to say that we had been directed [by Siciliano], that there was this concern and we needed to find a safe, appropriate place for the child while the investigation was occurring.").) Ross also has not provided any evidence that Cotton made the decision to remove Ross's children.[6] The plaintiff points to Cotton's statement that "[she] was involved in the removal, yes." (Cotton Dep. 47:6-7, ECF No. 120-1.)[7] But that testimony just points to the fact that Cotton went to Ross's home on the afternoon of August 15 to remove Ross's foster children. (*See id.* at 87:9-15.) Finally, the only allegation pertaining to Bailey in Ross's second amended complaint is that, "in her capacity as Assistant Director of Services at CCDSS, [she was] and still [is] responsible for controlling and directing the policies of CCDSS and the actions of its agents, including all other Defendants." (Second Am. Compl. ¶ 33.) Bailey testified, and Ross does not contest, that she was on vacation when the allegations of neglect were made. (Bailey Dep. 50:14-16, ECF No. 94-10.) Accordingly, in terms of the removal of Ross's foster children on August 15, the claim against Bailey is essentially one of vicarious liability. That doctrine is not applicable to Section 1983 actions. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (holding that liability under Section 1983 "will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights. The doctrine of *respondeat superior* has no application under this section."

---

[6] In her response in opposition to the motion for reconsideration, Ross says that Cotton "personally issued the [June 2009 CCFPA] election results certifying [a person other than Ross] as President . . . and made telephone calls to foster parents telling them to vote." (Resp. Opp'n 5.) As an initial matter, these allegations are not in Ross's second amended complaint. Further, Ross appears to allege that the certification of a different person as CCFPA president was retaliation for the investigation into her and her foster home, rather than for the removal of her foster children, which the court has already explained is no longer an issue in this case. (*See id.* ("Because of the 'investigation' into Betsy Ross which began . . . on August 15, 2008 . . . there was a new election for president of CCFPA later in June 2009.").)

[7] This exhibit is unlabeled. In her response, Ross cites to the exhibit when citing to Cotton's deposition, (*see* Resp. Opp'n 5, 5 n.2), and it appears to be a continuation of Exhibit A, (ECF No. 120), which is Cotton's deposition transcript.

(citation omitted)).[8] Accordingly, because she has not shown that any of the defendants other than Klesius retaliated against her, Ross cannot show that they violated her First Amendment rights. Linkous, Larson, Cotton, Compton, and Bailey are entitled to summary judgment.

With Klesius, Ross cannot meet the third element of a First Amendment retaliation claim. In order to establish a causal connection, "a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." *Constantine*, 411 F.3d at 501. "'Knowledge alone, however, does not establish a causal connection' between the protected activity and the adverse action." *Id.* (quoting *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004)). There must also be "some degree of temporal proximity to suggest a causal connection." *Id.* It is also "not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the [government official] would not have taken the alleged retaliatory action." *Tobey v. Jones*, 706 F.3d 379, 390 (4th Cir. 2013) (alterations in original, citation omitted). Here, Ross has not demonstrated a genuine dispute about whether Klesius knew—before Ross's children were removed—about Ross's allegations that CCDSS was using the CCFPA bank account to hide state funds.

To support her claim that the defendants retaliated against her for reporting Asti's allegations, Ross submitted her own and Burnette's affidavits. But even these documents do not

---

[8] At oral argument, Ross appeared to allege that the U.S. Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), contemplated supervisory liability in Section 1983 actions. In fact, that case states that "vicarious liability is inapplicable to *Bivens* and § 1983 suits," and "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676. Ross also may have cited to *Iqbal* for the proposition that, for causation, she is only required to show purpose rather than knowledge. The Supreme Court, however, said that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue," *id.*, and the Fourth Circuit has held that the causation prong of a First Amendment retaliation claim requires showing the defendant's knowledge of the protected activity, *see Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Further, purpose is, in fact, a heightened showing compared to knowledge. In precluding the use of vicarious liability in the context of Section 1983 or *Bivens* suits, the Supreme Court noted that purpose, rather than "*mere* knowledge," would be required to impose liability on a superintendent for a subordinate's actions. *Iqbal*, 556 U.S. at 677 (emphasis added).

demonstrate that any of the defendants, including Klesius, were aware of Ross's allegations before August 15, 2008. According to Ross, Asti told her in June 2008 that CCDSS used the CCFPA account to hide unused state funds. (Ross Aff. ¶ 4.) In July 2008, she reported the information to Doreen Hochlowski and Burnette of the MSFPA. (*Id.* ¶¶ 5, 6.) Burnette told her that Bertulis, as the new State Foster Care Ombudsman, would look into the matter "starting in September." (*Id.* ¶ 6.) Ross then met with Burnette and Bertulis several times in September. (*Id.* ¶¶ 17, 19.) And in her amended complaint, Ross states that Bertulis "began investigating CCDSS" "on or about September 10, 2008." (Second Am. Compl. ¶ 16.) Burnette, in her affidavit, averred that she referred Ross to Bertulis in July 2008. (Burnette Aff. ¶ 8.) She does not, however, state that Bertulis looked into the matter before August 15. Instead, she avers that she, Bertulis, and Ross met "on or about September 5, 2008 so that Betsy Ross could go into further depth with the details of her complaint and the fact that her children had just been removed which she felt was in retaliation to her raising the financial concerns." (*Id.* ¶ 12.) And in a portion of his affidavit that is uncontested by Ross, Bertulis averred that he was on vacation from August 7, 2008, through August 22, 2008. (Bertulis Aff. ¶ 4.)

Further, Edwards's testimony does not create a genuine dispute of material fact regarding whether Klesius had knowledge of Ross's protected speech. Edwards testified that CCDSS called her before 10 a.m. on August 15, 2008, to ask if she could take three foster children who were being removed from a foster home.[9] (Admin. Hr'g Tr. 262:6-13.) According to Edwards, she later found out from Sara Ellis and Jen Crooks, who appear to be CCDSS social workers, that the children the CCDSS caller was referring to were Ross's. (*Id.* at 267:12-15, 278:1-3.) Ross offers this testimony to argue that, if Edwards received a call about taking in Ross's foster

---

[9] This part of Edwards's testimony was a question or inquiry not intended as an assertion and, therefore, is not hearsay. *See United States v. Sinclair*, 301 F. App'x 251, 253 (4th Cir. Nov. 24, 2008).

children before 10 a.m. on August 15, then the defendants' claim that Linkous first received the allegations of neglect about Ross during an interview with T.G. at 10 a.m. cannot be true, thus creating a genuine dispute about whether the neglect allegations were retaliation for Ross's protected speech. Ross's theory, it seems, depends on Linkous having made up the neglect allegations, and Klesius knowing that Linkous made up the allegations before she authorized the removal of Ross's foster children. There is no basis, however, to suggest that Linkous never interviewed T.G.: in her affidavit, Ross herself avers that T.G.'s grandfather told her on September 4, 2008, that someone came by their house at approximately 10 a.m. on August 15 to question T.G. (Ross Aff. ¶ 21.) Any issues with the timeline, therefore, are not sufficiently material to overcome a motion for summary judgment. Further, Edwards's testimony is not sufficiently concrete to create a genuine dispute of material fact. In particular, Edwards testified that she does not remember who from CCDSS called her before 10 a.m., but said "it wasn't Tina and it wasn't Mary," presumably referring to Linkous and Klesius. (*Id.* at 265:23.) In addition, Edwards's testimony that Ellis and Crooks told her that the phone call was about Ross's children is hearsay. Ross argues that the statements should come in as a party-opponent statement, under Federal Rule of Evidence 801(d)(2). That rule provides that a statement is not hearsay if it is "offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). The burden is on Ross, as the proponent of the evidence, to show that the statement is admissible. *See* Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment. Ross, however, has offered no evidence that Ellis and Crooks provided the information to Edwards on a matter within the scope of their agency or employment.

Because Ross has not provided any evidence to show that Klesius had knowledge of Ross's allegations that CCDSS was hiding state funds before she made the decision to remove Ross's foster children, Klesius too is entitled to summary judgment.

### b. The Arc's Denial of Ross's Application

Ross argues that Murray-Miller, who was a licensing coordinator at the Office of Licensing and Monitoring in the Maryland Department of Human Resources, violated Ross's First Amendment rights by instructing The Arc to "indefinitely" put on hold her application because of Ross's letters to the editor that were critical of CCDSS. (*See* Resp. Opp'n 12, 17.) Murray-Miller reviewed those letters, along with the rest of Ross's application, when providing licensing advice to The Arc. (*See* Murray-Miller Dep. 29:7-31:10.)

As an initial matter, Ross makes allegations about Murray-Miller in several counts of her second amended complaint, but does not mention Murray-Miller in Count 10, the First Amendment claim. (*See* Second Am. Compl. ¶¶ 122-132.) Even if she did, Ross's First Amendment retaliation claim against Murray-Miller fails for two reasons. First, although Ross's letters to the editor constituted protected speech, there is no genuine dispute that Murray-Miller did not retaliate such that Ross's protected speech would be adversely affected. The record is clear that The Arc denied Ross's application before Murray-Miller ever got involved. (*See* Feb. 9, 2010 Email; March 16 Arc Letter.) Murray-Miller only become involved when The Arc reached out to her for advice after Ross appealed the denial. (Feb. 9, 2010 Email.) After The Arc sent her documents related to Ross's application, Murray-Miller responded by saying that Ross's "situation did not have any COMAR reasons for denial. Place the home study on hold until the Cecil County issue is resolved." (March 16, 2010 Email.) As a result, The Arc sent Ross a letter, which stated that, "[f]ollowing consultation with our licensing monitor from [the] Department of

Human Resources," "[t]he unresolved and high profile nature of your current situation with several entities determines that it is not a good time to proceed with a home study," but "[o]nce your issues with [CCDSS] are resolved to our mutual satisfaction you are welcome to . . . attend the next available training class for prospective foster parents." (March 18 Arc Letter.) Ross has pointed to no evidence in the record suggesting that Murray-Miller ordered the hold be put in place "indefinitely." Instead, the fairer interpretation of the evidence, even in the light most favorable to Ross, shows that Murray-Miller convinced The Arc to take a more lenient, rather than a retaliatory, approach with Ross. Any reasonable official in Murray-Miller's position would not have understood her actions to have violated a clearly established constitutional right. At a minimum, therefore, Murray-Miller is entitled to qualified immunity.

II.   Official Capacity Claims

The defendants argue that they are immune from suit in their official capacities under the Eleventh Amendment. The Eleventh Amendment bars federal suits by private citizens against an unconsenting state. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). A suit against state personnel acting in their official capacities is a suit against the State. *See Weller v. Dep't of Soc. Servs. for Baltimore*, 901 F.2d 387, 398 (4th Cir. 1990) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 68 (1989)). In Maryland, county department of social services employees are state personnel. *See* Md. Code Ann., State Gov't § 12-101(a)(7); *Keller v. Prince George's Cty.*, 923 F.2d 30, 32 (4th Cir. 1991). The Eleventh Amendment, however, does not bar private individuals from bringing suit against state officials for prospective or declaratory relief for ongoing violations of federal law. *See Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

Previously, Ross has argued that the defendants are committing ongoing constitutional violations by preventing her from operating a foster home and by placing her application to The Arc indefinitely on hold.[10] (*See* Resp. Opp'n Mot. Summ. J. Mem. Law 25, ECF No. 97-1; Aug. 14, 2014 Mem. 18.) As an initial matter, the portion of Ross's First Amendment claim concerning the closure of her foster home has been dismissed, so that cannot be the ongoing constitutional violation that supports her requested relief. That allegation was the only basis on which Ross could argue that Klesius, Larson, Cotton, Compton, Linkous, and Bailey could be sued in their official capacities. Further, as described above, Ross has not sufficiently alleged that Murray-Miller retaliated against her for protected speech; Murray-Miller, therefore, cannot be continuing to violate Ross's First Amendment rights. Accordingly, the defendants are immune from suit in their official capacities under the Eleventh Amendment.

## CONCLUSION

For the reasons stated above, the defendants' motion for reconsideration will be granted. A separate order follows.

8/11/2016
Date

_____/S/_____
Catherine C. Blake
United States District Judge

---

[10] In her response in opposition to the motion for reconsideration, Ross apparently confines her argument to the reasons why the official capacity claims against Siciliano, Larson, and Riciutti should not have been dismissed, instead of focusing on why the official capacity claims that are still in the case are valid. (*See* Resp. Opp'n 17.)